# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JAMIE S., on behalf of the class**,

        **Plaintiffs,**

    v.                        **Case No. 01-C-928**

**MILWAUKEE PUBLIC SCHOOLS, et. al.,**

        **Defendants.**

---

## DECISION AND ORDER

---

## I.  CHRONOLOGY

On September 13, 2001, the plaintiffs filed their complaint, alleging violations under the Individuals With Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA") and related state statutes, Wis. Stat. §§ 115.758, et seq.  Upon the written consent of the parties to the exercise of jurisdiction by the magistrate judge, the case was reassigned to this court on November 28, 2001. The court then issued its scheduling order establishing a time frame for pretrial discovery and for filing a motion seeking class certification.  On November 7, 2002, the plaintiffs filed their motion for class certification seeking to proceed on their claims within the context of a class action.  The defendants filed their opposition to the motion, and on May 23, 2003, the court, in its Decision and Order Regarding Class Certification, directed the plaintiffs to submit an amended class certification motion because the court determined that a number of the plaintiffs' claims were subject to the exhaustion of administrative remedies requirement, pursuant to the IDEA. 20 U.S.C. § 1415(l).  As

stated in that decision, this court determined that the plaintiffs' proposed class definition included claims for which exhaustion would be required. The court concluded that some of the plaintiffs' claims were not systemic in nature, identifying these as "post-determination" claims. The court reasoned that these claims were subject to administrative exhaustion because they are individual and substantive in nature and each alleged wrong could be potentially remedied through the administrative process outlined in the IDEA. The court identified the other claims as "pre-determination" claims and concluded that these could be systemic or procedural in nature. As such, these claims had the potential for class certification. The plaintiffs were required to file an amended motion for class certification limited to the pre-determination claims.

On June 23, 2003, the plaintiffs filed their amended motion for class certification, which sought class certification based upon the claims as narrowed by the court's May 23, 2003 order. On August 1, 2003, the court issued a second Decision and Order, which directed the plaintiffs to file a second amended motion for class certification because, in the court's opinion, both the plaintiffs and the defendants misconstrued the May 23, 2003, decision and order. Ultimately, on November 14, 2003, this court entered its third Decision and Order, and at that time, defined the class as follows:

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

At this point, a number of other motions were filed, including the defendant MPS's motion to dismiss certain claims as not typical of the class and the plaintiffs' motion to compel production of materials from the United States Department of Justice. The court ruled on these motions and

2

then met with the parties to discuss appropriate notice to the class, and a discovery schedule for expert witnesses. After notice to the class was given and expert discovery completed, the court requested that the parties file a joint stipulated statement of facts, together with summaries of their respective expert witnesses. Based upon the submissions, and in an effort to avoid the time consuming process involved in summary judgment motions, the court decided to bifurcate trial proceedings, and first conduct a court trial for expert witnesses. After some rescheduling, the court trial involving expert witnesses (referred to as Phase I ) was commenced on October 18, 2005, and completed on November 2, 2005 (the trial did not run continuously during that period). The court heard from six experts.

On November 28, 2005, the court held a hearing at which time the parties were advised of the court's initial reaction to the experts' testimony and conclusions drawn therefrom. The court informed the parties that it would be necessary to proceed to Phase II, which would consist of the factual presentations upon which the experts formed their respective opinions. The trial to the court in Phase II began on April 10, 2006, and was concluded on April 26, 2006. The testimony of 48 witnesses was presented, and numerous documents were received in evidence. Post trial submissions were filed by the parties in June, 2006. The court is now in a position to render its decision.

## II. FACTUAL SUMMARY

In preparation for the trial in Phase I of this case, the parties submitted a joint stipulated statement of facts. (Docket No. 267). The document contains 257 stipulated facts. In addition to the stipulated facts, the parties also submitted statements of facts in dispute. The agreed upon facts present a thorough foundation for the litigation in this case. The time line under consideration in this litigation is the period from September, 2000 to June, 2005. Following is a modified recitation of

a portion of the statement of stipulated facts that are germane to the court's decision. Since not all facts contained in the statement have been reproduced, the numbering that appears herein does not correspond with that found in the statement of the parties. This factual statement applies to the years under consideration in this litigation.

1.  All school districts in the State of Wisconsin, including Milwaukee Public Schools ("MPS") are required annually to submit data to the Wisconsin Department of Public Instruction ("DPI").  This includes data concerning students in special education.

2. As part of its obligations regarding special education, MPS requires each individual school to develop a School Educational Plan ("SEP") that outlines how each school will be working towards increasing student achievement throughout the school year. The foundation of all school based planning and decision making is guided by the SEP.  The SEP is developed at the building level by a team of individuals usually called the "Learning Team".  The SEP is  developed to incorporate the district's mission and teaching and learning targets which are aligned with state standards into a working document to guide the day-to-day activities of each school. School-based administrators are trained and offer in-service opportunities on the development of the SEP throughout the school year.  The SEP is intended to be a roadmap and a working document for each school to use during the school year to support its efforts in increasing student achievement.  The ten sections of the SEP guide the school's efforts in developing and implementing an effective educational plan.  The development of the plan is supported by the central administration through the provision of workbooks, electronic support, and personal training seminars to ensure that schools have the tools available to them to develop a meaningful plan aimed at boosting the achievement of all students.

4

3.  As part of its oversight responsibilities regarding special education, DPI monitors school districts for compliance with federal and state law.  DPI's July 17, 2001 letter to MPS summarizing its 2000-2001 on-site monitoring findings observed that MPS needed an effective system of administrative accountability at the school building level in order to resolve the compliance issues DPI had found through on-site monitoring and its other oversight activities.  The letter expressed DPI's pleasure that MPS had agreed to develop and implement such a system by September 1, 2001. MPS did not develop and implement a system of administrative accountability at the school building level by September 1, 2001.

4.  In October, 2001, DPI engaged a consultant, Dr. Lee Greenwald, to assist MPS in creating a centralized system of specialized education accountability within the district's decentralized service delivery system. The plan was completed in April, 2002 and entitled, "Milwaukee Public Schools Special Education Oversight Action Plan." The parties and witnesses in this case frequently refer to the plan by its initials – "SOAP."

5.  DPI's 2001-2002 on-site monitoring of MPS in May, 2002, revealed that MPS had not corrected the implementation errors found in DPI's 2000 on-site monitoring, and had not corrected the implementation errors identified in the five Consolidated Corrective Action Plans ("CCAPs") created in 2000 and 2001. CCAPs are corrective action plans centered around broadly-defined themes of placement, non-attendance, discipline, speech and language, and individualized education program ("IEP") services, identified in monitoring findings and IDEA complaint findings.

6.  The IEP is a written statement for each child with a disability that is developed, reviewed and revised in accordance with the requirements of the IDEA.  20 U.S.C. § 1414(d).

7. During the 2002-2003 and 2003-2004 school years, DPI focused its oversight activities on assisting MPS to build the effective, centrally administered system of special education procedural oversight and accountability mechanisms within MPS, and the mechanisms to be implemented at each school building, that DPI had ordered in its June 18, 2002 monitoring report to MPS.

8. With minor modifications, Dr. Greenwald's SOAP plan was adopted by the Milwaukee Board of School Directors on June 27, 2002, with instructions to MPS administrators to implement SOAP as soon as possible.

9. One of the essential features of SOAP is the establishment of direct lines of authority and accountability in the district's special education program. The Director of Special Services was charged with the accountability for SOAP with the authority equal to the Director of Leadership Services who provides comparable directions, support, and oversight of the district's general education program.

10. SOAP makes each school principal accountable for the provision of special education services and for the implementation of program improvements in his/her school. Under SOAP, the building-based oversight and evaluation of the delivery of special education services takes place through the SEP, which is developed each year by a school committee. SOAP requires that the special education component of each school's SEP be reviewed and approved by the Special Education Supervisor and the Special Education Leadership Liaison ("SELL") assigned to that school.

11. According to MPS policy, all school administrators, teachers, psychologists, building coordinators, SELLs, health professionals, counselors, pupil services central office staff, among

6

others in MPS, are responsible for meeting the district's Child Find obligations required by the IDEA and related state statutes. Child Find deals with the identification, location and evaluation of children with suspected disabilities, who may be in need of special education.

12. Ultimate oversight responsibilities for Child Find rest with the MPS Superintendent and the School Board. The Chief of Pupil Services is third behind the School Board and the Superintendent in ensuring that MPS meets its Child Find obligations. A majority of the oversight duties regarding Child Find activities have been delegated to the Director of Special Education and that office.

13. Because Child Find is an important responsibility, MPS assigned a specific SELL to oversee district-wide Child Find activities, even though the responsibilities for referral and evaluation are with the schools.

14. MPS publishes a Parent/Guardian Rights and Responsibilities Handbook which is distributed to the parents and guardians of MPS students at the beginning of each school year, and is also provided to parents when their students enroll in the district during the school year.

15. MPS policy requires that when a parent requests a special education referral, the district must evaluate the student, develop an IEP for eligible students, and send the student's parents a notice of educational placement, within 90 days of the receipt of the referral.

16. MPS policy requires that any time a parent or other individual inquires, verbally or in writing, about a referral for special education services or expresses concern regarding a possible disability, the parent or individual must be provided with information about how to initiate a referral.

17. MPS policy requires that when the district receives correspondence from any person requesting an evaluation for a student and the correspondence does not state that the reason for the

7

evaluation is a suspected disability, or does not identify the request as a special education referral, the district must determine if the correspondence is a special education referral. This policy is documented in MPS's IEP Team Procedural Handbook, revised September 2004.

18. MPS policy requires that, in order to make a determination within a reasonable time after receipt of such correspondence, the district must inform the correspondent of their right to make a special education referral and how to make a written referral. This policy is documented in MPS's IEP Team Procedural Handbook, revised September 2004.

19. MPS policy assigns responsibility for processing initial referrals for special education to the building coordinator at each school.

20. MPS policy requires that parents be provided with written notice of their procedural rights at the time they are notified that a referral has been received. This policy is documented in MPS's IEP Team Procedural Handbook, revised September 2004.

21. MPS policy requires that parents be given the opportunity to participate in the review of existing data on the child, and in identifying what additional data, if any, are needed to complete the evaluation. This policy is documented in MPS's IEP Team Procedural Handbook, revised September 2004.

22. MPS policy requires that IEP Team meetings include the following participants: one or more of the student's parents; at least one regular education teacher familiar with the student; at least one special education teacher; a qualified, knowledgeable representative of the local educational agency ("LEA") with authority to commit the district's resources; and under some circumstances, other specified individuals. This policy is documented in MPS's IEP Team Procedural Handbook, revised September 2004.

8

23. MPS policies restrict requests for extensions of time beyond 90 days to complete the IEP Team process and determine placement to a specific set of reasons, require that the reasons be documented, require that the requests be approved by a supervisor, and limit the number of extension requests to two per case. This policy is documented in MPS's IEP Team Procedural Handbook, revised September 2004.

24. MPS disseminates Child Find information in a variety of ways throughout the community. MPS sends information about special education forums that are held periodically throughout the year to various community organizations. MPS sends a packet of Child Find information to clinics and doctor's offices upon request. The packet is available in English, Spanish and Hmong languages. The packet includes a referral form, school and district contact information, and a booklet on the special education process, including a statement of parental rights.

25. MPS has a Parent Center located at its central office. The Parent Center staff answer calls and meet in-person with parents. Their role is to direct parents to the proper resource with MPS to have their issues resolved. The staff is trained in Child Find and other special education issues. The school application that the staff assists the parents in completing asks whether a child has special education needs. If a parent requests a special education referral, it is MPS policy that the Parent Center process that request.

