# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JAMIE S., on behalf of the class**,

        **Plaintiffs,**

    v.                                          Case No. 01-C-928

**MILWAUKEE PUBLIC SCHOOLS, et. al.,**

        **Defendants.**

## ORDER GRANTING PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT

### I. PROCEDURAL HISTORY

On September 13, 2001, the plaintiffs filed their complaint, alleging violations under the Individuals With Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA") and related state statutes, Wis. Stat. §§ 115.758, et seq. Upon the written consent of the parties to the exercise of jurisdiction by the magistrate judge, the case was reassigned to this court on November 28, 2001. The court then issued its scheduling order establishing a time frame for pretrial discovery and for filing a motion seeking class certification. On November 7, 2002, the plaintiffs filed their motion for class certification seeking to proceed on their claims within the context of a class action. The defendants filed their opposition to the motion, and on May 23, 2003, the court, in its Decision and Order Regarding Class Certification, directed the plaintiffs to submit an amended class certification motion because the court determined that a number of the plaintiffs' claims were subject to the exhaustion of administrative remedies requirement, pursuant to the IDEA. 20 U.S.C. § 1415(l). As stated in that decision, this court determined that the plaintiffs' proposed class definition included claims for which exhaustion would be required. The court concluded that some of the plaintiffs'

claims were not systemic in nature, identifying these as "post-determination" claims. The court reasoned that these claims were subject to administrative exhaustion because they are individual and substantive in nature and each alleged wrong could be potentially remedied through the administrative process outlined in the IDEA. The court identified the other claims as "pre-determination" claims and concluded that these could be systemic or procedural in nature. As such, these claims had the potential for class certification. The plaintiffs were required to file an amended motion for class certification limited to the pre-determination claims.

On June 23, 2003, the plaintiffs filed their amended motion for class certification, which sought class certification based upon the claims as narrowed by the court's May 23, 2003 order. On August 1, 2003, the court issued a second Decision and Order, which directed the plaintiffs to file a second amended motion for class certification because, in the court's opinion, both the plaintiffs and the defendants misconstrued the May 23, 2003, decision and order. Ultimately, on November 14, 2003, this court entered its third Decision and Order, and at that time, defined the class as follows:

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

At this point, a number of other motions were filed, including the defendant MPS's motion to dismiss certain claims as not typical of the class and the plaintiffs' motion to compel production of materials from the United States Department of Justice. The court ruled on these motions and then met with the parties to discuss appropriate notice to the class, and a discovery schedule for expert witnesses. After notice to the class was given and expert discovery completed, the court requested that the parties file a joint stipulated statement of facts, together with summaries of their respective expert witnesses. Based upon the submissions, and in an effort to avoid the time consuming process involved in summary judgment motions, the court decided to bifurcate trial

2

proceedings, and first conduct a court trial for expert witnesses. After some rescheduling, the court trial involving expert witnesses (referred to as Phase I) was commenced on October 18, 2005, and completed on November 2, 2005 (the trial did not run continuously during that period). The court heard from six experts.

On November 28, 2005, the court held a hearing at which time the parties were advised of the court's initial reaction to the experts' testimony and conclusions drawn therefrom. The court informed the parties that it would be necessary to proceed to Phase II, which would consist of the factual presentations upon which the experts formed their respective opinions. The trial to the court in Phase II began on April 10, 2006, and was concluded on April 26, 2006. The testimony of 48 witnesses was presented, and numerous documents were received in evidence. Post trial submissions were filed by the parties in June, 2006.

On September 11, 2007, the court issued its Phase II Decision and Order finding that MPS violated the IDEA's Child Find requirements. This violation was not limited to the representative plaintiffs but was systemic in nature and violated the rights of the plaintiff class. Specifically, the court held that MPS failed to refer children with a suspected disability in a timely manner for an initial evaluation, i.e. the 90 day requirement; MPS improperly extended the 90 day time requirement; MPS imposed suspensions in a manner that improperly impeded its ability to refer children with suspected disabilities for an initial evaluation; and MPS failed to insure that the child's parents or guardians attend the initial evaluation. The court further concluded that the actions of MPS in not reviewing all data to determine the exact nature of the child's disability, while violations in individual cases, did not constitute systemic violations of the IDEA.