26. The 2004-2005 MPS district policy regarding disciplinary removal procedures requires MPS staff to consider, in situations where a student has been removed for more than ten days in a school year, whether the child should be suspected of having a disability. Paragraph 8 of the policy provides,

Case 2:01-cv-00928-RTR   Filed 09/11/07   Page 9 of 64   Document 389

"if the student does not have an IEP and is not in the referral process but has been removed more than 10 days, the student may be in need of consideration for a special education or Section 504 evaluations. In such cases, the staff will need to consult with the building coordinator or Special Services Supervisor/Administrator regarding possible "Child Find" obligations under IDEA and Section 504."

27. Weekly truancy reports are generated by school and central office administrators, including principals, vice principals, and special services administrators. Each school is required to have a building Truancy Intervention Coordinator (i.e., social worker, psychologist, or another identified person) who is responsible to monitor these weekly reports, contact and meet with the parents, work with regular education teachers, and encourage students to attend school.

28. MPS has numerous programs and policies that target at risk students in the general education school population that may need special education or non-special education assistance in order to succeed at school.

29. It is MPS policy that each school principal is responsible for implementing and monitoring a dispute resolution process in their schools. Parents with a complaint may file an MPS complaint with their school principal. If a principal cannot resolve a complaint within five school days of the receipt of the written or verbal complaint, immediate intervention is requested from a SELL. The SELL must resolve the matter within five days of the request for intervention and may consult with the leadership specialist for that school, if necessary.

30. Under federal law, formal complaints can be filed with DPI. When an IDEA complaint is received by DPI, it is forwarded to MPS and, in accordance with the procedures in place, it is then sent to the appropriate school principal with directions to investigate and resolve the complaint. If the complaint is substantiated by DPI, the citywide program support teacher assists the school in implementing the corrective action plan in a timely manner.

10

31. The IDEA was re-authorized in the summer of 1997, before the beginning of the third year of DPI's new six-year on-site review schedule. Because of the numerous changes to special education law, DPI's six-year on-site review process was suspended and compliance review efforts were refocused to assist Wisconsin school districts to understand and implement the new provisions of IDEA.

32. DPI found in the Spring of 1998 that 17% of MPS students with disabilities did not have a current IEP in effect. In addition, the evaluation logs MPS submitted to DPI showed that only 81.1% of evaluations during the 1997-98 school year had been timely completed.

33. Throughout the 1998-1999 school year, DPI required MPS to take corrective action with respect to these issues, and required MPS to regularly provide DPI with data that reflected the extent of MPS's compliance with the requirements to have current IEPs in effect and to timely complete student evaluations.

34. On June 1, 1999, DPI notified MPS that 7.4% of MPS students did not have current IEPs recorded in the district database as of December 1, 1998, and that many of its evaluations were untimely. As a result, DPI notified MPS that the district would not receive $604,206 of its IDEA funds. DPI further informed MPS that it would approve the use of IDEA discretionary funds only to resolve outstanding compliance issues. DPI directed MPS to have a current IEP in effect for all children and to eliminate the evaluation backlog prior to the beginning of the 1999-2000 school year.

35. Also in June, 1999, DPI first consolidated its oversight of the corrective actions MPS had been ordered to take in response to substantiated IDEA complaints from individual students on the issue of timely evaluations. On June 28, 1999, DPI sent a letter to MPS, stating: "As you know, the department has five open complaints against MPS regarding timely evaluations (94-044, 98-050,

11

98-059, 99-009, 99-014.) The department will consolidate its oversight of necessary corrective action in those complaints and close each of the complaints when MPS documents: (1) compliance with any child-specific directive(s) in the decision, and (2) compliance with the two relevant directives issued in Superintendent Bensons' letter of June 1, 1999."

36.  Since June 1999, DPI has also continued to follow up on MPS's duty to timely complete evaluations. In May 2000, DPI on-site monitoring revealed that 95.6% of MPS sampled evaluations were completed timely. In July 2000, MPS evaluation logs submitted for DPI's review showed that 98.1% of evaluations initiated in January through March were completed timely.  Although DPI informed MPS in July 2000 that the issue of timely evaluations was resolved, DPI has continued to require MPS to submit IEP team evaluation logs since the resolution of the issue.

37.  DPI conducted its 1999-2000 on-site review of MPS by visiting three elementary schools, three middle schools and three high schools.  Ten student records were reviewed for each site.  DPI reviewers evaluated the soundness of MPS's self-assessment of its IDEA 1997 compliance, and also interviewed parents, regular education teachers, special education teachers, the building principal, and the special education supervisor for each site.  Implementation errors were found, and in October, 2000, DPI approved MPS's CAP regarding the 1999-2000 on-site review.

38. DPI conducted an on-site review during the 2000-2001 school year.  DPI's July 17, 2001 letter to MPS summarizing its on-site monitoring findings observed that MPS needed an effective centralized system of administrative accountability that reached down to the school level in order to resolve the compliance issues DPI had found through on-site monitoring and its other oversight activities. DPI stated that it was encouraged that MPS had agreed to develop and implement such

12

a system by September 2001, and expressed its pleasure that the initial focus of the accountability system would be on the unresolved compliance issues DPI and MPS had been discussing.

39.  One of DPI's findings in its 2000-2001 monitoring report specifically related to an MPS policy and procedure that could potentially delay the referral of a student suspected of being a child with a disability. The district's policies in effect at the time might have required district staff to take actions when making a referral that are not required in the law (i.e., a reasonable cause determination). These actions might delay a referral by a staff member or interfere with the duty to make a referral. DPI instructed MPS that the district's policies and procedures must make clear that these actions may not delay the referral when the referring person reasonably believes the child is a child with a disability. While MPS policies correctly explained the 90-day evaluation time limit requirement following referrals from parents and others, it did not clarify that the requirement also applies to referrals from district staff. DPI therefore directed MPS to add a clarification that any licensed school staff member who reasonably believes that a child has a disability is required to make a special education referral. In addition, DPI directed MPS to add new policy language clarifying that any physician, nurse, psychologist, social worker, or administrator of a social agency who reasonably believes that a child brought to him or her for services has a disability is required to refer the child for an evaluation. Moreover, DPI directed MPS to add policy language to clarify that when persons other than the school district staff make a written referral to the district, the receipt of the written referral by any MPS staff person marks the beginning of the 90-day time line. MPS complied with DPI's directives.

40.  On October 2, 2000, DPI informed MPS that it was consolidating its oversight of required corrective action in four open complaints where MPS had been directed to take steps to

13

provide children with a free and appropriate public education within a reasonable amount of time after the district learns that a child with a disability is not attending school. DPI's consolidated oversight regarding this issue came to be referred to by DPI and MPS as the "Non-Attendance Consolidated Corrective Action Plan (CCAP)."

41.  On October 11, 2000, DPI informed MPS that it was consolidating its oversight of required corrective action in five complaints where MPS was determined to have unlawfully failed to provide a free and appropriate public education by repeatedly suspending or excluding children with disabilities.  DPI's consolidated oversight regarding this issue came to be referred to by DPI and MPS as the "Discipline Consolidated Corrective Action Plan (CCAP)."

42. On August 10, 2001, DPI informed MPS that it was consolidating its oversight of required corrective action in three open complaints involving speech and language issues. DPI's consolidated oversight regarding this issue came to be referred to by DPI and MPS as the "Speech and Language Consolidated Corrective Action Plan (CCAP)."

43.  On October 3, 2001, DPI issued a decision in IDEA Complaint No. 01-058, finding that MPS failed to provide services to a student consistent with the requirements of the student's IEP.

44. During the 2002-2003 school year, DPI focused its MPS oversight activities on building MPS compliance capacity through the implementation of SOAP and the development of the MPS Internal Audit Action Plan. During that same school year DPI did not conduct on-site monitoring activities using the on-site monitoring model acknowledged by the United States Department of Education Office of Special Education Programs ("OSEP") in its 2000 monitoring of DPI's oversight. Where DPI found any compliance problems at this time, it ordered corrective action

14

through the mechanism of IDEA complaint decisions and directives, and their modifications to the CCAPs.

45. In the 2002-2003 school year, MPS used the IEP checklist system in 18 pilot schools. At the completion of the pilot, MPS did not provide DPI with a report on the assessment or the results.

46. In November 2003, the internal audit plan was renamed "MPS Continuous Improvement and Focused Monitoring Action Plan" ("MPS CIFM Action Plan"), and was revised to reflect the completion of activities during the 2002-2003 school year and to add additional activities for the 2003-2004 school year. The format of the MPS CIFM Action Plan was also changed to specifically identify whether an activity had been completed, and to specify the target dates for DPI's verification of the efficacy of the required corrective activities. A self-assessment pursuant to this plan was conducted in each MPS school in March, 2004.

47. Once the March, 2004 self-assessments of each school were completed, the Special Education Supervisors and SELLs scored each of the 62 checklist items measured by the school as requiring one of three levels for monitoring support. Some schools were at different levels of support for different checklist items.

48. Following receipt of their school data, the principals were required to develop a plan, including goals and actions, to remediate or address any of the 62 checklist or non-checklist items that were measured below 95% compliance. Principals were not required to develop a remediation plan for compliance items assessed at 95% or higher compliance ("periodic review" level of support), even though the district goal is 100% compliance in all schools. This plan was incorporated into the Special Education Section of each school's overall SEP. The SELLs and the Special

15

Education Supervisors conducted follow-up meetings with school principals and SEP representatives, as needed, for the purpose of amending or strengthening the special education component of the SEP.

49. The results of the overall assessment indicate compliance concerns including the following findings. The following findings are not limited to the allegations in this lawsuit.

    a.    Half of MPS schools (50.6%) merit ongoing oversight.

    b.    10.9% need intensive monitoring, including 25% of high schools and 28% of middle schools.

    c.    61.5% of MPS schools either merit intensive monitoring or ongoing oversight.

50. A September 2004 MPS CIFM Action Plan required MPS to evaluate the same specific checklist and non-checklist items as were in the original September, 2002 internal audit system action plan. This was to be done in the March, 2005 self-assessment.

51. In regard to data concerning untimely evaluations, MPS produced two reports. The first report covers referral dates from June 1, 2003 to July 8, 2004. The second report covers a time period from August 23, 1995 to June 30, 2003.

52. The first report documents 114 IEP placement offer dates that were over the 90-day time line. Past-due days range between 1 and 267 days. 58 children had evaluations that were overdue between 1 and 20 days. 44 children had IEP evaluations that were completed between 21-60 days past due. 5 children had evaluations that were completed more than 90 days overdue. One child had an initial evaluation that was 267 days past due. No information is provided regarding the reason for the delay in initial evaluation. The average number of days past due was 30 days.

16

53. The second report documents special education evaluations that are past the legally required 90 day time line for completion. This report is dated November 18, 2003, but covers an earlier period from August 23, 1995 through June 30, 2003. This report indicates that there were 978 past due initial evaluations from June, 2000 through June, 2003. Overdue days range from 1 to 579. Sixty eight children had their evaluations completed 100 or more days past due. Two children had initial evaluations that took 600 or more days to complete. The average days past due is 37.

DPI notified MPS that it had seven open complaints regarding MPS's failure to provide services consistent with the IEPs, and notified MPS that DPI was consolidating its oversight of the required corrective action in the seven open complaints. DPI's consolidated oversight regarding this issue area came to be referred to by DPI and MPS as the "IEP Consolidated Corrective Action Plan (CCAP)."

54. Nationally, DPI has received periodic guidance from OSEP about its special education oversight activities. In 2003, OSEP moved from a Continuous Improvement Monitoring Process ("CIMP") to the Continuous Improvement and Focused Monitoring System ("CIFMS"), and provided technical assistance to states.

55. During the second semester of the 2003-2004 school year, DPI established a pilot statewide CIFMS, in order to test new protocols in order to achieve positive results for children with disabilities.

56. The IDEA was reauthorized by the passage of H.R. 1350, the Individuals With Disabilities Education Improvement Act of 2004, in December, 2004.