Finally, the court concluded that during the time period from September, 2000 to June, 2005, DPI violated the IDEA and related state statutes by failing to adequately discharge its

oversight and supervisory obligations in regard to the compliance by MPS with the IDEA and related state statutes, as that compliance related to the systemic violations found by the court.

In light of this court's finding of liability, the court proceeded towards Phase III, the remedies phase of this matter. (See Docket No. 415.) A court trial is scheduled to commence on **November 3, 2008**.

On April 7, 2008, the plaintiffs and DPI filed a joint motion seeking the court to approve a settlement agreement between the plaintiffs and DPI. (Docket Nos. 431, 432, 433, 435.) Following a status conference on April 17, 2008, (Docket No. 441), the court ordered MPS to respond with any objections to the proposed settlement agreement between the plaintiffs and defendant DPI no later than May 1, 2008, and the plaintiffs and DPI were permitted until May 15, 2008 to reply. (Docket No. 441.) The pleadings on the plaintiffs' and DPI's motion to approve settlement are now closed and the matter is ready for resolution.

Also pending before this court is the plaintiffs' motion for interim attorneys' fees. (Docket Nos. 392, 393, 394, 395, 397; DPI / MPS resp. 400, 404, 405; Plaint. reply 408, 409, 411.)

**II. SUMMARY OF PROPOSED SETTLEMENT**

The settlement agreement between the plaintiffs and DPI addresses the three specific areas of systemic violations found by the court in Phase II, namely, MPS' failure to conduct timely initial evaluations, MPS' failure to insure that a child's parent or guardian participated in an initial IEP meeting, and the fact that MPS utilized suspensions in a manner that impeded its ability to refer children who may be suffering from a disability for an initial evaluation. (Docket No. 431-2 at 4-7.)

The settlement agreement provides that MPS shall conduct 95% of its initial evaluations within the required time period or the time period shall be properly extended, for two consecutive years. (Docket No. 431-2 at 4-5.) Similarly, the settlement agreement calls for MPS to have a parent or guardian present for an initial IEP meeting or for MPS to make reasonable efforts to ensure the

4

parent or guardian's participation, in 95% of its initial IEP meetings for a period of two consecutive years. (Docket No. 431-2 at 5-6.) Finally, the settlement calls for MPS, in two consecutive years, to refer 95% of students in kindergarten through fifth grade who are suspended ten or more days during a school year and 95% of students in sixth through twelfth grades who are suspended twenty or more days in a school year to a "system of early intervention services . . . designed to address the students' behavior issues that resulted in suspensions and which shall include the possibility of referral of the student for an evaluation to determine if the student is a student with a disability." (Docket No. 431-2 at 6-7.)

Compliance with these agreed-upon benchmarks shall be evaluated by a court-appointed independent expert, whom the parties agree should be Alan Coulter. (Docket No. 431-2 at 7-12.) This independent expert shall be paid for by DPI. (Docket No. 431-2 at 8.) The 95% compliance rate shall be measured in each individual MPS school for the timeliness of initial evaluations, parent or guardian participation in initial IEP meetings, and with respect to compliance regarding suspended students.

Further, the settlement agreement calls for MPS, in two consecutive years, to refer 95% of MPS students who are retained in a given school year and are not identified as suffering from a disability shall be "referred to a system of early intervention services approved by the Independent Expert designed to timely address the students' academic or behavior issues that resulted in retention and which shall include the possibility of referral of the student for an evaluation to determine if the student is a student with a disability." (Docket No. 431-2 at 7.) The 95% compliance is not referenced to "each school," and programs for the referred students will be implemented with an 80% degree of integrity. Unlike the three issues discussed above, the court has not found any systemic IDEA violation related to the retention of students.