17

# III. ANALYSIS

## A. CHILD FIND OBLIGATIONS UNDER THE IDEA

The parties are not in disagreement over the applicable federal and state law. Nevertheless, the court will very briefly highlight the provisions which constitute the legal foundation in this case. In order to be eligible for federal funding under the IDEA, each state must meet Child Find obligations, which the statute defines as follows:

> All children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are **identified, located, and evaluated** and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A) (1997) (emphasis added). As can be seen, the certified class implicates the Child Find obligations of the IDEA. The class, as stated earlier, is defined as,

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

The ultimate obligations for ensuring that a state's obligations, including Child Find, are met rests with the state education agency. See 20 U.S.C. § 1412(a)(11). In the case of Schaeffer v. Weast, 546 U.S. 49 (2005), the Supreme Court stated that "[s]tate educational authorities must identify and evaluate disabled children." Id. at 53. The state agency in this case is the defendant Wisconsin Department of Public Instruction. Regulations promulgated pursuant to the IDEA require each state agency to ensure that each local educational authority establishes and implements the obligations required under the IDEA. 34 C.F.R. § 300.530. The local educational agency in this case is the defendant Milwaukee Public Schools. In order to effectuate the requirements of the

18

IDEA, state statutes have been enacted to see that these obligations are met. For example, in regard to Child Find, MPS must identify, locate and evaluate "all children with disabilities who are in need of special education and related services, including such children who are not yet 3 years of age." Wis. Stat. § 115.77(1m)(a).

Once a child with a disability who may be in need of special education has been located and identified, that child is to be referred for an initial evaluation. The task of locating and identifying the child falls on a number of people, not only those associated with the school administration. Here, the child's parents play an important role. As acknowledged by the Supreme Court, "[p]arents and guardians play a significant role in the IEP process. They must be informed about and consent to evaluations of their child under the Act. . . .Parents are included as members of the 'IEP teams.'" Schaeffer, at 53.

When a child has been referred for an evaluation, the law requires that an IEP team be appointed. The team must consist of certain persons, which include the parent or guardian of the child, one regular education teacher of the child, one special education teacher or provider and a knowledgeable representative of the LEA. Other individuals with knowledge of the child can also be members of the IEP. Wis. Stat. § 115.78(1m). Moreover, during the time period being considered in this case, Wisconsin law required that the child's evaluation be completed, and an IEP placement be offered, within 90 days after the date the school district received the referral. Extensions of the 90 days, under certain conditions, may be granted. Wis. Stat. § 115.78(1m). The IDEA and related state statutes now requires that the evaluation take place within 60 days. 20 U.S.C. § 1414(a)(1)(C)(I) (effective July 1, 2005); Wis. Stat. § 115.78(3)(a) (2005-2006).

19

## B. POSITIONS OF PARTIES - AN OVERVIEW

It is the position of the plaintiffs that MPS has failed to meet its obligations under the IDEA, specifically in regard to Child Find. In particular, the plaintiffs have concentrated on the following areas: 1) the failure to refer children with a suspected disability in a timely manner; 2) the failure to review all relevant data to determine the appropriate needs at the child's initial evaluation; 3) the pattern of improper extensions of mandated time lines; and 4) the use of suspensions during the pre-referral process, which impede the child's initial evaluation. The plaintiffs contend that MPS, especially during the period in question, systematically delayed and illegally denied special education services for children.

In regard to DPI, the plaintiffs cite the IDEA, which places the ultimate implementation and enforcement obligations on the state education agency. Plaintiffs submit that DPI has failed its Child Find obligations in the Milwaukee public schools.

In response, MPS first contends that the plaintiffs have failed to establish a systemic violation of the Child Find provisions of the IDEA. MPS submits that any individual alleged violations were susceptible to resolution through the administrative hearing process. MPS also argues that its policies and practices in regard to Child Find comply with the IDEA. DPI acknowledges that the IDEA imposes certain obligations regarding Child Find on the state education agency. It contends that the various oversight procedures it instituted satisfied its obligations under federal law. DPI also joins MPS in its position that the plaintiffs have failed to establish a systemic violation of the law.

Case 2:01-cv-00928-RTR   Filed 09/11/07   Page 20 of 64   Document 389

## C.  SYSTEMIC VIOLATIONS/EXHAUSTION REQUIREMENTS

During the lengthy process eventually resulting in class certification, this court dealt with the issue of systemic violations vis-a-vis satisfying the exhaustion requirement of the law.  In its several decisions, the court engaged in a discussion of the post-and pre-determination stages. (See Decisions of May 23, 2003, August 1, 2003, and November 14, 2003.)  In particular, individual complaints arising after the post determination stage, i.e. after the initial evaluation has been made,  are susceptible to resolution through the administrative hearing process.  The court stated that no challenge had been raised to the adequacy of the due process procedure itself. For example, if the parents had a complaint regarding the appropriateness of the education being provided to their child, procedures for addressing their complaint are in place.  Therefore, the plaintiffs were unable to present challenges of a systemic nature that warranted the creation of a class to address those problems.  On the other hand, the court  found that the challenges focusing on the pre-determination stage did allege systemic violations, violations that were not amenable to individual exhaustion. These were complaints for which the due process format did not provide an adequate remedy, and they were basically in the area of Child Find.  As a result, the court ultimately defined and certified the class as follows:

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

The defendants now claim that, upon a review of the evidence presented at trial, the court should conclude that MPS has not systemically violated the Child Find provisions of the law.  First of all, MPS argues that a claim is not systemic if it deals with only a "limited component" of a

Case 2:01-cv-00928-RTR   Filed 09/11/07   Page 21 of 64   Document 389

program.  Doe v. Arizona Dep't of Educ., 111 F.3d 678, 682 (9th Cir. 1997).  MPS correctly states that this court did refer to Doe v. Arizona in its initial decision of May 23, 2003, when discussing a systemic violation.  This court stated, "[A] claim is 'systemic' if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves or requires restructuring the education system itself in order to comply with the dictates of the Act; but that it is not 'systemic' if it involves only a substantive claim having to do with limited components of a program, and if the administrative process is capable of correcting the problem." (Decision of May 23, 2003 at 4 (quoting Doe, 111 F.3d at 681)).

Addressing the court's prior statement, the evidence presented at trial clearly established that Child Find functions more than as a limited component of the IDEA; it functions as one of the most important elements in the pre-determination stage.  If a child with a disability is not found, that child will not receive any special education.  This court thus declines to accept the defendant's characterization of Child Find as merely a "limited component" of the program.

Next, the evidence established that certain deficiencies existed in the MPS system itself that adversely affected its ability to fully implement the requirements of Child Find.  As argued by the plaintiffs, these deficiencies are structural in nature.  In other words, whether or not one agrees or disagrees with the professional judgment exercised by an MPS professional in any individual case, and despite policies and procedures that look adequate on paper, during the period under challenge, MPS continually failed to comply with its Child Find obligations.   As will be discussed in greater detail, the 90 day time limit to complete evaluations is illustrative of a systemic problem.  Exhibit 336 sets forth the non-compliance figures on this issue.  The defendants contend that the percentages of non-compliance are small, approximately 3%, and arguably the violations are not pervasive.  To

22

this court, 3% still represents a significant number of students, but more importantly, the exhibit shows that there was no substantial improvement over time. Even if the defendants submit that this is a minor problem, something is wrong with a system that is unable to correct the problem, despite alleged improvements in procedures to foster compliance.

Returning to the MPS argument that the individual cases presented during Phase II of the trial are precisely the type of cases that can be resolved through the administrative process, as opined by one of the plaintiffs' experts, Dr. Rogers Adkinson, these cases are simply illustrative of many more. This court is not faced with the factual situation discussed in the case of <u>Hoffman v. East Troy Community School District</u>, 38 F.Supp.2d 750 (E.D.Wis. 1999), wherein Judge Adelman addressed the general policy of trying other interventions before making a special education referral. In that case, the judge agreed with the district that it did not have enough specific information regarding the student to suggest the need for an evaluation, so that there was "no reasonable cause to suspect that Joseph was emotionally disturbed." <u>Id.</u> at 766. As will be seen from the facts presented in the instant class action, the warning signs in the representative cases discussed were far more severe and occurred over a greater duration of time, all of which belie continuation of any conservative other interventions approach.

The cases presented in this litigation reflect a system that has failed to adequately address its Child Find responsibilities; these situations do not defeat, but support the certification of a class in order to address and hopefully remedy the systemic Child Find problems at MPS.

The court will subsequently discuss the facts and expert testimony upon which its conclusions are based, but at this juncture, it is the opinion of the court that the plaintiffs have satisfied their burden to establish a systemic problem with the MPS program.

### D. PHASE I CONCLUSIONS

Phase I of the trial involved the presentation of expert witness testimony, limited to the matters set forth in the respective expert's report. The subject matter of the experts' reports were the issues raised by the plaintiffs in this lawsuit. As stated earlier, after the conclusion of the testimony in Phase I, the court held a conference with the parties, advising them of the court's initial reaction and conclusions from the testimony and exhibits received during Phase I. Briefly, the parties were advised that the court found the conclusions reached by the plaintiffs' experts more persuasive than those offered by the defendants' experts. The court indicated that the plaintiffs' experts identified the following three categories of violations: 1) non-compliance with the 90 day time limit for completing evaluations; 2) failure to identify, or untimely identification, of children with disabilities who were in need of special education, including students who had been subjected to excessive periods of suspension; and 3) potential problems with record keeping.

The trial in Phase II has been completed and the court has now had the opportunity to fully consider the testimony of the experts, the testimonial and documentary facts from which the expert opinions were drawn, and the post trial arguments and briefs of counsel. Since the trial presentation was bifurcated, the court believes that it makes sense to follow a similar format with this decision and first analyze and discuss the expert testimony.

**Experts regarding MPS liability**

The plaintiffs presented the testimony of Dr. Diana Rogers Adkinson, an expert in the area of special education, with a particular expertise regarding programs for children with emotional disorders. Dr. Rogers Adkinson reviewed records for two categories of children: children whose evaluations extended beyond the 90 day timeline required by federal law; and children experiencing

24

high rates of suspension, greater than 10 days.  Concentrating on the time period in question, Dr. Rogers Adkinson requested 200 cumulative files of students involving extensions, but received 152. MPS was unable to locate 30 files.  For suspensions, she requested 90 cumulative files and received and reviewed 70.

Before discussing the testimony of Dr. Rogers Adkinson, it should be noted that, while  the defendants disagree with Dr. Rogers Adkinson's conclusions, they produced no evidence to rebut her findings of the records she reviewed.  In other words, the defendants did not offer the testimony of any expert who stated that he or she reviewed similar records, but reached contrary conclusions. The defendants argue that Dr. Rogers Adkinson only reviewed files; she never spoke to the children involved or their parents; and she never evaluated these children.  It is true that Dr. Rogers Adkinson conducted a records review, and from that review, concluded that certain patterns were evident.  The court is not persuaded by this challenge to the findings of Dr. Rogers Adkinson.  Much of this case is about record keeping.  In fact, a primary way in which the defendant DPI attempted to fulfill its duty under the IDEA was by reviewing records, records that were generated from the same type of cumulative files the plaintiff's expert reviewed.  As such, there is no compelling reason not to accept the findings of Dr. Rogers Adkinson concerning the records she reviewed.

The defendants also urge the court to disregard the findings of Dr. Rogers Adkinson because she failed to utilize any recognized scientific method in reaching her conclusions.  There is no dispute, not even from the plaintiffs, that Dr. Rogers Adkinson did not use a scientific methodology for her analysis.  One of the primary tests for scientific research is that another expert would be able to replicate the results.  Dr. Rogers Adkinson used her professional judgment in reviewing the files selected and drew certain conclusions.  So, if another expert reviewed the same files and exercised

25

his or her professional judgment, the conclusions drawn might be different. As pointed out earlier, no expert on behalf of the defendants was called upon to engage in such an exercise. Instead, the defendants simply argue that the court should not consider the conclusions of Dr. Rogers Adkinson.