5

The settlement agreement calls for MPS to have four years to achieve the required two consecutive years of compliance regarding timely initial evaluations and parent or guardian participation in initial IEP meetings and eight years to comply with the agreement regarding suspended and retained students. (Docket No. 431-2 at 14-15.) Non-compliance shall result in a hearing before this court for a determination of the remedy. (Docket No. 431-2 at 15.) Compliance shall result in termination of the agreement and dismissal with prejudice of the plaintiffs' claims against DPI.

Further, the agreement calls for DPI to order MPS to provide training to MPS' staff, as deemed necessary by the Independent Expert, on indicators of special education needs, referral procedures, and Child Find obligations. (Docket No. 431-2 at 13.) Finally, DPI agrees to provide for a fulltime professional to train and support parents and MPS staff regarding provisions of the IDEA and Child Find obligations for the length of this agreement, or until DPI's payments for this professional meets $300,000.00. (Docket No. 431-2 at 13.)

Finally, DPI agrees to pay to the plaintiffs $475,000.00 in attorneys' fees and costs to Disability Rights Wisconsin. (Docket No. 431-2 at 18.)

### III. MPS' OBJECTIONS TO CLASS SETTLEMENT

MPS primarily argues that the court should reject the proposed settlement because the settlement will strip MPS of its legal rights. (Docket No. 452 at 3-22.) Specifically, MPS contends that (1) the settlement strips MPS of the right to argue whether prospective relief is necessary and/or appropriate, (Docket No. 425 at 4-12); (2) the proposed settlement strips MPS of its right to make decisions regarding which students shall be retained, (Docket No. 452 at 12-13); (3) the proposed settlement strips MPS of its right to appeal a DPI directive to the Department of Education, (Docket No. 452 at 13-14); (4) and the proposed settlement agreement strips MPS of its right to discipline its students, (Docket No. 452 at 14-22).Further, MPS objects to the proposed settlement on the grounds

6

that it includes a class that it broader than that determined by the court, (Docket No. 452 at 23), the proposed settlement relieves DPI of liability for any potential compensatory education, (Docket No. 452 at 24-25), and the proposed settlement agreement exceeds DPI's authority under the IDEA, (Docket No. 452 at 25-27).

**IV. ANALYSIS**

A court in this district, some time ago in another class action involving MPS had this to say:

It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement. United States v. McInnes, 556 F.2d 436, 441 (9th Cir. 1977); Du Puy v. Director, Office of Workers' Compensation Programs, 519 F.2d 536, 541 (7th Cir. 1975). In the class action context in particular, "there is an overriding public interest in favor of settlement." Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources. Id.

Settlement of a class action is not, however, an unmixed blessing. Balanced against the "overriding public interest in favor of settlement" are strong countervailing public policies which counsel against automatic judicial acceptance of such agreements. First and foremost is the fact that most of those whose rights are affected by a class action settlement the members of the class are not involved in its negotiation nor are they present to voice their views in court. The class members must rely upon the representation of the class representatives and class counsel to protect their interests. While this representation is no doubt vigorous in most cases, on occasion the negotiating parties may find that their individual interests can best be served by a settlement which is not in the best interests of the class as a whole. Similarly, class counsel may be persuaded by the prospect of a substantial fee to accept a settlement proposal which leaves the class with less relief than could have been procured through more vigorous negotiation. In such cases, the class members may find that substantial rights have been bargained away in exchange for relief which inures primarily to the benefit of a few class members or class counsel. See In re General Motors Corp. Engine Interchange Litigation, 594 F.2d 1106, 1120 (7th Cir. 1979); Moreland v. Rucker Pharmacal Co., 63 F.R.D. 611, 615 (W.D.La.1974).