Dr. Rogers Adkinson engaged in what has been described as a qualitative analysis. This is a recognized methodology, but it has a different goal than a scientific analysis. The goal of a qualitative analysis is to ascertain certain patterns or trends. That is what Dr. Rogers Adkinson did. Her report and testimony sets forth the patterns she found from the files she reviewed, and she then projected those patterns over the entire MPS district. She testified that she believes that the same trends would appear if a scientific or true random sampling of files had been conducted. In fact, the type of analysis conducted by Dr. Rogers Adkinson is not dissimilar from the analysis engaged in by DPI in monitoring MPS. For example, Jack Frye-Osier, former assistant director of Special Education for DPI testified that for the school years 2000-2001 and 2001-2002, records from a total of nine schools were reviewed. MPS choose three of the schools and DPI chose six. From this review, DPI believed it obtained a representative district-wide sampling, upon which it could determine whether or not MPS was in compliance in certain areas. Furthermore, the schools selected for 2001-2002 were not the same as those selected for the prior school year. And yet, upon this less than scientific methodology, DPI was willing to reach certain conclusions regarding compliance by MPS with IDEA requirements.

The court accepts the qualitative analysis methodology used by Dr. Rogers Adkinson. The court further accepts her Child Find trends or patterns and applies them system wide to MPS. In particular, MPS failed to conduct initial evaluations within the required 90 day period and granted extensions more than once, often without a valid reason being placed in the file. This failure was

26

largely the result of not conducting evaluations during the summer months and often waiting until the following October. Even though MPS subsequently remedied this problem in the summer of 2003, until that time, the practice of extending evaluations over the summer and beyond the 90 day time period constituted a violation of the IDEA.

Dr. Rogers Adkinson also found that MPS engaged in a pattern of suspending students as a way of coping with the discipline and behavioral problems of students. However, as established by the Phase II evidence, the more appropriate approach for many of these students who were later found to be suffering from an emotional behavioral disorder, would have been a referral for an evaluation. Here, it should be noted that Dr. Rogers Adkinson utilized more of a random sampling of MPS elementary and middle schools. Phase II evidence established the factual reality of the system wide pattern of violations that Dr. Rogers Adkinson found from a review of the records.

As previously noted, MPS presented no expert witness to directly contradict or refute Dr. Rogers Adkinson's review of the records. However, MPS did present two experts who attempted to soften the impact of the findings of Dr. Rogers Adkinson. In regard to dealing with behavioral problems, Dr. Eric Hartwig, who specializes in discipline and behavior concerns, testified. Dr. Hartwig visited two schools, one that utilized a "problem solving" approach, and the other that did not. It was Dr. Hartwig's opinion that the best way to deal with a student who exhibits disciplinary or behavioral traits is the problem solving or intervention approach. In this way, the school might be able to avoid suspending the student. Dr. Hartwig also testified that not all disciplinary problems warrant special education referrals.

No one disputes Dr. Hartwig's last statement, but his testimony fails to advance the resolution of the issues in this litigation. First of all, Dr. Hartwig limited his testimony to two

27

schools, but still attempted to project his findings to the whole of MPS. Looking at two schools out of 160 is of no statistical significance. He also limited his visits to one point in time, November-December, 2004. More importantly, regardless of the merits of the problem solving approach, it does not obviate the school district's obligation to locate children in need of special education. The law requires the district to identify children with special education needs and then make a referral. When asked how long a particular child might be subject to the problem solving approach, Dr. Hartwig said this was a qualitative determination. In other words, it is not over until it is over. In the meantime, the referral may be unduly delayed. In the opinion of the court, Dr. Hartwig's testimony failed to establish that the problem solving approach meets the district's Child Find obligations.

The second expert called by MPS was Dr. Elise Frattura, a consultant who assisted the district in moving from centralization to decentralization. This is a process whereby the school itself, becomes responsible for the services delivered. According to Dr. Frattura, if the school becomes responsible for the services it delivers, it will become more responsive and implement appropriate and effective changes in the area of special education. Since the principal is in charge of his or her school, the major burden on implementing the decentralization process fell on the principals. This reorganization included an entire hierarchy of support staff and services. The decentralization process began in the 2000-2001 school year. In regard to the delivery of special education services, the process was described in various plans, referred to by their acronyms. For example, there was SEP ("School Education Plan") and SOAP ("Special Education Oversight Plan").

Dr. Frattura described the Child Find aspects of the process within the school and how the 90 day period was monitored. She also discussed Child Find when truancy problems are involved.

She acknowledged that the most difficult thing to do is find a child eligible for special education when no referral has been made. She indicated that since Child Find is a "proactive obligation," a "broad net" must be cast. In her opinion, MPS was meeting federal and state Child Find standards.

Unfortunately, the underlying refrain of Dr. Frattura's testimony was that this is "a process." In other words, nothing happens immediately. Dr. Frattura indicated that SOAP was a "good recipe" to create change. In the opinion of the court, while it may be a good recipe, the proof is in the pudding, and the evidence from reports generated from MPS gathered data show that during the period in question, MPS was not in compliance in regard to its obligations under Child Find. Even Dr. Frattura was unable to adequately support her opinion regarding compliance. For example, when cross examined about a statement in her report that IEP meetings are scheduled jointly with parents, a legal requirement, Dr. Frattura admitted that there was no specific data to support this statement. Or, when presented with statistics that the suspension rate increased between 2002 and 2004, she said that each building must be concerned with this.

Basically, Dr. Frattura relies on the structure of the plan itself. She says the plan strives toward success, and success is improvement toward goals. When asked to give a reasonable time frame for improvement, Dr. Frattura could not answer the question. Now that the school is responsible, she said it depends on the individual school and the particular problem. When pressed, she opined that it usually takes five to seven years for deep change, and at the time of her testimony, MPS was only in year four. However, under the IDEA compliance obligations, "it depends" is not a satisfactory response.

To determine whether or not MPS was in compliance with the law, SOAP included a plan to assess the data, and this was jointly developed by MPS and DPI. This was referred to as the

29

building based assessment process which was initially used during the 2002-2003 school year. It continued into the 2003-2004 year. The process used a checklist to measure compliance and involved taking a point-in-time snapshot of the compliance of each school. The plaintiffs presented the testimony of Mark Mlawer, a consultant in special education, with an expertise in the area of monitoring and compliance.

Mr. Mlawer concentrated his attention on the MPS building based assessment process and concluded that, in regard to the IDEA compliance issues raised in this litigation, the process was deficient in many respects. He also concluded that there was no way to measure the accuracy of the data used in the process. For example, Mlawer testified that the only issue in this case measured by the building based assessment process is the 90 day evaluation timeline, and compliance is the only aspect measured. Parenthetically, this fits into the method of analysis conducted by Dr. Rogers Adkinson, since she was only able to select files which indicated that the 90 day timeline was exceeded. Mr. Mlawer said that the assessment process did not monitor the IDEA requirement to identify, locate and evaluate all students with disabilities.

Regardless of the accuracy of the data used by MPS, these are the numbers that DPI used in fulfilling its monitoring and compliance obligations. Based on these numbers, DPI determined that MPS continued to experience compliance problems. As discussed by DPI's expert witnesses, in school year 2003-2004, it was decided to establish and impose a different type of monitoring process for MPS; this was known as the Continuous Improvement Focused Monitoring System ("CIFMS").

**Experts regarding DPI liability**

The plaintiffs called Dr. James Tucker to discuss the oversight responsibility of DPI. Dr. Tucker's report and testimony focused on whether DPI had adequately fulfilled its role regarding

oversight of MPS in the area of Child Find. In a word, Dr. Tucker's conclusion was "no." Dr. Tucker testified that DPI had created a system that only dealt with reporting, but not one that would assure compliance. Dr. Tucker explained that DPI would receive reports from MPS, determine non-compliance, impose a corrective action plan for MPS to implement, but then fail to follow-up. DPI would order many corrective action plans, give deadlines, but if MPS failed to meet the deadline, DPI set another deadline. Dr. Tucker stated that DPI failed to impose any sanctions on non-compliance by MPS, sanctions which could include public reprimand or loss of funds.

According to Dr. Tucker, DPI created a Child Find procedural checklist for MPS to follow, but failed to have a method in place to determine if the checklist was correctly completed. Further, this was only a checklist, rather than a comprehensive screening, which is the only way in which to identify and locate disabled children. Based upon his analysis, Dr. Tucker concluded that DPI does not understand the nature of its oversight role and thus cannot fulfill it.

Dr. Tucker was especially critical of the building based assessment plan. He stated that the building-based assessment plan, as it was used by DPI, was ineffective particularly because different buildings were evaluated each year and there was no year-to-year comparison of the same building. Included in Dr. Tucker's report are several recommendations for improving DPI's oversight responsibilities. One is to create a focused monitoring plan. He said that this is the best way to check for compliance, because it is a plan that does not end with the collection of the data, but analyzes it and establishes priorities and action plans. Also, that in creating priorities and action plans, input from a "stakeholders' group" or advisory council is very important. Interestingly, at the time of his report, DPI was in the initial stages of developing its focused monitoring plan and had just established a stakeholders' group.

Directly contrasting Dr. Tucker's characterization of DPI's oversight efforts as "all procedure and no substance," was Dr. Judy Schrag, also an expert in the area of IDEA compliance. She was engaged by the defendant DPI to review its systems, procedures and programs and render her opinion as to whether DPI was complying with its legal oversight responsibilities relating to the issues presented in this case. As part of her analysis, she looked at MPS under the procedures of SOAP, but she did not review any individual student record and offered no opinion as to whether any of the plaintiffs' rights were violated.

Dr. Schrag stated that each state agency is required to have appropriate practices and procedures in place to assure that the children in the state receive the benefits of FAPE, Child Find and §504. She further stated that, to satisfy these responsibilities, the state system must be a continuous improvement system. Dr. Schrag briefly reviewed the various monitoring systems established by the state agency since the 1997 IDEA. From 1997-2003, there was the Continuous Improvement Monitoring Process ("CIMP"). This was a self-assessment process which involved a records review of a selected sampling, plus interviews with stakeholders. During the 2003-2004 school year, the state agency replaced CIMP with the Continuous Improvement Focused Monitoring System ("CIFMS"). This monitoring process focused on established priorities and involved more targeted data review. It also had broader stakeholder involvement. In instituting both CIMP and CIFMS, the state agency took its cue from the federal agency, OSEP.

Immediately prior to the time period involved in this lawsuit, OSEP found that DPI's monitoring was in compliance, except for one area, investigating complaints regarding MPS within the required 60 day period. Dr. Schrag says that this deficiency was corrected by DPI. Moving into the time period covered by the lawsuit, DPI would review the data received from MPS, and order

MPS to take corrective action in the areas of non-compliance. For example, after its review in May 2000, corrective action was ordered for certain items (exhibit 206). The same occurred after the May 2001 review (exhibit 208) and May, 2002 (exhibit 233). These orders were known as corrective action plans, and then, in the spring of 2002, DPI consolidated these corrective action orders (exhibits 277 and 278). Since DPI had been issuing corrective action plans to MPS since 1997-1998, and there were still consolidated corrective action plans unresolved, DPI required SOAP on June 27, 2002.