In addition to this concern with the interests of class members, there is a concern with the interests of the public as a whole. The substantive issues involved in many class actions reflect a broad public interest in the rights to be vindicated or the social or economic policies to be established. In such cases, the ramifications of a settlement can extend far beyond the rights of individual class members. This public interest is present not only in civil rights suits such as the one now before us, but also in such economic litigation as antitrust and consumers' rights actions. Uncritical acceptance of a class action settlement can, therefore, disturb important national

> policies beyond the immediate impact upon the rights of class members. See *Developments in the Law Class Actions*, 89 Harv.L.Rev. 1318, 1536-39 (1976).
>
> To safeguard the rights of class members and allow consideration of the broader implications of a class action settlement, Rule 23(e) of the Federal Rules of Civil Procedure requires that notice of a proposed settlement be sent to all class members and that judicial approval of settlement offers be procured prior to dismissal of a class action. Rule 23(e) does not specify any particular standard which a settlement must satisfy nor does it provide for a procedure within which settlement proposals should be reviewed. The courts of appeals have required that district court approval of a settlement pursuant to Rule 23(e) be given only where the district court finds the settlement fair, reasonable and adequate. See, e.g., Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975).

Armstrong v. Board of School Directors, 616 F.2d 305, 313-14 (7th Cir. 1980). Thus, the threshold question presented to this court is whether the proposed settlement is fair, reasonable, and adequate. Only if this court determines that the settlement crosses this threshold does the court proceed to the first step in the settlement process; that being notification of the class members and a formal fairness hearing. See, e.g., id. at 314.

"Generally, a non-settling defendant lacks standing to object to approval of a settlement because the non-settling defendant is not affected by that settlement. Zupnick v. Fogel, 989 F.2d 93, 98 (2d Cir. 1993) (citing cases). Standing exists only where the non-settling defendant can show that it will 'sustain some formal legal prejudice as a result of the settlement.' Id. (citing Waller v. Financial Corp. of America, 828 F.2d 579, 583 (9th Cir. 1987))." In re NASDAQ Market-Makers Antitrust Litig., 176 F.R.D. 99, 103-04 (S.D.N.Y. 1997). The question of MPS' standing to object to the proposed settlement is essentially subsumed into the analysis of the merits of MPS' objections; MPS has standing only if the proposed settlement only if it affects MPS' rights and MPS objects largely because it alleges that the settlement adversely affects its legal rights. The court does not accept the concession of the plaintiffs and DPI that MPS necessarily has standing to challenge the proposed settlement, (Docket No. 456 at 2), and therefore rejects MPS' argument raised in its sur-

reply that the plaintiffs and DPI have conceded that MPS shall be legally prejudiced by the proposed settlement, (Docket No. 468 at 1).

The proposed settlement is between the plaintiffs and defendant DPI. Nonetheless, many of the provisions set forth in the proposed settlement agreement create benchmarks that are to be achieved by the non-settling defendant MPS. However, the establishment of such benchmarks per se does not mean that MPS' legal rights are affected by the settlement. This is because all of the obligations that would be imposed upon MPS as a result of the enforcement of this proposed settlement could independently be imposed by DPI pursuant to its authority as a supervising state educational agency ("SEA") under the IDEA. See 20 U.S.C. § 1412(a)(11); see also 20 U.S.C. § 1413(d). Therefore, in analyzing MPS' objections, the court turns to the question of whether DPI has the authority to order MPS to take the actions called for in the proposed settlement agreement.

In relevant part, the IDEA provides:

State educational agency responsible for general supervision.

(A) In general. The State educational agency is responsible for ensuring that—

> (i) the requirements of this part [20 USCS §§ 1411 et seq.] are met;
>
> (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency—
>
>> (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
>>
>> (II) meet the educational standards of the State educational agency;

20 U.S.C. § 1412(a)(11).

Similarly, Wisconsin Statute § 115.90, the provision outlining what may occur if a local educational agency fails to comply with Wisconsin law relating to the education of disabled students, provides:

(1) If, as the result of a monitoring procedure or a complaint investigation, the state superintendent finds that a local educational agency has violated this subchapter, the state superintendent may require the local educational agency to submit a corrective plan addressing the violation.