In the view of Dr. Schrag, SOAP was a significant factor in DPI's monitoring. The major features of SOAP are detailed in her report (exhibit 11), and they include clearly defined lines of authority, expanded staffing, annual self-assessment of each school, Child Find activities, and 95% accuracy. As a result of the various increased monitoring procedures implemented by DPI, from the corrective action plans, to the consolidated corrective action plans, to SOAP and finally, CIFMS, Dr. Schrag concluded that DPI was fully complying with its oversight responsibilities under the IDEA. Dr. Schrag testified that DPI engaged in a series of increased sanctions in order to give MPS an opportunity to correct specific problems and come into compliance with the law. Dr. Schrag concluded that, as a result of its various efforts, DPI is now in full compliance with its monitoring and oversight duties. She was unable to pinpoint an exact date as to when DPI's full compliance occurred.

Of course, even if full credence is given to Dr. Schrag's analysis, there is a flip side. Under the IDEA, the goal is 100% compliance. According to SOAP, if 95% compliance is reached on a particular issue, that issue need not be addressed in the school education plan. So this means that 5% of that area is not in compliance. Under SOAP, if there was 80-94% compliance, the issue

33

required "ongoing oversight;" "intensive monitoring" was required for under 70% compliance. As to when MPS might enter the area of 95% across the board compliance, Dr. Schrag opined that it usually takes three years for a plan such as SOAP to work.

The monitoring by DPI and its corrective action plans and SOAP clearly establish that MPS was **not in compliance** with the IDEA during the years in question. Further, despite the increased sanctions imposed by DPI, MPS failed to correct these areas of non-compliance. In fact, the evidence discloses that DPI's use of sanctions, and threat of more serious ones, failed to have the desired effect. In 1999, the State Superintendant of Public Instruction wrote to the superintendant of MPS that there were numerous children without IEPs in effect, and the withholding of state funds was possible (exhibit 222). No funds were withheld and, as seen above, various corrective action plans and SOAP were required, but as observed by Dr. Tucker, no deadlines were ever established. Dr. Schrag stated that MPS has shown good faith in implementing a series of strategies, but she also had to acknowledge that good faith does not always equal IDEA compliance.

Based on the experts' reports and their testimony, the court concludes that both MPS and DPI have failed to comply with their respective obligations under the IDEA during the period from September, 2000 to June, 2005. In regard to its Child Find responsibilities, throughout the entire time frame, the system in place at MPS was inadequate to satisfactorily locate and identify children with special education needs, and, in particular, this was a result of how MPS handled students with emotional problems and suspended students. Also, during a portion of the time, MPS failed to conduct initial IEPs within the required 90 day time frame. Similarly, DPI failed to adequately comply with its oversight responsibilities of MPS. Based on the records it reviewed, it knew that

34

MPS was not in compliance in certain areas, but it failed to impose sanctions sufficient enough to bring MPS into prompt compliance.

These are the court's conclusions based on the testimony from the experts (Phase I). The evidence presented at Phase II will now be addressed to see whether the facts upon which the experts' conclusions are based have been established.

## E. PHASE II FACTS and CONCLUSIONS

### 1. Liability of MPS

The testimony elicited from the named plaintiffs present the reality underlying the foregoing conclusions of the experts. The plaintiffs' post-trial brief sets forth a concise summary of the real life situations of the named plaintiffs. In reviewing the testimony, the court believes that the plaintiffs' summary accurately captures the testimony received in court. The response of MPS, in its post-trial brief, to the individual plaintiffs, does not take issue with the testimony presented, but rather contends that such testimony illustrates that these are the types of cases that should be handled under the administrative process. MPS further submits that the plaintiffs failed to link these individual cases to the larger MPS student population and therefore, the court should decertify the class. DPI has adopted a response approach similar to MPS. In its post-trial brief, DPI argues that the plaintiffs only produced limited testimony establishing, at best, ten occasions involving just seven MPS schools, where MPS failed to initiate or accept a parents' request for referral. Therefore, DPI similarly contends that the evidence is insufficient to establish a systemic failure.

Since the facts presented regarding the named plaintiffs are basically uncontested, the court will simply summarize. In reviewing the facts, it is important not to lose track of the ultimate inquiry, i.e. did the defendants systemically violate the IDEA, and, in particular, the Child Find

provisions?  The testimony discloses two overarching aspects in Child Find.  The first is to identify those children who may be eligible for special education.  According to the parties, the standard or guideline used by educators is whether there is a "reasonable belief" that special education "may be appropriate" for the child. (Stipulated Fact 39.)  A second aspect is that once this reasonable belief exists, how long does it take to make the initial determination that the child is eligible for special education, i.e. the length of time from the request or referral to the IEP.

Regarding the initial identification aspect, the plaintiffs presented testimony regarding certain children.  The plaintiffs first presented testimony regarding **Melanie V.**  Melanie was a good student until the fourth or fifth grade.  Her fourth grade report card characterized her as "bright and capable" with "clever ideas."  In the fifth grade, she started missing school (42 days); she said she was not feeling well, had difficulty sleeping, and was not herself.  Melanie attended the Milwaukee School of Languages for sixth grade in 2001-2002.  She failed  sixth grade and repeated in 2002-2003.  She failed to improve during her repeat year.  The school implemented a homework plan and maintained contact with her parents regarding Melanie's progress.  The situation got worse, and Melanie wrote notes about killing herself.  The school psychologist met with her parents and worked with Melanie regarding mental health concerns.  Nevertheless, Melanie's mental health deteriorated and she started being sent to the Milwaukee County Mental Health Complex.  She was sent there three times in the first semester of 2003.  In December, 2003, Melanie was found in possession of a razor blade, in violation of the MPS weapon's policy and was suspended for five days.  A hearing was conducted at the MPS central office, at which time the school principal stated that an alternative placement would have to be found;  it was determined that Melanie should not return to her current school, the Milwaukee School of Languages.

36

Up until this time, no-one from MPS suggested that Melanie may be a child with a special education need. No referral for this purpose was made. According to the testimony of the school psychologist, this was a mental health issue that required medical treatment. Even though Melanie was receiving poor grades, the school psychologist did not feel a special education referral was warranted. She testified that the standard was a "reasonable suspicion" that a child qualifies. At the central office hearing, the school principal recommended an assignment to another school, not a referral for an evaluation.

Finally, in January, 2004, almost two years after Melanie started having problems, a request for a special evaluation was made by Melanie's mother. This was after she made contact with the Wisconsin Coalition for Advocacy. Her mother testified that she had never heard of Child Find and believed that special education was only for children with learning and physical disabilities, not emotional disabilities. An evaluation was completed and Melanie was found eligible for special education. Melanie continues to receive special education and related counseling services.

**Ryan O's** problems began in the sixth grade at the Lincoln School of the Arts during the 2002-2003 school year. He started having behavioral problems and was suspended frequently. He was privately hospitalized for mental health problems. Ryan's mother met with the school's assistant principal to discuss her concerns, especially regarding her son's suicidal thoughts. She was of the opinion that the assistant principal was not interested and so she went to the principal. No suggestions were made. Ryan started the seventh grade at Lincoln School of the Arts but continued to have problems. His mother made a school visit and then had Ryan transferred to Bell Middle School in February, 2004. She advised the Bell assistant principal of Ryan's problems. Ryan's mental health problems continued and his grades dropped dramatically, from the honor roll in the

37

fall of 2003 to failing grades in June, 2004. The principal at Bell testified that students who transfer into the school are given an opportunity to improve, and she was advised that Ryan had good academic skills. At the start of the 2004-2005 year, Ryan's behavior had not improved. There was an incident on September 3, 2004, and he was suspended from school. The principal did not suggest a special education referral.

Ryan's mother went to the MPS Parent Center, but a special education evaluation was not suggested. Finally, she met with a child advocate who suggested that she request a special education evaluation. She made the request, Ryan was evaluated and found eligible for special education based on an emotional behavior disorder. According to the mother's testimony, despite her involvement and numerous meetings with MPS, no one from MPS suggested special education.

**Nathan L.** moved to Milwaukee from Florida in June, 2001. While attending school in Florida, Nathan had been receiving services under a §504 (Rehabilitation Act) plan. He was registered at Fritsche Middle School. His mother testified that at the time she registered Nathan, she advised school authorities that her son had a §504 plan in Florida and was diagnosed with ADHD and OHI. Nathan immediately started experiencing problems in school and he became very disruptive. His mother met with his teachers and mentioned the prior §504 plan. Nathan was eventually arrested for felony assault on a teacher. He hit his teacher in the head with a planner, and at age 13, was handcuffed and taken into custody. His mother then learned that no §504 plan had been put into effect; she was told that "they don't transfer."

In January 2002, Nathan's mother requested a special education referral, and only then, did MPS request Nathan's records from Florida. An IEP meeting was held on May 9, 2002.

38

The cognitive problems of **Jamie S.** began in kindergarten. Her mother asked Jamie's teacher in grade K-5 about certain problems in school and at home, but the response was to see what transpired during the year. At age nine, she was unable to multi-task and needed help with hygiene and dressing. She repeated first grade. According to the testimony, her mother repeatedly requested that Jamie be tested. An IEP was finally held, but Jamie's mother was not present. Her mother says she was working and not notified of the meeting. Jamie was found to have a low IQ and to be eligible for special education. MPS states that it attempted to contact Jamie's mother by phone calls and in writing on three occasions.

The academic and truancy struggles for **Bryan E.** began in the fifth grade. He was struggling with reading and repeated the fifth grade at Clement Avenue School. He then attended Bell Middle School in 1999-2000 for sixth grade, and despite the fact that his report card indicates "not promoted," he proceeded on to seventh grade. The same scenario occurred upon his "promotion" to eighth grade. His eighth grade report card in 2002-2003, shows a final grade point average of 0.821, but he was passed on to the ninth grade. In other words, even though he was consistently not receiving passing grades to qualify for a promotion, he was nevertheless passed along to the next grade.

Bryan's problems included numerous absences from school. His mother would place him on the bus, but he failed to attend school. Also, he would do his homework, but would fail to turn it in. His mother discussed her son's academic failures with the assistant principal, who suggested that she meet with an MPS social worker. Bryan's mother did this, raising a concern of ADHD and asking what tests were available. The social worker made no specific suggestions and no mention of a special education referral. Then Bryan went to Marshall High School and, apparently because

of a name mix up, was mistakenly placed in a special education classroom. Academically, Bryan started to do well. Then, the mistake was recognized, Bryan was returned to the regular classroom, and his poor performance returned. At this point, his parents went to the Parent Center for help and it was suggested that they request a special education referral. Bryan's mother then wrote a letter to the school principal requesting an IEP, but received no response. A second letter also failed to obtain a response. A third request was successful and an IEP was scheduled for February 26, 2004. Due to health problems, Bryan's mother said she would be unable to attend, but requested that she be provided alternate participation by telephone. Her alternate attendance at the IEP was not arranged, but Bryan was found eligible for special education.

As seen in Melanie's situation, the issue of suspension has an effect on the timely identification of children in need of special education. It also had an effect on the timeliness of providing services. These were areas reviewed by Dr. Rogers Adkinson. She requested 90 cumulative files, but was only provided with 70. Based on her study of those files, she concluded that certain patterns of conduct emerged. She found that the suspension rate was higher in the MPS schools than the state average, especially at the elementary school level. Parenthetically, she only analyzed elementary schools, because the MPS high school suspension rate was so much higher than the state average that she did not believe a review was feasible.

In her opinion, many of the suspension were the result of emotional behavioral problems, which can constitute a disorder eligible for special education if it impacts on the child's ability to learn. Dr. Rogers Adkinson testified that she reviewed the files with an eye toward academic failure correlating to suspension, and whether, in her opinion, the child would qualify for special education. Even though this involves a subjective analysis, none of the defendants' experts conducted a similar

review of individual files. According to Dr. Rogers Adkinson, suspensions not only delayed the identification of children with a disability, but also delayed their referral for an evaluation. The evidence introduced by way of exhibits 322 and 321 indicates that the suspension rate percentage increased from the 2002-2003 to the 2003-2004 school years, and the district wide SEP for 2004-2005 indicates that these rates have gotten worse.