(2) If the state superintendent, after reasonable notice and an opportunity for a hearing, finds that a local educational agency has failed to comply with any requirement in this subchapter, the state superintendent shall reduce or eliminate special education aid to the local educational agency until he or she is satisfied that the local educational agency is complying with that requirement.

(3) If the state superintendent finds that a corrective plan under sub. (1) has not been implemented, or that withholding aid under sub. (2) has been inadequate to ensure compliance with this subchapter, the state superintendent shall request the attorney general to proceed against the local educational agency for injunctive or other appropriate relief.

In exercising its authority over MPS, DPI's ultimate sanction is controlling the purse strings; in other words, its available enforcement mechanism is primarily the actual or threat of withholding funds. See id.; see also 20 U.S.C. § 1413(d)(1). When it comes to funding, MPS retains certain procedural rights to challenge DPI's withholding of funds, including an appeal to the Secretary of Education. See 34 C.F.R. § 76.401. MPS argues that proposed settlement unfairly infringes upon its legal rights by foreclosing its opportunity to seek review of DPI's orders.

The plaintiffs and DPI are explicit in their reply in stating that the proposed settlement does not expand DPI's authority to withhold funds from MPS and would not foreclose MPS' procedural rights to challenge any withholding of funds by DPI. (Docket No. 456 at 19.) From the court's own review of the proposed settlement, there is nothing in the document that affects MPS' right to challenge DPI's withholding of funds; MPS' procedural right to challenge any action by DPI remains unaffected by this settlement. The settlement could be viewed as essentially another corrective action, similar to any one of the numerous other corrective action plans previously established by DPI.

Another objection raised by MPS is that it has come into compliance with the IDEA, thus negating the need for prospective relief. MPS argues that the proposed settlement takes away its

ability to challenge prospective relief in Phase III. The correction of the systemic problems found by the court in Phase II would be an issue for this court to resolve in Phase III, but the question of compliance with the IDEA is not solely for the court. Rather, compliance with the IDEA is first and foremost the responsibility of DPI. This court's authority regarding compliance exists by virtue of the plaintiffs' suit and the determination of DPI's violations. This action in no way limits the ability of DPI to address the failures within MPS to comply with its obligations under the IDEA. By doing so, as evidenced in the proposed settlement agreement, DPI relieves this court of the time consuming task of receiving evidence and making prospective relief determinations in Phase III.

Looking at the obligations imposed upon MPS within the context of being pursuant to DPI's supervisory authority, the proposed settlement is not challengeable by MPS for improperly infringing upon MPS' legal rights. MPS retains its procedural rights to object to any action by DPI, and, in particular, the withholding of funds, if it should come to that. Even though DPI has statutory authority to impose corrective action upon MPS, the court by virtue of approving the settlement does give its imprimatur and independent authority to same. But, for the reasons stated, the court finds that by exercising its authority in approving the proposed settlement, it has not diminished the legal rights of MPS.

As for MPS' distinct but related arguments that the proposed settlement agreement infringes upon MPS' rights to discipline students and to determine which students should be retained, the court does not find that these arguments are sufficient to warrant rejection of the proposed settlement agreement.

It appears that MPS' objection to the settlement on the basis of its impact upon MPS' responsibilities regarding suspended students is based upon a misunderstanding of the nature and consequences of the proposed settlement agreement. MPS argues, "Pursuant to the proposed class settlement, however, the school could not suspend the [hypothetical disruptive fourth grade] student

11

for longer than [10 days], even if it had no reasonable suspicion whatsoever that the student might have a disability." (Docket No. 452 at 18.) Later, after citing numerous examples of students suspended for more than the threshold number of days, MPS alleges it "would not have been able to suspend or refer for expulsion either student as they had accumulated the threshold number of suspension days in a school year – according to the class settlement – and instead would have to be referred to a 'system of early intervention services.'" (Docket No. 452 at 21.) Parenthetically, the court notes that many of the suspensions cited by MPS as examples that "occur with frequency in the District," involve suspensions for truancy and tardiness. (See Docket No. 452 at 20.) As pointed out by DPI and the plaintiffs in reply, state law explicitly prohibits MPS from suspending students for truancy or tardiness. See Wis. Stat. § 120.13(1)(d); see also Wis. Stat. § 118.16(c). However, MPS' compliance or non-compliance with state law regarding suspending students for truancy and tardiness is an issue beyond the scope of this litigation.