The foregoing students are representative of the class. Testimony regarding other children was presented, and the pattern was similar to that described above was presented. For example, **Jyran J.** had received mental health treatment. Jyran's problems started at age 4, his twin sister had similar problems and was found eligible for special education, but Jyran's IEP was not held until age 13 in May, 2005. This was despite the fact that when Jyran was suspended in 2003, the notice stated, "Jyran is totally uncooperative! This has been going on for many weeks. He has become a danger to himself and others. Jyran is not responding to any of our interventions." (Exhibit 320.)

These children, the named plaintiffs and the other children for whom the court received evidence, exhibited behavioral and academic problems in school and often had diagnosed psychological conditions. But referrals were not made in a timely manner. What is interesting in the response of the witnesses for MPS is that MPS did not argue these were children who "slipped through the cracks," or that the plaintiffs selected the most severe examples, but rather the educators steadfastly stuck by their decisions not to refer. Witnesses spoke of use of other interventions before referral, or attempting to avoid the stigma of the special education label.

Turning to the responses of MPS, several approaches were presented. First, MPS established that it disseminates a substantial amount of material in an attempt to alert parents to the special education services it provides. It distributes a Parent/Guardian Handbook to parents and guardians

at the beginning of each school year. This handbook has a section that includes the MPS Child Find telephone number if a parent suspects his or her child may have special education needs. MPS sends Child Find information to community organizations, and to clinics and doctors's offices upon request. The MPS special education liaisons are responsible for outreach and training to private and parochial schools. The MPS Parent Center is also a source of special education referrals and information.

Even though MPS tries to get the word out about its special education programs, it is still missing too many children with needs. It certainly missed the individual children about whom testimony was taken at trial. And, it missed the hundreds more found as a result of Dr. Rogers Adkinson's record review. The dissemination of information is obviously required to comply with the IDEA, and it no doubt triggers a number of requests for referral. However, under the law, the obligation of MPS goes beyond a self-identification process, which is all that the dissemination of these materials does. When the parent or guardian fails to request a referral, it is incumbent upon MPS to initiate the process when appropriate.

Notwithstanding the stipulated MPS policy that requires any licensed school staff member who reasonably believes a child has a disability to make a special education referral, the evidence shows a delay in triggering the referral. Is that delay reasonable? In response to many of the individual situations, the testimony shows that MPS goes to great alternative lengths before it reaches the "reasonably believes" point that triggers the special education referral.

Illustrative of this point, is the testimony of Sandra Schroeder, who was assistant principal at Bell Middle School. She testified regarding **Ryan O**. In February, 2004, Schroeder met with Ryan's mother about having her son transfer to the sixth grade at Bell. His mother said that Ryan

42

was a good student, but picked on by his peers due to his gothic dress. According to Schroeder, initial problems with Ryan were new school adjustment issues. Bell had a behavior modification workroom where students who were acting out could be sent, and a variety of incidents resulted in Ryan's referral to the workroom. In March, 2004, Ryan met with the school psychologist, and Schroeder testified that the school psychologist observed Ryan for the balance of that semester. Schroeder testified that Ryan was seen by the Collaborative Support Team, but the MPS records do not substantiate this. As far as Ryan's grades, he entered with a 2.2 grade point average and ended the semester with at 0.88 grade point average. Ryan would also refuse to go to some classes and failed to turn in homework. Ryan also engaged in self-mutilation; after his dog was hit by a car, he carved the dog's name in his arm. When asked whether or not Ryan should have been referred for special education, Schroeder emphatically said "no." She believed that the school had sufficient interventions in place, such as a guidance counselor, a social worker, and an outside counselor to work through the issues. When cross-examined about Ryan's behavior, Schroeder acknowledged that she was concerned, but not alarmed.

Schroeder also encountered **Bryan E.** at Bell. A number of truancy letters were sent and Schroeder had a number of conversations about the problem with his mother. Bryan consistently had poor grades, often below 1.0 for a final grade point average. Schroeder testified that this was not a case for a special education referral because a student's grades will not be good if he is absent from class so often.

Therefore, in regard to this first aspect of initially identifying a child who may be eligible for special education services, MPS contends that referral decisions are individual and subjective. Since the educators have been trained in dealing with these issues, persons like Sandra Schroeder should

43

be accorded great deference.  Another important consideration that came into play in reaching the "when appropriate" guideline, was illustrated in the testimony of Lynn Boreson, who is a DPI consultant for emotional behavioral disability ("EBD").  Boreson had also been a special education teacher for 17 years, but not in MPS.  She has prepared an EBD worksheet for school staff to follow.  For the student exhibiting unusual behavior to be eligible for special education on the basis of EBD, the IEP team must answer each of the four questions in the affirmative.  For example, the behavior must significantly depart from the ethnic or cultural norm; it must be severe, chronic and frequent; it must occur at school and at least one other setting; and the student must display any of the behaviors on an enumerated list.

The consideration involved here, as indicated by Boreson, is to avoid "labeling" the child. In other words, once the school staff proceeds to the EBD checklist, the process of stigmatizing the child as an individual with a disability in need of special education begins.  Boreson testified that many view special education in negative terms and this label may stay with the child for years. Therefore, Boreson testified that other interventions should be tried first, but she also acknowledged that sometimes these alternates take too long and it is not reasonable to continue the child in regular education.

Although Boreson did not review the records of the plaintiffs, she was examined about their particular situations in a hypothetical context.  Basically, she stated that she did not want to second guess any of the decisions since they are subjective, but she did acknowledge that the facts do disclose reasonable suspicion for an earlier referral.  Boreson's testimony clearly indicates that the educators responsible for making a referral are very reluctant to do so because of what they believe it will do to the child, i.e. place an adverse label on the child.  Thus, they will go to great lengths in

44

attempting alternate methods of intervention, and in doing so, will not suggest a special education referral to the parent. As can be seen in the cases of the named plaintiffs, the extreme hesitancy of educators to pull the special education referral trigger, even if done in good faith, did a disservice to the educational and other needs of the child.

The IDEA, of course, does not contain a "stigma exception." Further, a child can be referred, evaluated, and have a disability identified, all without changing the child's academic situation. It is only after the disability is identified, that the IEP process will determine what changes, if any, major or minor, will be needed in the child's education plan. Finally, the stigma argument is illogical, because a worse stigma is going to attach to a child who is not referred and ends up being constantly disciplined, suspended, or too old for the grade he or she is in. In retrospect, and in the opinion of the court, it would have been better to make the referral and go forward with the IEP, since this only commences the process of determining whether or not there is a need for special education. Then, if the IEP team determines that alternative interventions are more appropriate in lieu of special education, if the parents disagree, there are sufficient due process administrative procedures in place to challenge that decision. To the contrary, as this litigation has clearly illustrated, when special education is not suggested, too often the parents default to the subjective judgment of the educators.

The second overarching aspect in Child Find, and one also reviewed by Dr. Rogers Adkinson was the delay during the years under consideration in conducting the IEP after the referral or request had been made. The determination as to whether the child is eligible for special education is made at this initial team meeting. Dr. Rogers Adkinson reviewed records in which the timing of the initial evaluation took longer than 90 days after the referral. This covered the period from June 1, 2000 to

June 30, 2005. Exhibit 336 shows that for the period from June 1, 2000 to June 30, 2003, a total of 853 (9.9%) of all initial evaluations exceeded 90 days; for the period from July 1, 2003 to June 30, 2005, the total was 778, which represents 8.4% of all referrals. The exhibit also discloses that numerous cases were marked closed, but the records fail to disclose the reasons for this action. Based upon her review of these records, Dr. Rogers Adkinson concluded that certain patterns emerged. She identified eight separate patterns of conduct engaged in by MPS in regard to these extensions of time. She testified as to these patterns, a summary of which is attached to her expert report, (exhibit 8, appendix A). They include extensions due to the fact that a referral was made between March and May and no evaluations were conducted during the summer, and extensions in order to obtain medical information. The patterns also include a category in which the MPS file was too incomplete for Dr. Rogers Adkinson to determine the reason for extension.

To demonstrate the various patterns observed by Dr. Rogers Adkinson, she testifed during Phase I of her review of cumulative files for specific students. Some of the files on which Dr. Rogers Adkinson offered testimony were of the named plaintiffs, but others were not. The stated purpose of this testimony was to illustrate the typicality of the files she reviewed, the files that underlie her conclusion regarding the systemic delay of IDEA services by MPS during the years in question.

By way of example, she noted the file of **Xavier**, (exhibit 191). The file shows that a special education referral was requested by Xavier's mother on November 5, 2002; the time within which to conduct the evaluation was extended until January 30, 2003; and the IEP was held April 29, 2003. The file also shows that the parent refused to consent to any extension, and no authorization was obtained from DPI. The only "justification" in the file for the extension is "additional testing and

observation," but Dr. Rogers Adkinson questions this reason because a language proficiency was conducted on December 2, 2002. Special education services did not commence until September, 2003.

Another example was **Joseph**, a first grader who had an existing IEP for ADHD at West Bend and transferred to MPS, (exhibit 260). After transfering, Joseph experienced many suspensions, including one occasion when the police were called. His mother requested a referral upon his transfer in July, 2002, but it was extended until October, 2002. At that time, the IEP team determined that his problem was "environmental," and did not qualify for special education. Despite the fact that Dr. Rogers Adkinson opined that this child qualifies for special education, there was no reason for the delay in evaluation.

**Desmond**, (exhibit 255), received 16 suspensions in first grade and 28 in second grade. In addition, he failed to complete his work at school. Psychological testing was suggested, but no special education referral was generated. Dr. Rogers Adkinson testified that examples like Desmond and others, as well as named plaintiff Melanie, students who exhibit extreme emotional behavior and are performing poorly academically, are subject to discipline and suspensions instead of being promptly referred for special education.

Finally, in regard to the adverse effect suspensions have on children who may qualify for special education is that, under the law, if a child has a suspected disability, the maximum suspension that can be imposed is 10 days. However, before a referral is made of a child suspected of having a disability, there is no such maximum. So, for example, if Dr. Rogers Adkinson's opinion regarding Desmond is correct, that he should have been referred for special education early on, the

47

excessive period of suspension would not have occurred, unless he was determined not to be disabled.

The court finds that the plaintiffs have proven by a preponderance of the evidence that, during the years in question, MPS violated the Child Find provisions of the IDEA. The evidence establishes that, system wide, MPS failed to refer children with suspected disabilities in a timely fashion, improperly extended the initial evaluation of children with suspected disabilities, and inappropriately used suspensions in a manner that adversely affected both the identification and evaluation of children with suspected disabilities. The plaintiffs have also claimed that MPS violated the Child Find provisions of the law by failing to review all data to determine the appropriate needs within the child's initial evaluation of a suspected disability, and by not having parents or all appropriate persons at the initial IEP.

The court previously discussed the defendants' challenge to finding systemic violations in regard to their arguments that this case is dealing with just limited components of the IDEA and that the plaintiffs have failed to exhaust their administrative remedies. As this court stated at the time it certified the class,

> [A] claim is 'systemic' if it implicates the integrity or reliability of the IDEA dispute resolution procedures themselves, or requires restructuring the education system itself in order to comply with the dictates of the Act.

Doe, 111 F.3d at 682. At this point, the court will address the defendants' arguments that the plaintiffs have presented only individual cases and have failed to establish that these situations are examples of system wide problems.