In no way does the settlement agreement prohibit MPS from suspending or otherwise disciplining students to the full extent authorized by law. Quite the contrary, the effectiveness of the settlement agreement in identifying students whose discipline problems may be caused by an undetected disability depends largely upon MPS utilizing suspensions in much the same way that it has in the past. It says that students who are suspended ten days or more during a school year "shall be referred to a system of early intervention services." (Docket No. 431-2 at 6.) The court fails to see how this abrogates the ability of MPS to discipline students. It simply establishes a threshold for taking a closer look at the disciplined student.

Granted, to some degree, the costs or time likely to be incurred by MPS in making a referral "to a system of early intervention services" may act to dissuade MPS from surpassing the suspension threshold of ten days, but the court is unable to conclude that this subtle disincentive constitutes an infringement upon MPS' statutory right to discipline students.

12
Case 2:01-cv-00928-RTR   Filed 06/06/08   Page 12 of 19   Document 471

Further, MPS argues that the proposed settlement agreement should be rejected because it would provide the Independent Expert with the "authority to overturn MPS' suspension and expulsion decisions." (Docket No. 452 at 22.) Wisconsin law provides that decisions regarding the suspension or expulsion of students are within the authority of local school boards. Wis. Stat. §§ 119.04, 120.13(1)(b)(2); see also Wis. Stat. § 119.18(21).

The court finds nothing in the proposed settlement agreement that would empower the Independent Expert to overturn a disciplinary decision of MPS. There is nothing in the proposed settlement agreement to suggest that the referral to early intervention services is designed to replace a suspension imposed by MPS, but rather referral is an additional step that DPI has determined MPS must undertake to comply with the IDEA's Child Find obligations.

As for MPS' objection to the proposed settlement agreement with regards to the retention of students, MPS objects on the basis that the retention of students was not a basis for liability in Phase II and that the agreement would strip MPS of its authority to make rules regarding the retention of students. The court finds that, for many of the same reasons discussed above with respect to suspension of students, the proposed settlement does not improperly infringe upon MPS' authority to make retention decisions for its students.

Although the court did not make any finding of MPS' retention policies being a source of systemic IDEA violations in MPS, the fact that this matter was not at issue in this litigation does not preclude DPI from exercising its supervisory authority under the IDEA and determining that MPS must undertake corrective action. In the give-and-take of settlement discussions, the parties are free to include matters beyond those before the court. For example, a court cannot order a tortfeasor to apologize to a plaintiff, but an apology can certainly be a term of a private settlement. It is pursuant to its supervisory authority that DPI may order the changes called for in proposed settlement

13

agreement, and thus the court does not find that MPS' arguments merit rejection of the proposed settlement agreement.

Having addressed and rejected many of MPS' specific objections to the proposed settlement agreement, the court shall turn to the more general questions of whether the proposed settlement is fair, reasonable, and adequate and in doing so the court shall address the remaining concerns raised by MPS.

DPI's failure to supervise MPS' compliance with the IDEA contributed to the systemic failures the court found in the Phase II. Therefore, any remedy imposed, whether as a result of a settlement agreement or an order of this court, must address these systemic failings and DPI's lax oversight.

The remedies called for in the proposed settlement agreement are entirely prospective and thus do not directly compensate any class member for any injury suffered by the class member. For example, the settlement does not call for any class member to receive compensatory education. MPS objects to the settlement on the basis that it leaves it entirely liable for any compensation sought by the class. (Docket No. 452 at 24-25.)