First of all, the actions of the defendant DPI lend support to the conclusion that the Child Find problems at MPS were in need of restructuring. These problems have been the subject of

48

continual monitoring by DPI during the years in question and resulted in a forced remaking of the special education system at MPS in order to comply with the requirements of the IDEA, in more areas than just Child Find. DPI began issuing corrective action plans ("CAPs") which turned into consolidated corrective action plans ("CCAPs"). DPI altered its monitoring of MPS in an attempt to bring the district into compliance. Finally, at the beginning of the 2002-2003 school year, DPI required MPS to establish a Special Education Oversight Action Plan ("SOAP"). This was followed by the CIFM Action Plan. Notwithstanding these multiple corrective actions, Child Find violations continued to occur at MPS, even at the end of the period under scrutiny in this litigation. As noted earlier, even MPS's expert Dr. Elise Frattura opined that it may take five to seven years following the latest corrective action for MPS to come into compliance in regard to Child Find. Based on this history, it would simply be counterintuitive to view DPI's continual oversight as merely attempts to require MPS to correct sporadic individual complaints. If that were the case, it would be akin to using a shotgun to kill a fly. MPS was in need of system wide restructuring, DPI knew this and therefore required it. What has been presented in this litigation is evidence of systemic violations.

Turning to the discrete areas of challenge raised by the plaintiffs, finding a systemic violation in regard to failing to conduct IEPs within the required 90 days is not difficult. The evidence establishes that MPS failed to conduct IEPs over the summer months, and as a result, improperly extended the 90 day period. Until this particular problem was corrected by having IEP teams available during the summer, this was obviously a district wide practice. In other words, no evaluations during the summer means just that, i.e. none were performed. Therefore, in those cases in which the referral was made during the spring, waiting until the following October to conduct the IEP violated the IDEA. The fact that this problem has now been corrected is something that can be

considered when discussing appropriate remedies, but the eventual corrective action does not nullify the violation.

In regard to other reasons for delay, as noted above in exhibit 336, MPS records disclose that from June 1, 2000 to June 30, 2005, hundreds of referrals were not evaluated within the 90 day period. Adequate reasons to support the extensions are not found in the records. Referrals were closed without explanation. The evidence presented is more than sufficient to support the conclusion that MPS systemically violated the 90 day requirement.

During Phase II, plaintiffs presented evidence concerning individual situations in which the referral should have been made at an earlier point in time. In Phase I, Dr. Rogers Adkinson concluded from her review of over 200 files that this failure to refer was a system wide problem. In addition to the testimony offered during Phase II, she testified about other particular students. Again, while it was only her subjective analysis that a referral should have been made sooner, her opinion based on a review of MPS files was not contradicted. Hers was a qualitative analysis to ascertain certain trends. However, these were not trends that were limited simply to the files being reviewed; they are trends that Dr. Rogers Adkinson opines should be projected over the entire district.

Based on the totality of the evidence presented, which includes testimony regarding the individual situations, the experts' opinions, together with the fact that DPI found MPS in noncompliance with Child Find issues, this court concludes that the plaintiffs have established systemic violations during the years in question. As discussed earlier, one reason for the delay in referral was that MPS preferred to utilize alternate intervention methods. These pre-referral interventions, while well-intended, do not excuse the Child Find violations. The evidence

50

establishes that alternate intervention was always MPS's preferred choice, when in fact, a referral for special education was the more appropriate route to choose.

The court's conclusion regarding failure to refer on a timely basis applies equally to the improper use of suspensions. Although suspensions were not the subject of any noncompliance orders from DPI, here the evidence submitted by the plaintiffs, including from Dr. Rogers Adkinson provides a sufficient basis for projection system wide. The evidence presented indicates that the suspension rates at MPS were not only greater than the state average, but were increasing during some of the school years in question. The comparison between school years 2002-2003 (exhibit 322) and 2003-2004 (exhibit 321) shows an increase. Suspensions alone do not qualify a child for special education, but such disciplinary action is indicative of a child with a disability, when combined with the other signs exhibited by the child pointing to that same conclusion. Each of the representative plaintiffs in the class exhibited, not just one, but many warning signs pointing to the need for a referral for an evaluation.

Turning to the plaintiffs' claim regarding the failure of MPS to review all data to determine a child's appropriate needs at the initial evaluation, the proof presented to establish that this is a systemic violation is not as persuasive as that regarding other claims. First of all, Dr. Rogers Adkinson discussed this issue in regard to one of her several categories of improper reasons for extension from the referral to the IEP. Here, she provided specific examples wherein she contended that MPS ignored existing data of an emotional disorder and extended the time in order to seek evidence for a referral under a different disability. Although her analysis is supportive of ways in which MPS misused extensions, that conclusion does not establish a systemic failure to consider all data to determine a child's appropriate needs for an initial evaluation.

51

In each of the examples in this category, she reviewed the child's cumulative file and disagreed with the way in which MPS discerned the child's disability. By way of illustration, she testified regarding **Marquita**, (exhibit 256), who was qualified as OHI, but Dr. Rogers Adkinson said she should have qualified under EBD; she said that based on the nature of the child's problems, EBD was the appropriate diagnosis. Primarily, she used this file as an example of improper use of several extensions, but the plaintiffs now seek to expand its significance. For Dr. Rogers Adkinson to make a diagnosis of a specific disability on a paper record, without seeing the child, is troubling to this court. This is not the same as reviewing the paper record and concluding that MPS should have suspected such a disability earlier and made a referral, as in the case of **Tennessee**, (exhibit 257), a child who was diagnosed with schizophrenia and depression, had behavior problems at school, was suspended, changed schools five times, but was never referred for an IEP. This claim appears more related to the exercise of individual professional judgment in each case, and not a violation that is inherent in the system. The plaintiffs on this issue have failed to persuade the court that the specific failure to consider all of the available data in attempting to ascertain whether the child has a disability, or the nature of same, is a systemic problem.

The evidence presented at Phase II demonstrated that there were other problems in regard to Child Find, such as not having the parent at the IEP. The law requires that parents are to be involved in the initial evaluation process and the IEP should be scheduled at a time that is mutually convenient to educators and parents. Wis. Stat. § 115.78. The plaintiffs presented evidence that this was not always done. Without going into detail, the plaintiffs presented testimony from certain parents that they were not in attendance at the IEP. The argument is that MPS failed to make adequate attempts

Case 2:01-cv-00928-RTR   Filed 09/11/07   Page 52 of 64   Document 389

to secure the presence of these parents. In response, MPS offered testimony to demonstrate the efforts made in an attempt to secure the presence of the parent or parents.

In order to get a better grasp on whether or not MPS was complying with certain Child Find requirements, both a checklist and non-checklist of items was established. Checklist items #1, #2 and #4 pertain to parent participation in the evaluation process. ( See exhibit 195 (2003-2004 report)). The results vary. For example, for the school year 2003-2004, for checklist item #1, which is whether the child's parents are provided with a notice of the evaluation, the district wide average was 87.8%. Exhibit 353 is a comparison between school years 2003-2004 and 2004-2005 for district wide compliance with Child Find checklist items. This exhibit shows that the district wide average for checklist item #1 for 2004-2005 was 87.7%. On the other hand, checklist item #4 covers whether the child's parents attended the meeting to determine whether their child is, or continues to be, a child with a disability. This item includes whether attempts were made to find a mutually agreeable time for the meeting. The compliance rate for 2003-2004 is 95.2% and for 2004- 2005 is 95.5%.

Checklist item #2 covers whether the child's parents were contacted and afforded an opportunity to participate in the review of existing evaluation data. For 2003-2004, the compliance rate was 92% and for the following year, 89.9%. What should be made of these statistics is the question asked by the court. Of significance in answering that question is the fact that the creation of the checklist was a result of DPI's continued efforts to bring MPS into compliance in these areas. It was in 2002, when DPI recognized that its many corrective action plans were not accomplishing their goal that it felt sufficiently motivated to require a system of internal accountability. MPS was unable to translate corrective action plans into compliance and apparently, in some areas, the more rigorous accountability plan was able to move MPS toward better compliance.

53

The fact that MPS has improved its compliance rate in some of these Child Find areas does not alter this court's conclusion that the violations of the IDEA are nevertheless systemic in nature. The testimony and the data lead this court to only one conclusion, which is that the inability of MPS to reach full compliance with the law in the area of Child Find is not the result of numerous isolated and unrelated cases, but stems from systemic inadequacies.

### 2. Liability of DPI

Plaintiffs' experts, and in particular, Dr. Tucker testified that the actions of DPI to fulfill its obligation to assure compliance with the IDEA were all procedural, but lacked substance. In other words, DPI engaged in substantial efforts to obtain reports from MPS, but not compliance. As just discussed, the court has concluded that MPS failed to comply with the law in regard to Child Find. Like MPS, DPI also contends that the plaintiffs have failed to establish any systemic violations, and that they should not be excused from the law's exhaustion requirement. Since DPI does not raise any new arguments on these points, it is not necessary for the court to reiterate what it has previously stated in rejecting the defendants' positions.

Instead, the court will address the issue of whether DPI is also liable for the failures to comply with the IDEA. Here, the court recognizes that the state agency is in a difficult position since it has the overall duty to ensure IDEA compliance. The state is responsible for success, but in this case, the Child Find efforts of MPS were not successful, in that they failed to comply with the law. Of course, DPI knew MPS was not in compliance, and attempted to bring about a change by issuing continual procedural requirements. DPI argues that its constant oversight satisfied its obligations under the law. Unfortunately, a similar argument, that a state's duty is satisfied by general oversight and supervision, was rejected in the case of <u>Corey H. v. Board of Education of the City of Chicago</u>,

995 F. Supp. 900 (N.D. Ill. 1998). As with MPS, this court is not saying that DPI did not act in good faith and did not try, but it efforts were not able to bring about the required compliance.

The evidence, as it is relevant to this case, details the efforts of DPI to bring about compliance starting in 1999. In June, 1999, the State superintendent wrote a letter to the MPS superintendent raising serious concerns regarding the district's failure to ensure timely IEP evaluations. The letter states, in part, "The second compliance issue of major concern is MPS's failure over a four- and- one-half year period to ensure timely evaluation of children with suspected or known disabilities . . . Data submitted by MPS continue to demonstrate a significant number of children are not evaluated in a timely manner." (Exhibit 222.) In an effort to obtain a change in direction, DPI insisted upon specific corrective actions and cautioned MPS that DPI might withhold $1.84 million in IDEA discretionary funds, or would permit use of such funds only for correcting MPS deficiencies. At that time, there were five open corrective action plans which DPI decided to consolidate, so it issued consolidated corrective action plans ("CCAPs") in an effort to tighten up its oversight. Nevertheless, Child Find problems continued at MPS.

Then, with the 1999-2000 school year, DPI started increased on-site monitoring. In May, 2000, it visited three elementary, three middle, and three high schools, and ten student records were reviewed at each school. DPI found a number of errors in implementation of Child Find, including a failure to complete timely evaluations in 4.4% of the sampled records. As a result, a directive requiring corrective action was issued to deal with the compliance problems. (Exhibit 206.)

The next annual on-site monitoring was conducted in May, 2001, but it did not focus on the compliance problems of the prior year. This review found additional compliance problems, which included documentation of data for initial evaluations. Additional directives requiring corrective

55

action were issued, (exhibit 208),  and in May, 2002, DPI conducted its third annual on-site review. More problems were found.  The annual on-site monitoring by DPI did not effectively correct implementation problems previously identified within the district.  By letter dated July 18, 2002, (exhibit 29), the assistant state superintendent wrote the MPS Superintendent as follows: "With respect to the implementation errors identified in the May 2000 onsite compliance report, the current report documents that MPS has not yet corrected these errors.  These implementation errors must be corrected without undue delay."  The letter goes on to state that with respect to the CCAP issues reviewed, these have not been corrected, and "the district must establish oversight and accountability mechanisms at each building to ensure that these continuing implementation errors are corrected."