The fact that the settlement does not provide any direct benefit for the members of the class does not render the proposed settlement agreement unfair, unreasonable, or inadequate. This case has always involved much more than simply obtaining relief for each class member; creating comprehensive change in the manner in which special education is addressed by MPS has formed the foundation of this litigation from the plaintiffs' perspective. And this proposed settlement does much to accomplish this goal. In fact, it accomplishes more than what might have been achieved had this case fully continued through Phase III. For example, as discussed above, the proposed settlement addresses MPS' retention of students, a matter that was not a basis for this court's liability determination and would not have been the subject of remedial relief.

Similarly, the court did not explicitly find that DPI and MPS violated the IDEA by failing to provide parents with adequate support and information to effectively navigate MPS' special education bureaucracy, but nonetheless, as was made clear by the numerous stories told by the representative plaintiffs' parents during Phase II, there was substantial room for improvement. The proposed settlement agreement addresses this concern by requiring DPI to fund a fulltime position to coordinate and facilitate parents' involvement in MPS' special education system. This settlement provision, although again not a direct benefit to the class members, should prove to be a substantial asset for other parents who face the same or similar struggles, as did the representative plaintiffs' parents. Thus, this provision shall serve to aid in remedying the systemic Child Find failures that formed the basis for MPS and DPI's liability, at least until MPS meets the goals established by the proposed settlement agreement and DPI's obligation to fund the position terminates.

Further, this agreement is not merely a corrective action plan by which DPI promises to do a better job monitoring MPS' compliance with the IDEA. Rather, the proposed settlement agreement represents a truly different approach by having the Independent Expert undertake the substantive role in ensuring MPS' compliance, a responsibility that DPI failed to effectively discharge during the years in question.

At the April 17, 2008, conference with the parties, the court raised a significant concern with the proposed settlement agreement, that being the 95% compliance rate. The IDEA does not call for some percentage of compliance, but rather calls for full compliance, i.e. a 100% compliance rate. However, when dealing with a large urban school district with thousands of disabled students, the absence of 100% compliance does not necessarily constitute systemic noncompliance with the IDEA.

Certainly, if 95% compliance is attained, violations of the IDEA are still occurring. Even if MPS were to meet the standards set forth in the proposed settlement agreement, the rights of as

many as 5% of MPS' disabled students may be violated. Of course, the law provides each one of these students with the right to pursue an individual claim against MPS. But this litigation was not contesting a failure of procedural rights, it was addressing systemic failures. Based upon what has been presented in Phases I and II of this litigation, the court is of the opinion that a 95% compliance rate in these key areas is sufficient and appropriate to remedy the systemic failures the court found in Phase II. This is particularly true because the 95% compliance rate is to be measured by individual school, rather than district-wide. Therefore, because one could assume that certain schools would exceed the 95% minimum compliance rate, while others may just squeak by, the district's overall compliance rate will necessarily be higher than 95%.

MPS argues that measurement by school is inappropriate because certain schools are too small to permit for a meaningful sample. For example, certain MPS schools have fewer than 5 initial referrals for evaluation in each school year, (Aff. Patricia A. Yahle, Docket No. 453 at 7, ¶30), and thus a single untimely initial evaluation in a school with few disabled students may result in MPS failing to meet the standards established in the proposed settlement agreement for a given year. However, because special education services are administered largely at the individual school level in MPS, the court finds that measuring compliance by school is not only appropriate, but will be more effective. Based on the evidence presented at Phases I and II, district-wide compliance measuring was very inadequate in the challenged areas. Further, the court finds that the higher standard established by measuring compliance by school rather than district-wide is appropriate to remedy MPS' systemic failures.