As a result, DPI ordered MPS to establish for the 2002-2003 school year, a special education oversight and accountability plan, one which would provide an effective centralized system that would hopefully resolve the compliance problems at the individual school level.  This plan, which was established by school board resolution in June, 2002, became known as SOAP (Special Education Oversight Action Plan).  During the district's transition to SOAP, DPI did not continue its on-site monitoring, but instead worked with MPS in implementing the plan's protocols.  SOAP required MPS to develop an internal auditing system that would address the implementation errors found by DPI.  School staff were also trained in the self-assessment program.  In November, 2003, the internal audit plan became known as CIFM  The CIFM plan was subsequently revised and additional forms, procedures and standards were developed by MPS, with the assistance of DPI. Finally, a checklist which contained all of the out of compliance issues from the 2000-2002 on-site monitoring was created, as was a list of non checklist items which related to implementation issues.

In March, 2004, MPS conducted a self-assessment in each of its schools, with a focus on both the checklist and non-checklist items. During the 2004-2005 school year, MPS changed its policy in order to check the accuracy of its underlying data. Parenthetically, one of the concerns raised by plaintiff's expert Mark Mlawer was that there was an absence of any meaningful verification or validation by either MPS or DPI of the recorded results. (Exhibit 9.) However, even if the numbers reported by MPS were not valid, they were relied on by DPI, and they showed that MPS was not in compliance.

In any event, the March 2004 self-assessment found a varying range of compliance levels, and still showed compliance concerns. Under SOAP, different levels of compliance were to be slated for different degrees of monitoring. The higher the compliance, the less monitoring was required. If there was 95% or higher compliance, only periodic review was required; ongoing support was required for 80-94% compliance; and intensive monitoring was needed for less than 80% compliance. Therefore, in August, 2004, the Milwaukee School Board directed that each school review its checklist and non-checklist items to see which type of monitoring was required for the following school year.

The March, 2004 self-assessment disclosed that one half (50.6%) of MPS schools required ongoing oversight, and 10.9% needed intensive monitoring. In other words, 61.5% warranted either intensive monitoring or ongoing oversight. The district, as a whole, required ongoing oversight (90.5% compliant). Based on this assessment, Mr. Mlawer concluded that MPS "paint[s] a picture of a district with significant compliance concerns. . ." (Exhibit 9 at 9.)

The foregoing simply highlights some of the key evidence, but having fully considered all of the evidence presented, this court concludes that DPI did not satisfactorily fulfill its oversight

57

obligation under the IDEA. MPS was in non-compliance, but DPI only had to encounter the situation every six years. Then, during the start of the period involved in this lawsuit, DPI commenced annual on-site monitoring in an effort to pressure compliance. This tool was not successful so DPI armed itself with SOAP and CIFM. The procedures changed, but the compliance picture remained unsatisfactory.

Despite its continuing supervisory efforts, the compliance by MPS, while improved in some areas, was still inadequate under the law. For example, the failure of MPS to comply with the 90 day time limit is one of the major issues in this litigation, but the district had no adequate method to track compliance. Kim Brizendine, the MPS supervisor of special services information, testified that the system for tracking the 90 day time line for evaluations was not satisfactory until the second semester of the 2004-2005 school year. Her testimony corroborates the findings of Mr. Mlawer, who indicated that, in his opinion, there was only one self-assessment item that even tangentially related to the 90 day time limit, and that was non-checklist item #1, which is notification to parents. (Exhibit 195.) This item, however, does not check whether everything required is completed within the 90 day period. Brizendine testified that it was necessary to manually track extensions. The defendants did not present any witnesses who were able to point to any checklist or non-checklist item that monitored each school's compliance in this area. Mr. Mlawer, in his report, concludes that the building based self-assessment process "is manifestly inadequate to monitor compliance with the requirements at issue [in this litigation]."

Maybe the lack of an adequate system is a partial explanation for the data contained in the "Over Ninety Day" report, (exhibit 336). This summary shows that from the period from July 1, 2000 to June 30, 2003, MPS had 853 cases over 90 days, with extensions granted in 603 and no

58

extensions in 250. For the period from July 1, 2003 to June 30, 2005, 778 cases were over 90 days, with extensions in 529 and no extensions in 249. As a percentage of the total referred in the district, the over 90 day percentage decreased from 9.95% to 8.47% during these two periods. In the latter period, the summary shows a total of 622 closed cases, i.e. cases which never reached an evaluation. Parenthetically, there are no standards for closing cases.

Regardless of the reasons for the non-compliance of MPS, as concerns DPI, the question is did it do all that was reasonably required to assure compliance, even at the 95% level? It appears to this court, that the underlying problem was the failure of DPI to put any teeth into its bite. DPI required new procedures, but failed to impose appropriate sanctions when the acronym programs did not produce satisfactory compliance. As Donna Hart-Tervalon, assistant director of special education for DPI, acknowledged, no time line for compliance by use of SOAP was imposed. She was not aware of any deadline being established by DPI for MPS to remedy non-compliance items. Or, as Elliot Weiman, consultant to DPI on school administration and one of the monitoring co-leaders during the 2000-2005 period, was asked, were there specific consequences for MPS failing to improve? His answer was that the consequences would be non-resolution of the items and more intensive work would continue.

In other words, after the on-site monitoring, in which DPI failed to conduct year-to-year comparisons of non-compliance items, more intensive monitoring was established by way of SOAP and CIFM, but no deadlines were ever imposed on MPS. No consequences were ever imposed. The IDEA gives the supervising state agency a substantial sanction for non- compliance: reduction or withholding of federal funds until compliance is met. 20 U.S.C. § 1413(d)(1). However, according to Stephanie Petska, state director of special education, there were never any monetary sanctions of

withholding funds imposed. In her opinion, DPI would rather "direct the use" of funds than withhold, the latter which requires a public hearing. She also acknowledged that DPI also could impose a sanction of decertifying a district, although that has never been done during her tenure.

DPI has urged this court to find that throughout the entire period of this lawsuit, it has fulfilled its supervision responsibilities over MPS as they relate to the issues in this litigation. For the reasons set forth in this decision, the court cannot reach that conclusion. It finds that DPI during the period in question, and in regard to the issues raised in this lawsuit, has failed to fulfill its oversight responsibilities over MPS.

## IV. CONCLUSIONS

Based on the evidence presented at both Phase I and Phase II of the trial, and for the reasons stated above, the court reaches the following conclusions of law:

A. The court confirms its certification of the class in this action as,

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

B. The court concludes that during the time period from September, 2000 to June, 2005, the group of defendants identified as the Milwaukee Public Schools violated the Individuals with Disabilities Education Act and related state statutes. These violations consisted of the failure of MPS to comply with the provisions of the IDEA known as Child Find. Pursuant to the requirements of the IDEA and related state statutes, MPS failed to adequately identify, locate and evaluate children with disabilities in need of special education and related services. The court further concludes that

60

the violations of MPS during this period of time not only violated the rights of the individual plaintiffs, but were systemic in nature and thus violated the rights of the plaintiff class .

C.  In particular, the court concludes that the systemic violations of the Child Find provisions established during the trial consisted of the following:  MPS failed to refer children with a suspected disability in a timely manner for an initial evaluation, i.e. the 90 day requirement;  MPS improperly extended the 90 day time requirement; MPS imposed suspensions in a manner that improperly impeded its ability to refer children with suspected disabilities for an initial evaluation; and MPS failed to insure that the child's parents or guardians attend the initial evaluation.  The court further concludes that the actions of MPS in not reviewing all data to determine the exact nature of the child's disability, while violations in individual cases, did not constitute systemic violations of the IDEA.

D.  The court concludes that during the time period from September, 2000 to June, 2005, the group of defendants identified as the Department of Public Instruction  violated the Individuals with Disabilities Education Act and related state statutes.  The violation of DPI consisted of its failure to adequately discharge its oversight and supervisory obligations in regard to the compliance by MPS with the IDEA and related state statutes, as that compliance relates to the systemic violations found by the court.

In reaching the foregoing conclusions, the court notes that the period in question spanned five years and the situation did not remain static.  The evidence established that, throughout this period, both MPS and DPI were aware of their respective responsibilities to comply with the Child Find provisions of the law, and they made efforts to discharge these responsibilities.  As discussed in this decision, their respective efforts, while taken in good faith, were not adequate to bring MPS into

61

satisfactory compliance.   As further discussed, as DPI continued to insist upon more thorough internal accountability procedures, compliance by MPS did improve in some areas, but overall, remained uneven.  However, the evidence established that by the end of the time period under analysis, June, 2005, the situation regarding Child Find was in a much better position than it was at the start of the period, September, 2000.   Furthermore, according to the testimony of one of the defendant's experts, Dr. Judy Schrag, it takes time for the internal accountability procedures to work and things are improving.  The court would hope that Dr. Schrag's assessment is accurate; if not, no lessons have been learned by the parties as a result of this protracted litigation.

Nevertheless, even though the court has determined liability, before judgment can be entered, the court must address the issue of what sanctions/remedies are appropriate to be imposed.  As for individual members of the class, since these students with disabilities may have suffered educationally as a result of Child Find failures, are they entitled to some form of compensatory education?

Next, since the violations were systemic in nature, what sanctions should be imposed to bring MPS into satisfactory compliance with the IDEA?  Is satisfactory compliance considered something less than the 100% required by law? In order to address these questions, the present level of compliance for MPS must be determined.  How much improvement has occurred since the latest internal accountability procedures were put into place and since the CIFMS approach has been implemented? One of the plaintiff's experts, Dr. James Tucker testified that a number of things can be done to bring a school district into compliance.  One of his recommendations is for the state supervisory agency to establish a "stakeholders group," which would consist of representatives of every organization that has a stake in seeing that children receive a free appropriate public education.

62

DPI recently instituted such a group, and it includes participation by plaintiffs' counsel. Dr. Tucker also recommended that an outside monitor be appointed to oversee full and appropriate development and implementation of Child Find strategies.

To resolve the issues raised in this next step of the litigation, the court will need to receive input from the parties. In an effort to avoid a fully litigated Phase III, it would be appropriate for the parties to again attempt to resolve this case by mutual agreement. The court knows the parties have made prior efforts to settle this case, but those efforts were unsuccessful. In the court's opinion, now is the time to renew such efforts. It seems that a mutually agreeable solution would be more satisfactory than a court-imposed resolution. Also, it would have the effect of terminating the litigation, except for a possible supervisory role by the court. An agreement between the parties would expedite remedies and curtail continuing litigation costs, especially if either or both parties contemplate an appeal.

However, the court can only suggest, but the parties must act. This court must proceed with the case and to that end, the court will schedule a status conference with the parties to discuss the sanction/remedy phase of this case. This conference will be conducted on **September 27, 2007** at **10:00 a.m.**, in Room 254, United States Courthouse, 517 E. Wisconsin Avenue, Milwaukee, Wisconsin.

Dated at Milwaukee, Wisconsin, this 11th day of September, 2007.


s/AARON E. GOODSTEIN
U.S. Magistrate Judge


63

**APPENDIX: Table of Acronyms**

ADHD: Attention Deficit Hyperactivity Disorder

CAP: Corrective Action Plan

CCAP: Consolidated Corrective Action Plan

CIFM: Continuous Improvement and Focused Monitoring

CIFMS: Continuous Improvement Focused Monitoring System

CIMP: Continuous Improvement Monitoring Process

DPI: Wisconsin Department of Public Instruction

EBD: Emotional Behavioral Disorder

FAPE: Free Appropriate Public Education

IDEA: Individuals With Disabilities Education Act, 20 U.S.C. §§ 1400 et seq.

IEP: Individualized Education Program

LEA: Local Educational Agency

MPS CIFM: MPS Continuous Improvement and Focused Monitoring Action Plan

MPS: Milwaukee Public Schools

OHI: Other Health Impairment

OSEP: United States Department of Education Office of Special Education Programs

SELL: Special Education Leadership Liaison

SEP: School Educational Plan

SOAP: Milwaukee Public Schools Special Education Oversight Action Plan