With respect to the 95% compliance rate, the court notes a different standard in regard to the measurement for retained students. It is clear that the 95% compliance rate is to be measured by each school for timely initial evaluations, (Docket No. 431-2 at 4), parental participation in initial IEP team meetings, (Docket No. 431-2 at 5), and referrals of suspended students who surpass a

threshold number of suspension days, (Docket No. 431-2). In contrast, the proposed settlement in regard to retained students states, "As measured during a twelve (12) month period as designed within the Compliance Plan, ninety-five percent (95%) of MPS students who are retained in a grade shall be referred to a system of early intervention services . . . ." (Docket No. 431-2 at 7.) Thus, unless the court is misreading or misinterpreting this statement, it appears that compliance with this provision shall be measured on a district-wide basis.

Unlike the parental participation and timely evaluation requirements, the IDEA does not require a referral to early intervention services for students who are retained. Rather, the IDEA simply requires appropriate systems be in place to ensure that a local school district is identifying students with disabilities, and DPI has determined that this referral system is necessary for MPS to comply with its Child Find obligations. Because the referral process set forth in the proposed settlement agreement is not required by the IDEA, the court finds evaluating compliance with the requirement that MPS refer retained students to a system of early intervention services on a district-wide rather than individual school basis is appropriate.

The court notes that the proposed settlement agreement does not define what shall constitute "a system of early intervention services," other than to say that this system shall be approved by the Independent Expert and "designed to timely address the students' [academic or] behavior issues that resulted in suspension [or retention] and which shall include the possibility of referral of the student for an evaluation to determine if the student is a student with a disability." (Docket No. 431-2 at 6, 7.) It appears that all parties are deferring to the judgment of the Independent Expert for a determination of what sorts of services shall be sufficient, and thus it appears that the parties are asking the court to likewise defer to the Independent Expert. Having reviewed the curriculum vitae of proposed Independent Expert Alan Coulter, the court finds him amply qualified to make

appropriate judgments as to the nature of the early intervention services that shall be provided, and therefore the court finds that deferring to the Independent Expert in this respect is appropriate.

Finally, the proposed settlement provides for a payment of attorney's fees to plaintiffs' counsel by DPI in the amount of $475,000. Currently pending before the court is the plaintiffs' petition for interim attorney's fees and costs in the amount of $1,319,898.89. That motion was filed on October 12, 2007. The court recognizes that the plaintiffs are prevailing parties in this action by virtue of its September 11, 2007 decision, but the total interim amount of attorney's fees and costs which should be awarded pursuant to the fee shifting provision of the IDEA and Wisconsin statutes has not been decided.

20 U.S.C. § 1415(i)(3)(B) provides for an interim award of fees. The court is of the opinion that plaintiffs are entitled to an award of interim fees. This litigation has been protracted and all parties have incurred substantial legal expense. The court need not resolve the plaintiffs' petition for interim fees at this time to reach the conclusion that the sum of $475,000 is fair and reasonable. From the court's review of the petition and supporting documentation, and having considered the defendants' objection, the court would have awarded at least that amount as an interim award. Thus, the court will approve the attorneys' fees provision of the proposed settlement.

### V. CONCLUSION

Therefore, for the reasons set forth above, the court rejects MPS' objections and finds the proposed settlement fair, reasonable, and adequate. Thus, the court grants its preliminary approval of the proposed settlement agreement.

However, the court has certain questions with some of the language of the proposed class notice. Therefore, the court will defer its approval of the proposed class notice, (Docket No. 431-2 at 19-21), until it has an opportunity to discuss its concerns with the parties. In addition, the court wishes to know the procedures the parties intend to utilize in disseminating the class notice.

**IT IS THEREFORE ORDERED** that the court **grants** its preliminary approval of the proposed class settlement between the plaintiffs and the DPI defendants.

**IT IS FURTHER ORDERED** that the court will conduct a telephone conference with counsel for the parties to discuss the content of the class notice and the procedures for its dissemination. The conference shall be held on **June 20, 2008** at **10:00 AM**. The court shall initiate the call.

Dated at Milwaukee, Wisconsin this 6th day of June 2008.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge