# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JAMIE S., et. al. individually and
    on behalf of the class,

      **Plaintiffs,**

    v.                       **Case No. 01-C-928**

MILWAUKEE PUBLIC SCHOOLS, et. al.,

      **Defendants.**

## DECISION AND ORDER FOLLOWING PHASE III

I. PROCEDURAL HISTORY .................................................................................3

II. SUMMARY OF PHASE III.............................................................................8

    A. Patricia Yahle ....................................................................................8

    B. Kina K. ............................................................................................11

    C. Jamie S. ...........................................................................................12

    D. Erin Goff .........................................................................................13

    E. Claudia Weaver Hendrickson .........................................................14

    F. Audrey Potter..................................................................................15

    G. Kim Brizendine ..............................................................................15

    H. Christine Shafer .............................................................................15

    I. Cynthia J. ........................................................................................16

    J. Georgette Rodriguez .......................................................................17

    K. Melanie V.......................................................................................18

    L. Bryan E. .........................................................................................19

**M. Dr. Diana Rogers-Adkinson** ......................................................................... 20

**N. Jyran J.** .......................................................................................................... 25

**M. Dr. Eric Hartwig** .......................................................................................... 26

**N. Patricia Hall** ................................................................................................. 29

**O. Roxanne Mayeur** .......................................................................................... 30

**P. Sara Janacek** ................................................................................................. 31

**Q. Dr. Barbara Van Haren** ............................................................................... 32

**R. Dr. Cindy Walker** ......................................................................................... 34

**S. Patricia Gill** ................................................................................................... 35

**T. Stephanie Petska** .......................................................................................... 36

**III. PLAINTIFFS' PROPOSED REMEDY** ...................................................... 37

**IV. MPS' PROPOSED REMEDY** ..................................................................... 40

**V. ANALYSIS** .................................................................................................... 42

    **A. Evaluation of Class Members** ................................................................... 44

        *i. Independent Monitor* ................................................................................ 44

        *ii. Hybrid IEP Team* ................................................................................... 47

        *iii. Determination if Purported Class Member is a Class Member* ........... 49

        *iv. Determination if Class Member is Entitled to Compensatory Services* ... 52

    **B. Eligibility** .................................................................................................... 58

    **C. Parent Advocates** ....................................................................................... 61

    **D. Segregated Fund** ........................................................................................ 62

    **E. Dispute Resolution** .................................................................................... 62

    **F. Named Plaintiffs** ........................................................................................ 67

**VI. DPI'S MOTION** ........................................................................................... 69

**VII. CONCLUSION** ................................................................................................................70

**VIII. APPENDIX** ..................................................................................................................72

## I. PROCEDURAL HISTORY

On September 13, 2001, the plaintiffs filed their complaint, alleging violations under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq. ("IDEA") and related state statutes, Wis. Stat. §§ 115.758, et seq. Upon the written consent of the parties to the exercise of jurisdiction by the magistrate judge, the case was reassigned to this court on November 28, 2001. The court then issued its scheduling order establishing a time frame for pretrial discovery and for filing a motion seeking class certification. On November 7, 2002, the plaintiffs filed their motion for class certification seeking to proceed on their claims within the context of a class action. The defendants filed their opposition to the motion, and on May 23, 2003, the court, in its Decision and Order Regarding Class Certification, directed the plaintiffs to submit an amended class certification motion because the court determined that a number of the plaintiffs' claims were subject to the exhaustion of administrative remedies requirement, pursuant to the IDEA. 20 U.S.C. § 1415(l). The court concluded that some of the plaintiffs' claims were not systemic in nature, identifying these as "post-determination" claims. The court reasoned that these claims were subject to administrative exhaustion because they are individual and substantive in nature and each alleged wrong could be potentially remedied through the administrative process outlined in the IDEA. The court identified the other claims as "pre-determination" claims and concluded that these could be systemic or procedural in nature. As such, these claims had the potential for class certification. The plaintiffs were required to file an amended motion for class certification limited to the pre-determination claims.

On June 23, 2003, the plaintiffs filed their amended motion for class certification, which sought class certification based upon the claims as narrowed by the court's May 23, 2003 order. On

3

August 1, 2003, the court issued a second Decision and Order, which directed the plaintiffs to file a second amended motion for class certification because, in the court's opinion, both the plaintiffs and the defendants misconstrued the May 23, 2003, decision and order. Ultimately, on November 14, 2003, this court entered its third Decision and Order, and at that time, defined the class as follows:

> Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

At this point, a number of other motions were filed, including the Milwaukee Public Schools ("MPS") defendants' motion to dismiss certain claims as not typical of the class and the plaintiffs' motion to compel production of materials from the United States Department of Justice. The court ruled on these motions and then met with the parties to discuss appropriate notice to the class, and a discovery schedule for expert witnesses. After notice to the class was given and expert discovery completed, the court requested that the parties file a joint stipulated statement of facts, together with summaries of their respective expert witnesses. Based upon the submissions, and in an effort to avoid the time consuming process involved in summary judgment motions, the court decided to bifurcate trial proceedings, and first conduct a court trial for expert witnesses. After some rescheduling, the court trial involving expert witnesses (referred to as Phase I) commenced on October 18, 2005, and completed on November 2, 2005 (the trial did not run continuously during that period). The court heard from six experts.

On November 28, 2005, the court held a hearing at which time the parties were advised of the court's initial reaction to the experts' testimony and conclusions drawn therefrom. The court informed the parties that it would be necessary to proceed to Phase II, which would consist of the factual presentations upon which the experts formed their respective opinions. The trial to the court in Phase II began on April 10, 2006, and was concluded on April 26, 2006. The testimony of 48

4

witnesses was presented, and numerous documents were received in evidence. Post-trial submissions were filed by the parties in June, 2006.

On September 11, 2007, the court issued its Phase II Decision and Order finding that MPS violated the IDEA's Child Find requirements. This violation was not limited to the representative plaintiffs but was systemic in nature and violated the rights of the plaintiff class. Specifically, the court held that MPS failed to refer children with a suspected disability in a timely manner for an initial evaluation, i.e. the 90-day requirement; MPS improperly extended the 90-day time requirement; MPS imposed suspensions in a manner that improperly impeded its ability to refer children with suspected disabilities for an initial evaluation; and MPS failed to ensure that the child's parents or guardians attend the initial evaluation. The court further concluded that the actions of MPS in not reviewing all data to determine the exact nature of the child's disability, while violations in individual cases, did not constitute systemic violations of the IDEA.

Finally, the court concluded that during the time period from September, 2000 to June, 2005, the Wisconsin Department of Public Instruction defendants ("DPI") violated the IDEA and related state statutes by failing to adequately discharge its oversight and supervisory obligations in regard to the compliance by MPS with the IDEA and related state statutes, as that compliance related to the systemic violations found by the court.

In light of this court's finding of liability, the court proceeded towards Phase III, the remedies phase of this matter.

On April 7, 2008, the plaintiffs and DPI filed a joint motion seeking the court to approve a settlement agreement between the plaintiffs and DPI. Following a period of briefing in which MPS voiced its objections to the proposed settlement, on June 6, 2008, this court granted its preliminary approval of the proposed class settlement. On July 1, 2008 this court approved the proposed class notice, and a final fairness hearing was held before this court July 28, 2008. The court received no

written objection and no objector appeared at the final fairness hearing. Therefore, on July 28, 2008, the court approved the class settlement and dismissed DPI from this case.

The settlement agreement between the plaintiffs and DPI addresses the three specific areas of systemic violations found by the court in Phase II, namely, MPS' failure to conduct timely initial evaluations, MPS' failure to ensure that a child's parent or guardian participated in an initial IEP meeting, and the utilization of suspensions in a manner that impeded the ability of MPS to refer children who may be suffering from a disability for an initial evaluation. (Docket No. 431-2 at 4-7.)

The settlement agreement provides that MPS shall conduct 95% of its initial evaluations within the required time period or the time period shall be properly extended, for two consecutive years. (Docket No. 431-2 at 4-5.) Similarly, the settlement agreement calls for MPS to have a parent or guardian present for an initial IEP meeting or for MPS to make reasonable efforts to ensure the parent or guardian's participation, in 95% of its initial IEP meetings for a period of two consecutive years. (Docket No. 431-2 at 5-6.) Finally, the settlement calls for MPS, in two consecutive years, to refer 95% of students in kindergarten through fifth grade who are suspended ten or more days during a school year and 95% of students in sixth through twelfth grades who are suspended twenty or more days in a school year to a "system of early intervention services . . . designed to address the students' behavior issues that resulted in suspensions and which shall include the possibility of referral of the student for an evaluation to determine if the student is a student with a disability." (Docket No. 431-2 at 6-7.)

Compliance with these agreed-upon benchmarks shall be evaluated by a court-appointed independent expert, whom the parties agreed should be Alan Coulter. (Docket No. 431-2 at 7-12.) This independent expert shall be paid for by DPI. (Docket No. 431-2 at 8.) The 95% compliance rate shall be measured in each individual MPS school for the timeliness of initial evaluations, parent

or guardian participation in initial IEP meetings, and with respect to compliance regarding suspended students.

Further, the settlement agreement calls for MPS, in two consecutive years, to refer 95% of MPS students who are retained in a given school year and are not identified as suffering from a disability "to a system of early intervention services approved by the Independent Expert designed to timely address the students' academic or behavior issues that resulted in retention and which shall include the possibility of referral of the student for an evaluation to determine if the student is a student with a disability." (Docket No. 431-2 at 7.) The 95% compliance is not referenced to "each school," and programs for the referred students will be implemented with an 80% degree of integrity. Unlike the three issues discussed above, the court has not found any systemic deficiencies related to the retention of students.

The settlement agreement calls for MPS to have four years to achieve the required two consecutive years of compliance regarding timely initial evaluations and parent or guardian participation in initial IEP meetings and eight years to comply with the agreement regarding suspended and retained students. (Docket No. 431-2 at 14-15.) Non-compliance shall result in a hearing before this court for a determination of the remedy. (Docket No. 431-2 at 15.) Compliance shall result in termination of the agreement and dismissal with prejudice of the plaintiffs' claims against DPI.

Further, the agreement calls for DPI to order MPS to provide training to MPS' staff, as deemed necessary by the Independent Expert, on indicators of special education needs, referral procedures, and Child Find obligations. (Docket No. 431-2 at 13.) Finally, DPI agrees to provide for a fulltime professional to train and support parents and MPS staff regarding provisions of the IDEA and Child Find obligations for the length of this agreement, or until DPI's payments for this professional meets $300,000.00. (Docket No. 431-2 at 13.)

Finally, DPI agrees to pay $475,000.00 in attorneys' fees and costs to class counsel, Disability Rights Wisconsin. (Docket No. 431-2 at 18.)

On August 15, 2008, this court granted the plaintiffs' motion for interim attorneys' fees and ordered MPS to pay to the plaintiffs' attorneys an additional $459,123.96 in attorneys' fees. The court denied without prejudice the plaintiffs' request for interim costs.

On November 6, 2008, a court trial, referred to as Phase III, commenced to determine the appropriate remedy for the systemic violations the court found in Phase II. Following the trial, the court ordered the parties to submit simultaneous post-trial briefs no later than January 16, 2009 and simultaneous replies no later than January 30, 2009. The court also provided the parties with certain questions the court sought the parties to address in their post-trial briefs. (Docket No. 566.) The matter is now ready for resolution.

During Phase III, DPI filed a motion seeking a declaration that it is not responsible for any further remedy that the court may order in Phase III. (Docket No. 559.) The court permitted MPS to respond and DPI to reply. The pleadings on this motion are closed and the matter is ready for resolution.

## II. SUMMARY OF PHASE III

### A. Patricia Yahle

Patricia Yahle ("Yahle"), MPS' Director of Special Services, was called adversely by the plaintiffs and directly by MPS, testifying as both the first and last witness in this phase of trial. Set forth here is a summary of all of her testimony in Phase III.

Yahle's responsibilities are largely the same as those she had when she last testified in 2006 although the No Child Left Behind legislation has added additional responsibilities for her. Under No Child Left Behind, MPS has been identified as a "District Identified for Improvement," and this has imposed additional requirements for the district.

Yahle testified that according to MPS' IEP Team Procedural Handbook, Revised September, 2007, (Ex. 402), the IEP team has a responsibility to determine whether compensatory education or services are appropriate "[a]ny time any school staff member becomes aware that a student with special education needs has received inappropriate or insufficient education services." (Ex. 402.) Ultimately, it is a complex decision left to the professionals on the IEP team to determine what type of service is needed to bring the child to the place he would be if appropriate education had not been denied, but one that is regularly conducted by MPS' IEP teams. For example, all students identified in Exhibit 197 (2003-2004 school year) whose evaluations occurred beyond the 90-day deadline were evaluated for compensatory education; she directed that all students, from 2000 forward, who were identified late for special education, be evaluated for compensatory education. However, when presented with Exhibit 401, (for 2000-2005 school years), a list of students whose evaluations occurred beyond the 90-day deadline, she could offer no explanation as to why very few of these students had a "Y" in the column titled "Discussed Comp Ed." Yahle testified she had not seen this exhibit in a while.

When a student is referred late to special education, MPS' existing procedures require the IEP team to make a determination if that individual was denied FAPE as a result of that delay. The compensatory services that might be awarded may be equivalent in duration to the time the student was denied FAPE but a 1:1 equivalence would not be appropriate in every case. Each compensatory education determination, like each referral or special education determination, must be individualized.

As for the roughly 11,000 students who were suspended ten or more days in any school year between 2000 and 2005, (Ex. 400), Yahle does not know if any of these students were evaluated for special education, but testified that Child Find is an ongoing process. The only way MPS could

learn if these students were referred for special education would be the exceptionally time-consuming process of physically reviewing all 11,000 student file folders.

With respect to MPS' proposed remedy, Yahle testified that it was crafted so as to enable MPS to best utilize its limited resources. For example, students who are no longer enrolled in MPS who have a history of suspensions, students whose IEP was delayed less than 10 days beyond the 90-day deadline, or students older than 22 years of age, would be excluded from any potential remedy. If a student was found to be eligible for compensatory education, the nature of the compensatory education determined to be appropriate would determine where that service would be provided.

Yahle believes that MPS has the staff and resources to be able to effectively monitor the implementation of any court ordered remedy and to assist parents in the process, and therefore an outside monitor or parent advocate, as are called for under the plaintiffs' proposed remedy, would be unnecessary. Further, Yahle testified that the plaintiffs' proposed remedy of giving all class members their first choice of school would be unworkable for MPS.

In April of 2004, MPS implemented a protocol for automatically considering compensatory education at the time of the initial IEP team meeting for each case in which the meeting did not occur within the statutory timeline. For students whose IEP team meetings were delayed before the implementation of this new protocol, MPS reviewed a list of students whose IEP team meetings were delayed more than 10 days and identified 221 students who were current students who were eligible for special education or whose eligibility had not yet been determined. A worksheet was developed for auditors to rely upon in conducting a review of these 221 student files. These auditors, all of whom were experienced IEP team leaders, were tasked with determining whether the information in the database regarding the delay was accurate and to gather some preliminary information for the next step of the evaluation. This audit, (Ex. 461), revealed that of the 221

students, 48 required an additional IEP team meeting to assess the need for compensatory education. Of these 48 students, the IEP team determined that compensatory education was appropriate for 7. As part of this process, it was necessary for the IEP team to determine at what point the student was denied FAPE. Yahle acknowledged that MPS has not conducted any review of students whose initial review was delayed after April of 2004.

Since this court's September 11, 2007 decision, MPS has upgraded its technology to make it easier to calculate and track the relevant dates in the special education referral process and track IEPs, increased its Child Find training of staff members, and strengthened parent participation, among many other things.

**B. Kina K.**

Kina K. is the mother of Jamie S. Jamie's problems began when she was in K-4 in the Wauwatosa School District. She was referred for special education but was not identified because Wauwatosa was not her home district and thus, she was told MPS was required to conduct the evaluation. MPS told her that they would monitor Jamie.

In May of 2001, after Jamie was required to repeat the 1st grade for the third time, she was evaluated, found eligible for special education, and an IEP put in place. Jamie has had an IEP in place every year since 2001, including years Jamie was not enrolled in MPS, and Kina has regularly participated in Jamie's IEP meetings. Frequently, Jamie was unable to meet her IEP goals. At no point was compensatory education ever discussed with Kina, and Jamie has never received compensatory education. However, during an April 16, 2007 IEP meeting, a meeting attended by Kina, Jamie, and a representative from DRW, MPS recommended that Jamie attend summer school. Jamie declined because she prefers to spend the summers in Chicago with her grandmother.

Currently, Jamie is 15 years old and in the 9th grade at Wisconsin Career Academy. This is Jamie's second year in 9th grade. According to her more than three-inch thick file, (Ex. 215A),

11

Jamie reads at an early 2nd grade level, writes at a beginning 3rd grade level, and has 4th grade math skills, (Ex 215A at 94807). Jamie also has a long history of significant attendance problems. For example, as of October 7, 2008, Jamie attended her 1st hour class only once, and had missed 14 full days of school so far this school year; however some of these full-day absences were due to a psychiatric hospitalization. (Ex. 215A at 94808.) Sometimes Jamie misses school intentionally or as a result of suspensions. (Ex. 215A at 87549). However, Kina is frequently unaware of Jamie being truant or suspended because Jamie destroys correspondence from the school. (Ex. 215A at 87549.) Jamie was offered the opportunity to participate in a career program but was required to maintain perfect attendance to be eligible for the program. Jamie continued to frequently miss school.

According to her IEP, Jamie is able to perform ordinary household chores, estimate money, baby-sit, but should continue to work on skills such as reading a menu, measurements skills, and math and budgeting. (Ex. 215A at 94808.)

### C. Jamie S.

Jamie does not like going to school because she is teased by other students for doing easier work and she has only one friend. She gets frustrated. Her special education math class consists of copying a checkbook, and doing worksheets on multiplication, addition, and subtraction. She is in a regular education biology class but her teacher is hard to follow because she speaks Spanish. Jamie's special education teacher gives her additional science assignments, such as looking up science pictures on the internet and writing a description of the picture.

In her reading class, she is supposed to read silently to herself for about 10 minutes, but she does not understand what she is supposed to be reading so she stops reading and just sits there. The teacher then will read to the class but the teacher does not offer any explanations. And then she is supposed to write in her journal but she does not do this because she once wrote personal information in her journal that was reported back to her mother.

Case 2:01-cv-00928-RTR   Filed 06/09/09   Page 12 of 72   Document 598

Jamie likes her history class because the teacher provides explanations. However, on cross-examination, Jamie admitted she had been to history class only once in the last six weeks.

In the special education room she goes on the computer to "Blink" and meets people. Some of the males she has met online she has met in person.

Jamie has not been taught job skills and she is not involved in any school activities. One day she would like to become a nursing assistant like her mother. She believes she needs more help and if she received more help, she would attend more.

In an effort to accommodate Jamie, MPS permitted her to begin her school day at 10 AM but she still failed to attend. Teachers have come to her home to discuss her attendance problems. When she was told that she would fail 9th grade if she did not attend that last two days, she still did not attend. Although her teachers offered to help her after school, she refused to stay late because she had "other things to do" at home. Similarly, she refused to attend summer school because she spends summers with family in Chicago.

**D. Erin Goff**

Erin Goff ("Goff") is the Program Director for Creative Employment Opportunities, a for-profit company that contracts with various governmental organizations to provide employment services for persons with disabilities and other employment barriers. The company at times does receive school district referrals as part of a student's IEP. Clients receive individualized services tailored to their unique needs. An internship might be appropriate for a person such as Jamie and unlike Wisconsin Career Academy, Goff would not condition eligibility for the internship upon school attendance. Creative Employment Opportunities has contracts with school districts, but not with MPS.

**E. Claudia Weaver Hendrickson**

Claudia Weaver Hendrickson ("Hendrickson") is a MPS Special Education Leadership Liaison ("SELL"), and has been since 2003. She is a member of Yahle's management team in charge of special education training including issues relating to compensatory education.

She testified that compensatory education must be viewed on an individualized basis, first determining whether the student was denied FAPE. She acknowledged that in determining whether FAPE was denied as a result of a delay, or whether the student had no prior IEP, it is necessary to rely upon the best judgment of professionals to determine where the student would be had FAPE been provided on a timely basis. Determining whether or not a student was denied FAPE and if so, what type of compensatory services are necessary will require an evaluation of a variety of factors, including how long was the delay, what are the child's needs, and what services the child received in the past. Compensatory education must be above and beyond what the child is now receiving; otherwise, it is not compensatory.

Hendrickson supervised an audit of files for students whose initial evaluations occurred beyond the 90-day deadline without a valid extension between September of 2000 and April of 2004. (See Ex. 461.) As Yahle also testified, MPS identified 487 students who met these criteria and determined that 221 of these student files needed to be reviewed. (Ex. 461.) MPS excluded students who were no longer enrolled in MPS or who were not initially reviewed by MPS. (Ex. 461.) As a result of this review, it was determined that it was necessary to reconvene the IEP teams for 48 students. As a result, the IEP teams determined that compensatory education was appropriate for 7 of these 48 students. (Ex. 461.)

Since 2004, IEP teams have been required to report whether or not compensatory education is discussed during an initial IEP meeting. Hendrickson said that Exhibit 336 indicates whether or not compensatory education was discussed in a particular case. She, however, acknowledged that

this record may not be entirely accurate since some educators turned in the proper data and others did not.

Finally, she testified that only on rare occasion will she question an IEP team's compensatory education determination; on less than 10 occasions has she asked for an IEP to convene specifically to consider compensatory education.

### F. Audrey Potter

Audrey Potter ("Potter") is MPS' Coordinator of Psychological, Speech, Language, and Health Services, and is also a part of Yahle's management team. Potter supervises 150 school psychologists in the district.

Potter testified that compensatory education is viewed as part of the IEP process. In regard to this case the MPS staff has not received any specific training regarding how to determine compensatory education for class members who should have been evaluated earlier.

### G. Kim Brizendine

Kim Brizendine ("Brizendine") is a Special Services Information Management Systems supervisor for MPS. Her responsibilities include data tracking and managing software to comply with the IDEA's 2004 amendments. She discussed Exhibits 401 and 336 and stated that if there is a "Y" ("Yes") in the compensatory education column, it shows that compensatory education was discussed. However, the absence of a "Y" does not mean that compensatory education was never discussed because the report simply documents an isolated point in time.

### H. Christine Shaver

Christine Shaver ("Shaver") is a self-employed special education advocate living in East Troy, Wisconsin. She is generally contracted by county human services departments or hired by private clients. She has been doing this contract work since May of 2003. The children she works with have serious emotional or mental health needs. Not all are in special education. Nearly all of

these children attend MPS. She referred 7-8 of these students to special education and she went to IEP team meetings for these 7-8 students. At none of these meetings was the issue of compensatory education raised by MPS. On the other hand, neither did Shaver raise the issue. She testified that she did not raise the issue of compensatory education because she was concerned about moving forward.

Shaver testified that in her experience, advocates are able to assist parents in navigating the special education process because, although districts provide parents with information, the parents are often not able to understand the information they receive. Even though the plaintiffs are proposing requiring MPS to fund advocates as part of their proposed remedy, she knows that the IDEA does not require a school district to provide parent advocates.

### I. Cynthia J.

Cynthia J. is the mother of Jyran J., a 17-year-old MPS student who was identified for special education when he was 13 or 14. He was found eligible for special education in May of 2005 on the basis of an emotional disorder and a learning disability. Since that time, he was in MPS for all years, except for one. Prior to being found eligible for special education, Jyran was repeatedly retained in 3rd grade so that he was eventually 12-years-old and still in the 3rd grade. He then transferred schools and was placed into the 7th grade. Therefore, Jyran never attended 4th, 5th, or 6th grades.

Jyran has a significant truancy problem; he rarely goes to school. Although Cynthia acknowledges that Jyran has a significant problem, she believes that the attendance records included in Jyran's file, (Ex. 317A), were fabricated and he was at school more often than the records indicate. Jyran reports to his mother that he does not go to school because he does not feel like MPS can help him anymore. Jyran has a twin sister who was found eligible for special education in 1999. She does not have a similar truancy problem.

At an IEP team meeting on November 30, 2005, the IEP team concluded that Jyran should undergo an hour of "[t]utoring in all academic areas" twice a week from December 1, 2005 to March 31, 2006 "to address compensatory time." (Ex. 317A at 95173.) Cynthia did not request a due process hearing or otherwise object to this finding. Immediately after this IEP team meeting, Jyran transferred to another school and was truant for nearly the entire period he was supposed to be receiving tutoring. (Ex. 317A at 94897.) Jyran's truancy has continued. From July of 2005 through October 22, 2008, Jyran was truant for 61 partial days and 330 full days.

MPS attempted to accommodate Jyran by, for example, providing him with a shortened school day, an altered school schedule, and offering door-to-door bus service. (Ex. 317A at 94991, 95013.) However, Jyran refuses to take the bus and Cynthia told this to MPS.

### J. Georgette Rodriguez

Georgette Rodriguez ("Rodriguez"), herself disabled, serves as a volunteer assistant for parents of children with disabilities. She worked for 26 years as an advocate for families with special needs, and in 2001 she began working for MPS to assist parents as a Parent Information Specialist. She worked for MPS until March of 2007 when she was discharged for violating MPS' leave of absence policy. (See Ex. 465.)  After two years of assisting parents and attending IEP meetings, Rodriguez's duties were limited so that she no longer attended IEP meetings and her work related to advising families regarding disability questions became just one subset of the wider duties she was tasked with as an employee of MPS' Parent Education Center.

Rodriguez testified as to her disagreement with the policy implemented by the new Director of Student Services, which limited her ability to inform parents of their rights regarding disability services. She continued to attempt to inform parents who called the Parent Education Center of their rights regarding disability matters but she did so in a "low tone" so as to not let her supervisor know

what she was doing. She filed a grievance with the district contending that her supervisor inappropriately restricted her ability to discuss matters with parents.

Sometimes when she wrote up Parental Dispute Resolution Forms, she would write "comp. ed." on the form followed by a question mark when she thought the dispute might lead to an evaluation for compensatory education, but she is not aware what, if anything, happened as a result of these forms. Sometimes she would contact staff members to make inquiries, and sometimes she felt that she was encountering resistance from staff and administrators. Rodriguez got the impression that they felt she was over-stepping her bounds.

As part of her duties, Rodriguez would attend disciplinary hearings. When she encountered a student with a history of suspensions, she may have suggested a special education referral.

Based upon her experience, parents are in need of assistance from advocates in order to navigate the special education system, and if the court ordered MPS to provide parent advocates, she would like to be one of them.

**K. Melanie V.**

Melanie's problems, which included depression, self-injury, and hallucinations, began in 5th grade and she repeatedly missed school in 6th grade. Melanie also has a longstanding history of excessive absences that continued until she left MPS. (See Ex. 214A at 88132.) She was referred and found eligible for special education in January of 2004 when she was in 7th grade. (Ex. 293 at 46.) Neither at this initial meeting nor at any subsequent meeting, including those attended by her, her mother, and advocates, was compensatory education discussed.

Once she was placed in special education, matters improved slightly for Melanie. While she was in high school, Melanie and her mother requested that she be removed from special education and be given a Section 504 plan instead. (See Ex. 214A at 88131.) This 504 plan was put in place in Melanie's junior year and Melanie was provided with accommodations similar to those she was

18

provided when in special education. Melanie never made it to her senior year. She no longer wanted to go to school; when she did go, she would leave mid-day because she no longer wanted to be at school. Her depression worsened. And so she arranged to obtain her GED.

When she alerted MPS of her intent to withdraw from school, her principal wrote Melanie a letter informing her that although she was age 18 and thus MPS could not compel her to attend, MPS encouraged her to continue attending and offered to provide Melanie with additional services under her 504 plan. (Ex. 214A at 94552.) The letter closed, "The district is prepared to provide any necessary accommodations to ensure that you receive appropriate educational services." (Ex. 214A at 94552.)

While at MPS, she was not provided information on how to create a resume or how to look for a job, but was given career exploration opportunities in her junior year. Right now, at age 19, Melanie is not interested in looking for a job, and does not have any ideas as to what she might like to do for a career in the future, although she is interested in forensic science.

**L. Bryan E.**

Bryan is currently 20 years old. He was not found eligible for special education until the 9th grade. Prior to that he was required to repeat the 5th and 7th grades and at other times he was promoted although he did not meet requirements. Beginning in about 5th grade, Bryan was frequently truant because he did not like going to school. When he was at Marshall High School, Bryan was mistakenly placed in a special education class. When the mistake was discovered, he was placed back into regular education and the work was harder.

After three requests by his mother, he was placed into special education and Bryan came to like school better and did not miss as often, although he did continue to have problems with attendance. He appreciated the one-on-one support he received and the extra time to complete assignments that he received as part of his IEP. The issue of compensatory education was never

19

brought up at any of his IEP meetings, although he was frequently assisted by an advocate from DRW. In November of 2006, Bryan was determined to be no longer eligible for special education. He later contested this determination and was placed back into special education.

Bryan graduated from Community High School with a regular education diploma in June of 2007 despite testing at the academic level of a student in 6th or 7th grade. Since graduation, Bryan has had various unskilled jobs, but is currently unemployed and acts as the primary caretaker for his daughter. Prior to graduation, Community High School assisted Bryan in searching for college scholarships, filling out college applications, and took him on a college visit. However, Bryan did not receive training on filling out job applications or job shadowing opportunities, but he was provided with an internship at the Milwaukee Art Museum and at a local barber shop. Bryan would like to continue with his education in order to become an electrician.

### M. Dr. Diana Rogers-Adkinson

Dr. Diana Rogers-Adkinson, chair of the special education department at the University of Wisconsin-Whitewater testified as an expert for the plaintiffs. Dr. Rogers-Adkinson previously served as an independent educational evaluator for New Berlin public schools as part of a 6-month IEP process, and has been part of a compensatory education determination for a student in Kenosha. She was also an expert witness in a case in Kansas where summer school was ordered as compensatory education.

Dr. Rogers-Adkinson described special education as being distinct from general education because special education provides a very specialized service that is geared towards the individual student and is tailored in a manner to be most beneficial to that student. A student is required to have a disability and a need for special education services in order to qualify; in other words; it is possible to have a disability that does not translate into a need for special education. It is not

uncommon for schools to utilize a system of pre-referral interventions as part of the general education process, before deciding to refer a student to special education.

Students who are in special education at age 14 under Wisconsin law, or age 16 under federal law, may also be provided with transitional services geared towards enabling the student to develop the necessary skills to be a productive member of society. These may include a wide variety of services such as job coaching or shadowing, recreation and leisure skills, or assisting the student in obtaining vocational rehabilitation. These services may be provided by the school or an outside community organization.

Turning to the issues in Phase III of this case, the age of the child when the denial of FAPE occurs is significant in determining the impact of such denial. The impact of denial of FAPE early in a student's educational career, for example between ages 5 and 8 when the child is learning primary literacy skills, may be more significant. A lag in early skills can compound later deficiencies. The impact of being denied FAPE may have an impact even after a child's eligibility for special education is determined, as it may be more difficult to re-engage the child in the educational process. This can lead to the student being frustrated, which may lead to increased truancy or disruptive classroom behavior.

Compensatory education is the remedy for a child who has been denied FAPE. Determining the level of compensatory education that is appropriate for a denial of FAPE requires a determination of where the student would be had he received appropriate special education services. Compensatory education services can cover a broad spectrum. Dr. Rogers-Adkinson testified that compensatory education services can be provided to students who graduated from high school with a special education diploma or even to persons over age 22. She does not have any personal experience in providing compensatory services to students who either graduated from, or dropped out of, high school.

Addressing the question of whether MPS provided compensatory education to the class, Dr. Rogers-Adkinson updated her prior analysis built upon the records and methodology that she relied upon in Phase II. (See Expert Report, Ex. 445.) In regard to the 96 student files she reviewed, she now identified a pattern for the students who were suspended more than 10 days of not being provided compensatory services, even though some of these students were found eligible for special education. (Ex. 445, Appendix A.) Tables 1-8 in her report were created by an independent statistician; Dr. Rogers-Adkinson did not independently verify the statistician's work.

Dr. Rogers-Adkinson also reviewed 316 files of students who were considered for compensatory services in MPS. As a result of this qualitative analysis, Dr. Rogers-Adkinson was not able to identify any pattern regarding the decision to award or deny compensatory services. Dr. Rogers-Adkinson did not find any clear rationale for the failure to provide compensatory services for 80% of the students. For the students she could determine the rationale for denial, 4 were denied because the IEP team felt that significant harm did not result from the delay, and others were denied because the IEP team felt the student was making adequate progress.

In Dr. Rogers-Adkinson's opinion it is necessary to evaluate whether a student needs compensatory services every time there is a denial of FAPE.

To support her conclusions, Dr. Rogers-Adkinson provided examples from various student files, which in her opinion, contained deficient compensatory education determinations. She pointed to a student who was denied compensatory services because he was receiving double the services called for in his IEP. (See Ex. 411.) Dr. Rogers-Adkinson testified that simply doubling special education is not necessarily an appropriate means to compensate for a prior denial of FAPE because it is not necessarily providing the student with what was lost. Additionally, it may result in further deficiencies because it requires a decrease in regular education services.

Dr. Rogers-Adkinson also noted that MPS inappropriately planned for suspensions in advance for a special education student by stating in his IEP that he should receive one hour of services after school for every day the student was suspended. (See Ex. 421.)

Another student was determined not to need compensatory services because, although his evaluation was delayed, he went through the problem solving model. (See Ex. 408.) Dr. Rogers-Adkinson regarded this approach as inappropriate because the problem solving model is part of regular education and regular education cannot substitute for special education.

Dr. Rogers-Adkinson also testified that she reviewed the files of the named plaintiffs in this action, Jamie S., Melanie, and Byran, and determined that compensatory services were never discussed for any of these students.

In the opinion of Dr. Rogers-Adkinson, MPS' compensatory education guidelines, as set forth in its IEP Team Procedural Handbook, (Ex. 402), are deficient because, although they provide a variety of examples, they do not provide very specific guidelines for helping the IEP team make its decision. She pointed to the fact that, for example, IEP teams were finding that compensatory services were not necessary because the student was receiving twice the services called for under the IEP, as evidence that there was a general misunderstanding of compensatory education among IEP teams.

As a remedy for the class, Dr. Rogers-Adkinson testified that, in her opinion, compensatory services must be delivered on a 1:1 basis where the amount of compensatory services received is equivalent to the time period the student was denied FAPE. She testified that this approach would be necessary because of the size of the class. It should be noted that her 1:1 recommendation was offered for the first time at trial and did not appear in her report. It appears that Dr. Rogers-Adkinson's opinion that compensatory services on a 1:1 basis are appropriate originates from a single sentence in a single article. In "Punitive Damages in Special Education," by Antonis

23

Katsiyannis and Maria Herbst, published in 2004 in the *Journal of Disability Policy Studies*, in discussing the Supreme Court's decision in <u>Barnes v. Gorman</u>, 536 U.S. 181 (2002), a case brought under the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), the authors stated, "Using a contract law analogy—when a contract is broken, the promise should be enforced to put the parties in a good position, as they would have been had the contract been fulfilled—the court [sic] held that punitive damages are not compensatory and are therefore not embraced by that rule." (Ex. 460A at 11.) From this sentence, Dr. Rogers-Adkinson concluded that compensatory services must be provided on a 1:1 basis.

However, on cross-examination, Dr. Rogers-Adkinson acknowledged that not all students progress at the same rate and the age at which a student was denied FAPE may be significant in determining what, if any, deficiencies the student may have as a result of that denial. Further, Dr. Rogers-Adkinson acknowledged that special education does not resolve every student's deficiencies, even if the IEP is appropriate.

In order to implement remedies, Dr. Rogers-Adkinson recommended an oversight monitor be put into place, a checklist be developed to assist the IEP teams in their compensatory education determinations, additional training for IEP teams members, and methods be developed to ensure that regular education did not suffer as a result of compensatory education. She also recommended increased alternative interventions to address the continuing problem of suspensions.

In regard to the category of suspended students, Dr. Rogers-Adkinson recommended that students who have never been evaluated for special education should be automatically referred for special education evaluation if they were suspended more than 10 days in a school year. This should be done even if the student is performing at grade level and there are no other indicators, because 10 days of suspensions signals a child may be in need of special support and services. On cross-examination, she did acknowledge that it is necessary to determine in every case if there is a

24

link between the suspension and the potential special education need. Further, she acknowledged that if there is not a reasonable suspicion of disability it would be "unfair" to force the child to undergo the experience of a special education evaluation.

MPS provided numerous examples to which Dr. Rogers-Adkinson acknowledged that a variety of factors would affect whether any of those exemplar students would be entitled to compensatory services. Dr. Rogers-Adkinson acknowledged that the student's specific disability, current life situation, external stressors, rate of learning, progress on IEPs, behavior, attitude, and tolerance for programming would all be factors that would need to be considered in determining what, if any, compensatory services are necessary for a student who was denied FAPE.

Dr. Rogers-Adkinson emphasized that not being provided FAPE is a substantive denial. This means that a student's willingness to participate should not be considered in determining whether compensatory education is needed.

### N. Jyran J.

Jyran's behavior problems began in elementary school. He acted out to get attention. He was frequently suspended and received bad grades. He repeated 3rd grade three times and became embarrassed because he was older than the other students. He felt his failures were not his fault because teachers refused to help him and instead chose to suspend him. When he transferred schools and was placed into 7th grade, he was placed into special education. School was difficult because he missed out on the things he should have learned in 4th, 5th and 6th grades, but the teachers were helpful.

Jyran transferred schools again and at this new school his primary teacher took the time to work with him one-on-one, and this was helpful. He got into a fight at this school and transferred to another school. Coincidentally, the teacher who was particularly helpful to Jyran transferred with him and continued to work with him.

25

Jyran is now in 9th grade at yet another school. He is 17 years old, and he continues to miss a lot of school. He feels that the school does not care about him and so he does not go. For example, he felt he worked hard and should have passed the 9th grade but nonetheless was retained. When he does go, he does not understand certain elementary matters in subjects such as math. He is embarrassed to ask questions in class and so instead walks out of the classroom. Jyran feels he needs one-on-one attention.

Jyran likes to work on computers and believes that an online school might be beneficial. He wants to graduate and would be willing to accept one-on-one tutoring at home.

**M. Dr. Eric Hartwig**

Dr. Eric Hartwig, Marathon County's Administrator for Pupil Services, testified as an expert for MPS. He supervises 110 employees who work in special education in six rural school districts in Marathon County, Wisconsin. The largest district he oversees, Marathon School District, has approximately 80 special education students. He regularly participates in IEP meetings. In preparation for his testimony, Dr. Hartwig met with Melanie and reviewed various student files. He also reviewed the professional literature for discussions of the issue of compensatory education but realized that there is a dearth of information. Therefore, his opinions regarding special education were shaped, in large part, by prior court cases. None of the cases he relied upon were class actions. His expert report was received as Exhibit 455.

In reviewing Dr. Rogers-Adkinson's report, Dr. Hartwig found it remarkable that it had only a single citation and that citation was to an opinion piece. An opinion piece is not subject to the same sort of rigorous scrutiny to which a peer-reviewed article is subjected. Dr. Hartwig also noted the limitations of a records review, such as the one conducted by Dr. Rogers-Adkinson. It is one-dimensional, capturing only the opinion of the writer at an isolated point in time, the records are frequently incomplete, and the records often times focus primarily upon problems rather than

26

presenting the entire portrait of the student. In Dr. Hartwig's opinion, it would be inappropriate to conclude that any student needed compensatory education based solely on a review of records, as conducted by Dr. Rogers-Adkinson.

According to Dr. Hartwig, the process for making a compensatory education determination is identical to that necessary for crafting the IEP, and it is necessary to evaluate the student's individual needs. Ultimately, the goal of compensatory education is to put the student in the position he would have been had he not been denied FAPE. (Ex. 455 at 7.) Dr. Hartwig noted that the idea of compensation underlies many special education determinations; for example, frequently an IEP team is initially convened only after a student has failed over a period of time, and thus every initial IEP seeks to remedy this lack of services and thus special education is inherently compensatory. He emphasized that compensatory education must look forward; after determining the child's present level of performance, it must be determined what is needed prospectively by way of compensatory education.

Dr. Hartwig dismisses any formulaic approach. In other words, in determining the level of compensatory services a student may receive for a denial of FAPE, it is inappropriate to simply provide a student with one minute of additional instruction for every minute lost because one minute of instructional time does not necessarily equal one minute of engaged instructional time. Rather, when determining the level of compensatory services, it is necessary to consider many variables, including the student's level of engagement. A formulaic approach may be useful in establishing a framework for determining compensatory services but individual tailoring remains necessary.

In his own review of the professional literature on the subject, Dr. Hartwig found no support for Dr. Rogers-Adkinson's conclusion that compensatory services should be provided on a 1:1 basis

or any support for the plaintiffs' contention that compensatory services provided should be rounded up to the next semester on a 1:1 basis for every semester for which a student was denied FAPE.

Dr. Hartwig noted that Dr. Rogers-Adkinson's failed to rely upon scholarly research for her conclusions and this impeded her ability to make a recommendation. Dr. Hartwig said that often times her statements lacked foundation or were counter-intuitive; he described Dr. Rogers-Adkinson's method of analysis as "like shooting at a barn and then drawing a bull's eye around it after it was over."

Dr. Hartwig testified that only the IEP team can determine whether compensatory education is appropriate for a student, and if so, what sort of services are appropriate. A compensatory education determination for a member of the class would be uniquely challenging because so much time has passed since the denial of FAPE.  As for the process to be implemented to meet this challenge, Dr. Hartwig did not reject plaintiffs' recommendation for an outside monitor, but opined that this is often a cumbersome procedure.

Further, Dr. Hartwig testified that Dr. Rogers-Adkinson's recommendation that all students who were suspended 10 or more days a year should be automatically referred for an evaluation totally misconstrues the notion of individual analysis that underlies special education. Misconduct is not synonymous with disability.

In his review of Melanie's records, discussion with staff who interacted with Melanie, and his meeting with Melanie, it is Dr. Hartwig's opinion that Melanie does not need compensatory education because she was provided with a program that met her educational needs. Of particular importance to Dr. Hartwig was the fact that Melanie was dismissed from special education. Dr. Hartwig also offered his impression regarding various other students based upon his review of their records, but acknowledged that this was no substitute for an IEP team meeting.  In this regard, the

court finds that Hartwig's records review "impressions" do not advance the issues being considered. They are no more than random comments. (See Ex. 455 at 30-42.)

### N. Patricia Hall

Patricia Hall ("Hall") is in her third year as a special education teacher at Wisconsin Career Academy. Overall, she has 10 years of teaching experience. She first met Jamie S. last school year, which was Jamie's first year in high school. Since then, she has been Jamie's special education teacher, except for the second semester of last year when Hall was on medical leave. Jamie is currently repeating 9th grade; she failed 9th grade because of attendance issues. Her attendance problems have continued this year. So far, Jamie was at school only three full days.

Hall has talked to Jamie about the things going on in Jamie's life including discussions about problems at home and about Jamie's group of friends at school with whom she socializes on the weekends. Jamie has never discussed being teased with Hall, nor has Hall witnessed or heard of such incidents from other staff members. Hall speaks with Jamie's mother roughly once a month and would frequently contact her by sending written information to her.

As for Jamie's post-high school plans, Jamie used to want to go into child care but has recently expressed interest in becoming a certified nursing assistant like her mother. When Jamie was still interested in working in child care, Hall did a class with her exploring issues relating to working with young children. Jamie was also given the opportunity to work at Boston Store, an opportunity usually limited to 11th and 12th graders, but Jamie failed to appropriately attend school, which was a requirement to take advantage of this opportunity.

Hall has participated in Jamie's IEP team meetings and describes Jamie as a very verbal and active participant in these meetings. Jamie's mother was also present and participating. In part, Jamie's IEP calls for her to get one-on-one assistance and Hall is the one to provide that assistance. Jamie is given the opportunity to work on a computer in the special education room but her activity

is monitored and Hall has never observed Jamie on websites such as Facebook or Blink. In Hall's opinion, Jamie has made good progress when considering her cognitive disability. In fact, she may be nearing her cognitive level, although there are still some goals to reach.

Jamie has received various other accommodations such as a later start time and a community awareness class where Jamie was very involved in a project raising money and purchasing toiletries for a community organization. Jamie was also given the opportunity to participate in group and individual counseling; Jamie chose not to. No one has ever objected to the services Jamie receives. Further, no one has raised the issue of compensatory education or suggested that she pursue online education or home tutoring.

### O. Roxanne Mayeur

Roxanne Mayeur is employed at Community High School as its Special Services Administrator. Community High School is a charter school within MPS that is run by its teachers rather than a single administrator and emphasizes social justice and community involvement. Students are required to participate in some sort of community service at least once a week. This component is designed to build skills that will enable the student to transition into a professional environment. Community High School helps all its students in gaining vocational training, completing job applications, writing resumes, exploring career interests, completing college applications, and visiting colleges.

Mayeur has known Bryan E. since 2004, when Community High School opened. Mayeur describes their relationship as a good one and he discusses with her the problems he is having. Bryan has an interest in art and Mayeur's teaching background is in art; therefore, she has had several classes with him. Bryan has done well in these classes, including an advanced art class where he designed clothes and developed an art portfolio. In light of Bryan's interests, he was given the opportunity to complete his community service at the Milwaukee Art Museum. He later

30

expressed interest in working at a local barbershop and the school approved a placement arranged by Bryan's family.

Mayeur has attended Bryan's IEP meetings, and Bryan has been an active participant in these meetings. In November of 2006, the IEP team concluded that Bryan was on par with his peers and on pace to graduate. The team recommended that Bryan was no longer eligible for special education, and neither Bryan nor his advocate from DRW objected. Subsequently, Bryan stated that he wanted to return to special education. Another meeting was convened, and Bryan was returned to special education; there was no lapse in services. At no point was the issue of compensatory education ever raised.

Bryan was found to be eligible for graduation, but was not at a 12th grade level in any subject when he graduated. According to Mayeur, such deficiency in grade level is not uncommon for a regular education student at Community High School. So even though his IEP goals did not require Bryan to be at a 12th grade level, he was on par with his regular education peers.

**P. Sara Janacek**

Sara Janacek ("Janacek") is the school psychologist at the Milwaukee School of Languages where she has known Melanie since 2002. Janacek attended all of Melanie's IEP meetings. In Melanie's November 2006 IEP meeting, the team, which included Melanie, her mother, and her attorney, concluded that Melanie should be dismissed from special education and a Section 504 plan be put in place. This Section 504 plan included accommodations similar to those provided under the IEP.

During the 11th grade, Melanie began having significant problems completing assignments and her grades declined. She expressed her frustration with school to Janacek and discussed plans of dropping out and pursuing her GED. Melanie had frequent problems with attendance throughout her

time in special education and under the Section 504 plan. At some point after she turned 18 years old and MPS was no longer able to compel her to attend, she completely stopped coming to school.

Melanie never requested that the IEP team be reconvened following her dismissal from special education. At no point did she or her attorneys request a due process hearing.

### Q. Dr. Barbara Van Haren

Dr. Barbara Van Haren is the Director of Special Education Services for Cooperative Educational Service Agency ("CESA") #1 in Brookfield, Wisconsin, (Ex. 451), and testified as an expert on behalf of MPS. CESA #1 provides services for 45 school districts, including MPS, and acts as an intermediary between DPI and the local school districts, providing the districts with the special education services and support they might not be able to provide on their own. Previously, Dr. Van Haren worked as a middle school special education teacher and a director of special education services and an assistant superintendent of pupil services. Her expert report was received as Exhibit 454.

Dr. Van Haren was asked to review Dr. Rogers-Adkinson's conclusions regarding compensatory education. Dr. Van Haren concluded that Dr. Rogers-Adkinson relied upon numerous erroneous assumptions. For example, Dr. Rogers-Adkinson erroneously concluded that post-secondary education may be appropriate compensatory education. Dr. Van Haren testified that it is a school district's responsibility to provide transitional services that may lead to post-secondary education, but the district is not responsible for providing that education. Dr. Van Haren has never seen post-secondary education ordered as compensatory education. She is not aware whether Chapter 118 of the Wisconsin Statutes provides for tuition to technical colleges for at risk students. Further, Dr. Van Haren disagrees with Dr. Rogers-Adkinson's conclusion that special education is the only remedy for students who are not successful; many students may struggle for reasons other than a disability and there are programs and interventions available to assist those students.

As for Dr. Rogers-Adkinson's conclusion that compensatory services should be provided to students with a history of suspensions, Dr. Van Haren found this conclusion overbroad. Students may be suspended for a wide variety of reasons that have nothing to do with a disability.

In Dr. Van Haren's opinion, an IEP team asked to determine whether compensatory education is appropriate must consider numerous factors including, whether the student was denied FAPE, the type of services the student received, the services the student was denied, the students academic and attendance records, the time between the denial of FAPE and the remedy, opportunities and participation in additional services such as summer school, after school programs, or other compensatory services, and the student's progress on IEP goals. (Ex. 454 at 8.) Further, in her opinion, Dr. Rogers-Adkinson's conclusion that compensatory services should be provided on a 1:1 basis fails to consider the student as an individual.

Dr. Van Haren also reviewed individual student records as well as interviewing those students and key staff involved in the students' education. In her opinion, Bryan is not eligible for compensatory education because she saw no timeline violations in his referral process. Even if there was a denial of FAPE, compensatory education is not appropriate because he made appropriate progress on his IEP goals and graduated. Further, Dr. Van Haren disagreed with Dr. Rogers-Adkinson's conclusion that Bryan was subjected to "excessive" suspensions; Bryan was suspended only twice. In her interview with Bryan, he reported that he felt he needed special education once he got into high school; however, Dr. Van Haren acknowledged that it is unusual for a learning disability to first appear at age 15. Ultimately, she conceded that she does not know whether Bryan should have been referred earlier.

As for Jamie, Dr. Van Haren believes that Jamie may be eligible for compensatory services based upon a delay in her referral. In Dr. Van Haren's opinion, Jamie should have been referred after testing indicated she might have a mild cognitive disability; the referral occurred roughly two

months later. She believes that Jamie might receive a benefit if she participated. She recognized that Jamie's truancy is severe and frequent and conceded that a functional behavioral assessment in regard to this problem might be warranted.

In regard to Dr. Rogers-Adkinson's conclusion that Jamie should receive three years of compensatory education, Dr. Van Haren disagreed since there was only a two-month delay in referral. In Dr. Van Haren's interview with Jamie, she discussed summer school and Jamie stated that she did not feel summer school was necessary and she preferred to spend her summers in Chicago. Further, although Jamie continued to have significant academic problems, in Dr. Van Haren's opinion, this did not indicate that the IEP was inappropriate, especially in view of her significant absences.

Based upon her review of these and other student records, she was unable to discern any pattern within MPS with respect to handling compensatory education determinations.

**R. Dr. Cindy Walker**

Dr. Cindy Walker is a professor at the University of Wisconsin – Milwaukee where she teaches numerous courses including Educational Statistics, Techniques of Educational and Psychological Measurement, and Techniques of Educational Research. (Ex. 450.) She testified as an expert on behalf of MPS. Her expert report was received as Exhibit 453.

Dr. Walker reviewed Dr. Rogers-Adkinson's report to determine whether her analysis was sound from a methodological point of view. Dr. Walker pointed to numerous deficiencies in Dr. Rogers-Adkinson's methodology. As an initial matter, Dr. Rogers-Adkinson failed to explain her methodology in a manner that would allow a subsequent researcher to replicate her work.

Dr. Walker described qualitative research as intended to discern on a micro level what is happening in a specific situation. This is distinguished from quantitative research, which is typically utilized when the researcher seeks to generalize the research to a larger population and is conducted

on a much larger scale. The only way that a research finding can be generalized to the population as a whole is if the population studied was selected as the result of random sampling.

Random sampling is distinguished from purposive sampling, which is utilized when a researcher is attempting to answer a specific research question that might not lend itself to the use of a random sample. For example, if the target population is small, it might not be appropriate to utilize a random sample.

Given the size of the sample, Dr. Rogers-Adkinson utilized purposive sampling and engaged in quantitative analysis but then attempted to call it qualitative. Dr. Walker also found it inappropriate that Dr. Rogers-Adkinson relied upon statistical data that she did not verify. Further, Dr. Walker considered it inappropriate for Dr. Rogers-Adkinson to utilize in Phase III the same research design she utilized in Phase II because the research questions being asked in these respective phases were very different.

In Dr. Walker's opinion, the question being presented in Phase III, whether all members of the class should receive compensatory education, is not the type of question that could be answered through a review of a few select files and then generalized to the entire population. It is not a question that lends itself to generalizations but rather would require a review of each individual file.

**S. Patricia Gill**

Patricia Gill ("Gill") is a Student Services Coordinator at MPS and works particularly on matters involving student discipline and expulsion. On a daily basis, schools provide her with records of disciplinary actions, and if it appears that an expulsion hearing is forthcoming, she begins the expulsion process. The first step is to review the student's computer records to determine whether the student is in regular or special education. If the student is in special education, a separate process at the school level occurs. If the student is in regular education, the expulsion process continues with the scheduling of an investigative interview.

At times, a student who was previously in regular education may be identified as possibly being eligible for special education during the expulsion process. If this were to happen, the expulsion process is either returned to the school or the student is placed into an interim placement while the referral is completed.

Gill discussed Pheng, a student who received As and Bs, and received report cards stating that he was never a problem in class, but who was suspended for 15 days pending an expulsion hearing for possession of marijuana. Prior to that, he was suspended on two other occasions for 2 days each. (Ex. 449.) Gill also discussed Greg, a student who was suspended for 13 days pending his referral for expulsion for possession of marijuana. Years earlier, he had been suspended for three days. At the time of his referral for expulsion, Greg's grades ranged from a B to two Us. Neither Greg nor Pheng were expelled and both graduated from MPS.

Although Pheng and Greg were suspended more than 10 days during the period purportedly covered by Exhibit 400, inexplicably, neither of these students were listed on Exhibit 400.

**T. Stephanie Petska**

Stephanie Petska ("Petska"), DPI's Director of Special Education, testified that DPI does not have any guidelines regarding the delivery of compensatory education. It is for the IEP team to analyze each case on an individual basis to determine whether compensatory education is appropriate and if so, what form that compensatory education should take. The use of a formula to determine compensatory education would be inappropriate. The student's age and health, severity of disability, the specific services the student did not receive, the student's pre-referral progress, early intervention services provided, and the length of the delay are just some of the factors that the IEP team should consider in making any compensatory education determination. In determining whether compensatory education is appropriate, the IEP team must determine whether the student

should have been referred for special education earlier than he was. The IEP team should try and ascertain this date because FAPE was not being received during this period.

A referral to special education is appropriate when there is reasonable cause to believe that the student has a disability. In certain situations, a single factor might be sufficient to warrant a referral. However, simply because a student was suspended for 10 days, alone, would not be sufficient to warrant a referral. Rather, suspensions should be one factor to be considered among others in determining whether a referral is appropriate. This could be a difficult determination to make.

DPI does not have any guidelines relating to providing post-secondary education as compensatory education. However, although post-secondary education is not required, it also is not prohibited. It might be provided in the appropriate situation.

DPI has never reviewed MPS to assess its compensatory education determinations. It has no opinion as to whether MPS has effectively provided compensatory education for students between 2000 and 2005.

## III. PLAINTIFFS' PROPOSED REMEDY

Plaintiffs seek the appointment of an independent monitor, in addition to the independent monitor called for under the settlement with DPI, who will be paid for by MPS. (Docket No. 540-2.) The monitor will be able to order MPS to take corrective action and to report to the court any failures of MPS to comply. (Docket No. 540-2.) This independent monitor will provide both parties with monthly reports indicating the class members that have received compensatory education, the amount of compensatory education received, and the results of all initial evaluations of class members. (Docket No. 540-2.)

The plaintiffs seek a written notice to be provided directly to the last known address of each potential class member

including all students whose initial evaluation for special education exceeded statutory guidelines anytime during the period September 2000 through June 2005, all students who were initially found eligible for special education since that time, all students who were suspended 10 or more times in any one school year between September 2000 and June 2005, and were not evaluated for special education eligibility.

(Docket No. 540-2.) Further, the plaintiffs seek the creation of a separate fund, in the amount to be determined by the parties and the outside monitor, to be used to fund compensatory education. (Docket No. 540-2.)

As for class members who have aged out of MPS or are no longer residents of the district, the plaintiffs seek compensatory services depending upon the length of time they were denied appropriate services, which may include:

1. Tuition and support for post secondary technical college or university

2. Provision of functional community based assessments to determine current needs, recommendations for employment, benefits analyses, community participation.

3. Training on self-determination and self-advocacy from providers such as People First.

4. Passport to Employment program at Creative Employment Opportunities.

5. Job Internship series- 3 internships of 40-60 hours each, minimum of 10 hours per week in multiple areas of interest such as retail, office, construction, factory, etc.

6. Job placement and training.

7. Job coaching.

8. Life skills training such as budgeting, money management, food planning and preparation, shopping, transportation, self-advocacy, etc.

9. Life planning assistance- includes employment, independent living, life skills, etc.

10. Provision of technology such as computers, internet access, software programs, and assistive technology.

(Docket No. 540-2.)

As for class members who are current MPS students, the plaintiffs seek compensatory services that may include:

38

1. Any of the services mentioned . . . above especially with regard to transition age students.

2. Tutoring through outside programs such as Sylvan, Huntington's Learning Center, Marquette, possibly Boys and Girls Clubs, including transportation.

3. Summer Camps, such as Easter Seals, YMCA, UW Whitewater, etc. including transportation if necessary.

4. Tuition for private schools such as Cradwell, Wisconsin Lutheran, or St. Francis Children's Center.

5. Mentoring services-such as Running Rebels.

6. Community based specialized services such as occupational therapy, physical therapy, or speech and language therapy.

Additionally, all class members shall be assured of their 1st Choice of 3 Choice list after parents are provided with information of the school's performance, its special education performance and the nature of special ed service offered at that school.

(Docket No. 540-2.)

The plaintiffs also seek that MPS "fund the services of at least 5 new community based (independent of MPS) parent advocates to assist at all compensatory service determination meetings, all initial IEP meetings for newly referred class members . . ." and that "[a]ll students receiving compensatory services under this agreement shall be assigned an expediter (paid for by MPS) whose duty and authority is to ensure that the compensatory services are delivered in a timely and appropriate manner." (Docket No. 540-2.)

As for the students who have not yet been found eligible for special education, MPS shall evaluate for special education all students who were suspended 10 or more times in any one school year between September 2000 and June 2005 who have not yet been evaluated for special education eligibility. (Docket No. 540-2.) "A parent advocate . . . will be provided for all initial IEP evaluation meetings and the record shall contain complete information about all efforts including adjusting times and locations to ensure parental involvement." (Docket No. 540-2.) Students who become

eligible as a result of this identification process shall be entitled to receive compensatory education in accordance with the terms set forth above. (Docket No. 540-2.)

As for the named plaintiffs, the plaintiffs seek compensatory education services that include, for example, the provision of laptop computers with software and a high speed internet connection, YMCA membership, educational aides to work with the named plaintiff at home, school, and during extracurricular programs, college education at the school of the plaintiff's choice, job placement, and life skills training. (Docket No. 540-2.)

As part of their post-trial briefing, the plaintiffs submitted an amended proposed remedy. (Docket No. 585-2.) In this revised proposed remedy, the plaintiffs outline additional responsibilities for the outside monitor, which would include developing screening tools to determine whether students who were suspended 10 or more days during a school year or respond to the class notice contending that they should have received special education should be provided with a full special education evaluation, to determine when students who were delayed entry into special education should have been referred for special education, and a tool for IEP teams to utilize in determining what sorts of compensatory services a student should receive. (Docket No. 585-2 at 1-2.)

Further, in its revised proposed remedy, the plaintiffs "clarify that not all students who had extensive suspensions are eligible for compensatory education. Students must first be found eligible for special education before they could be considered for compensatory education." (Docket No. 584 at 2.) Finally, the plaintiffs acknowledge "that there may be situations in which the denial of FAPE was *de minimis* and compensatory education is no longer necessary." (Docket No. 584 at 2.)

## IV. MPS' PROPOSED REMEDY

Under MPS' proposed remedy, (Docket No. 552), MPS divides those eligible for compensatory services into three distinct categories:

1. Students enrolled in MPS on the date of the remedy is approved by the court who, while in Kindergarten through Grade 5 who were suspended at least 15 days or while in Grades 6-12 were suspended at least 25 days between September 13, 2000 and June 30, 2005 "[w]ho are eligible for special education services on the date on which" the remedy is approved by the court, whose IEP team has not previously determined that compensatory services were necessary due to a delay in a referral for special education.

2. Students enrolled in MPS on the date of the remedy is approved by the court whose initial evaluations took longer than ten days beyond the statutory time limit without a valid extension who are eligible for special education services on the date the court approves the proposed remedy, whose initial evaluations occurred between September 13, 2000 and June 30, 2005, and whose IEP has not previously made determinations as to whether compensatory services were necessary due to a delay in a referral for special education.

   a. If the student's initial evaluation was delayed between 10 and 30 days, the student shall receive a general notice, which shall include, for example, publication on party websites, posting in MPS's buildings, and distribution to local media.

   b. If the student's initial evaluation was delayed more than 30 days, the student shall receive an individualized notice sent to the student or parent.

3. Students who were found to be initially eligible for special education by MPS between September 13, 2000 and June 30, 2005 but whose initial evaluation was improperly delayed more than 30 days, and who reside within the geographic boundaries of MPS and are not yet 22-years-old on the date the remedy is approved by the court, and did not graduate, shall receive an individualized notice.

41

For each of these students, an IEP Team shall be convened to determine if the student was denied FAPE as a result of his or her delayed referral to special education and to determine if compensatory services are necessary to remedy any deficiency. If the IEP Team cannot agree as to whether compensatory services are necessary or the type of compensatory services that are necessary, the parties shall go to binding arbitration.

MPS and DPI shall establish a fund to ensure that funds are available for compensatory services with DPI and MPS contributing equally.

## V. ANALYSIS

All told, this case has been pending for roughly 7½ years, consisted of 28 days of trial, generated a transcript that is nearly 5,000 pages long, involved tens of thousands of pages of exhibits, and, as is outlined, in part, above, resulted in many, many, motions by the parties and consequently decisions and orders by this court. Now, the court is in a position to take a final step towards resolving this case.

Upon reviewing and considering the evidence presented, remedial intervention by the court is required. Although Director of Special Services Yahle's testimony indicates that MPS is now paying more attention to the issue of compensatory education when there is a delay in completing an evaluation, the evidence demonstrates that MPS has a long way to go.

MPS' own procedural handbook calls for the IEP team to consider whether compensatory services are appropriate whenever "a student has received inappropriate or insufficient services," (Ex. 402 at 247), but the evidence demonstrates that this infrequently occurs. Exhibit 401 identifies hundreds of students whose initial evaluations were delayed beyond the statutory deadline between September of 2000 and June of 2005, but there is a "Y" in the "Discussed Comp Ed" column in only a miniscule percentage of cases. Further, a "Y" in a column on a spreadsheet offers no insight into the nature of the discussion or if compensatory services were provided.

Case 2:01-cv-00928-RTR   Filed 06/09/09   Page 42 of 72   Document 598

Even now, after this case has been pending for years, and nearly two years since this court determined that MPS was liable for its systemic violations of the IDEA, MPS has not demonstrated that it has taken steps to evaluate whether compensatory services for a denial of FAPE are appropriate for all the members of class. Although MPS conducted an audit of the files of students whose initial special education evaluations occurred more than 90-days after the initial referral without a valid extension between September 1, 2000 and April 1, 2004, to determine whether there was a need for compensatory services, (Ex. 461), this audit was significantly narrower than the entire class. Further, Potter, MPS' Coordinator of Psychological, Speech, Language, and Health Services, testified that following this court's Phase II ruling, MPS did not provide any specific training as to how IEP teams should assess whether compensatory services are appropriate for class members. (See Docket No. 567 at 195-96.) Thus, MPS has failed to demonstrate that it is taking appropriate steps to comply with its obligations under the IDEA to remedy a denial of FAPE suffered by class members. MPS has had more than ample time to provide a remedy on its own; the only option left is a court ordered remedy.

As demonstrated by the testimony and the parties' proposals, this will not be an easy task. It is one that involves many considerations. In structuring the appropriate remedy in this case, the court must resolve many issues, both logistical and substantive. The former includes the method of notification and the latter includes the method to be used for evaluating whether those class members whose entry into special education was delayed are in need of compensatory services, and if so, what sort of compensatory services are required. For those who have not as yet been determined to be eligible for special education, what type of additional evaluation will be required? The remedy proposed by the plaintiffs is broad and comprehensive whereas the remedy proposed by MPS far more limited. It is the conclusion of the court that the appropriate remedy lies within the two extremes proposed by the parties.

In broad terms, it is the conclusion of this court that the establishment of an additional special education system providing relief to class members is not necessary. Such a system would, in a sense, piggyback the existing structure and plaintiffs have failed to demonstrate such a broad framework is warranted. Instead, the court believes that development of a remedy structure that to the extent practical parallels the well-established existing structure for determining eligibility and a student's special education plan under the IDEA is a more workable approach. Moreover, the court finds that a deviation from the IDEA's procedural requirements would be inconsistent with the spirit if not the letter of the Act. Thus, for example, the court finds it inappropriate to impose a condition of binding arbitration as a class member's exclusive means of remedying a dispute. The IDEA sets forth a comprehensive and well-established procedural framework that is familiar to participants in the special education system and provides a practical foundation upon which to base the court's remedy in this case. In essence, this court's conclusion that MPS systemically violated the IDEA during the class period "resets the clock" for class members, and thus permits class members to pursue relief through the court ordered remedy set forth here that might be otherwise time barred.

### A. Evaluation of Class Members

All persons who shall receive or respond to a notice may not be class members. Even if they are determined to be class members, compensatory services may not be appropriate. And finally, even if they are class members and are entitled to compensatory services, not all class members are entitled to the same compensatory services. Thus, it is necessary for this court to establish the framework for a system whereby these difficult individualized questions may be answered.

#### i. *Independent Monitor*

As a preliminary matter, the court must address the question of whether it is necessary to appoint an independent monitor to oversee the court ordered remedy. The court does not believe

that MPS will accomplish the task required without outside intervention. Throughout this litigation, MPS had an opportunity to correct the alleged and later established systemic deficiencies in Child Find. Self-correction would have been the best way for MPS to avoid the interventions that it has fought so vigorously to avoid. While MPS has made certain improvements, its efforts have fallen short of the mark. As just one example, if the conduct outlined in Exhibit 401, which includes many pages of late initial referrals without valid extensions and indications that compensatory education was considered in few such cases, constitutes MPS' "best efforts," the court finds it unreasonable to expect that MPS is capable of implementing any court ordered remedy without either the court's direct oversight of every step or the direct oversight of an independent monitor.

Not only would the utilization of judicial resources to undertake the detailed monitoring that shall be necessary to implement this remedy be inefficient, the interests of the class members would be best served if this monitoring is completed by a person with professional expertise in the field of special education, knowledge that even after these many years addressing these issues, this court does not possess, see Mather v. Hartford Sch. Dist., 928 F. Supp. 437, 445 (D. Vt. 1996) (citing Board of Education v. Rowley, 458 U.S. 176, 206 (1982)). This is an exceptional case where the unique requirement of conducting individual evaluations of a potentially large number of class members warrants the appointment of an independent monitor to oversee this remedy. See Thomas S. v. Flaherty, 902 F.2d 250, 255-56 (4th Cir. 1990); see also Amos v. Board of School Directors, 408 F. Supp. 765, 822-24 (E.D. Wis. 1976). Accordingly, pursuant to Federal Rule of Civil Procedure 53, the court shall appoint an independent monitor to oversee the implementation of the court ordered remedy, attempt to resolve issues that may arise between the parties, and to report back to the court as necessary. (Rule 53 refers to "masters." The court uses the term "monitor" here because it is the term used by the parties, and it better connotes the role envisioned by the court. Substantively, the distinction is one without consequence.)

Pursuant to Rule 53(g)(2)(A) and in accordance with Rule 53(g)(3), MPS shall pay all costs associated with the independent monitor. The independent monitor shall be empowered to "regulate all proceedings" necessary to effectuate the court ordered remedy and to "take all appropriate measures to perform the assigned duties fairly and efficiently." Rule 53(c)(1). The independent monitor shall have the primary authority to fill in the details to the framework the court constructs here regarding the means by which purported class members shall be evaluated to determine whether they are entitled to compensatory services. A primary concern for the independent monitor shall be ensuring that this remedy is implemented in an expeditious manner, including establishing deadlines for completing all phases of this remedy, so as to not unnecessarily further delay any relief for class members.

In accordance with Rule 53(d), the independent monitor shall issue orders necessary to effect the remedy the court discusses in more detail below, including, for example, orders appointing permanent members to the hybrid IEP team, and establishing the guidelines that the hybrid IEP team shall apply in making the individualized determinations necessary for each purported class member. Further, in accordance with the Appendix to this Decision and Order, which is incorporated herein by reference, the independent monitor shall be tasked with establishing firm deadlines to complete all tasks necessary to implement this remedy. The independent monitor is authorized to issue orders establishing such deadlines throughout the implementation process.

Although the plaintiffs contend that this independent monitor must be separate from Alan Coulter, the monitor appointed under the settlement with DPI, the court, at this point, makes no determination on the selection. There may be any number of reasons why Dr. Coulter is not an appropriate person to appoint as the independent monitor to oversee the court ordered remedy, but the court shall not disqualify Dr. Coulter ab initio.

The parties shall engage in a good faith effort to agree upon an independent monitor. If the parties are not able to agree, the plaintiffs and MPS shall each submit to the court the name and curriculum vitae of up to two proposed independent monitors for the court to consider. Regardless of whether the independent monitor is proposed by the parties individually or jointly, in addition to providing the curriculum vitae of any proposed independent monitor, the parties shall also submit an affidavit of any proposed independent monitor in accordance with Rule 53(b)(3)(A), as well as information regarding the proposed monitor's rates of compensation for services rendered. Upon receipt of the parties' recommendation, the court shall then issue an order in accordance with Rule 53 appointing an independent monitor.

### ii. *Hybrid IEP Team*

The plaintiffs contend that eligibility determinations should be conducted by "a team appointed by the Monitor that includes special educators from outside of MPS and an independent Parent Advocate" utilizing a "tool" developed by an outside monitor. (Docket No. 585-2 at 1.) MPS contends that these determinations should be conducted by the IEP team. (See Docket No. 552 at 2.) Again, similar to many issues presented in this litigation, the court finds that the acceptable answer lies somewhere in-between the parties' proposals.

It is the conclusion of the court that all questions related to a purported class member's status as a class member, eligibility for compensatory services, and the nature of any compensatory services awarded, shall be resolved by a team that the court shall refer to as a "hybrid IEP team." This hybrid IEP team shall consist of certain "permanent" members, consisting of MPS personnel, approved by the independent monitor, and at later stages of the evaluation, as explained below, "rotating" members who shall be best suited to address the unique needs of the individual class member.

A traditional IEP team is composed of members who are generally unique to each student. In the present case, an entirely unique IEP team for each purported class member may lead to disparate analysis among class members. Further, the questions that this hybrid IEP team will be asked to resolve are different from those an IEP team is traditionally tasked with resolving. Proper resolution will require an understanding of this litigation and this court's orders. It would be grossly inefficient to require each person who may serve on an IEP team to become familiar with this sizable amount of information. Thus, the court finds it appropriate to utilize an IEP team composed of certain permanent members.

Therefore, MPS shall nominate individuals to serve as permanent members of the hybrid IEP team. Then, in consultation and cooperation with the parties, in accordance with the requirements set forth herein and subject to the procedures set forth below, the independent monitor shall enter an order appointing the permanent members of the hybrid IEP team. There shall be, at a minimum, four permanent members of the hybrid IEP team and, to the extent practicable, the hybrid IEP team should be composed of individuals from diverse professional backgrounds, thereby avoiding any potential predisposition to a monolithic perspective and placing the team in the best position to address the wide variety of issues with which it will be faced. For example, the independent monitor may find it appropriate to include on the hybrid IEP team elementary and secondary general and special education teachers, professionals with backgrounds in psychology or social work, as well administrators, as opposed to, for example, only administrators. At least one permanent member shall meet the qualifications set forth in 20 U.S.C. § 1414(d)(1)(B)(iv) and (v). However, the hybrid IEP team need not meet all the formal requirements set forth in 20 U.S.C. § 1414(d). At all phases of the individualized evaluation process, parents and, where appropriate, students should be provided the opportunity to participate, see 20 U.S.C. § 1415(b)(1), and the independent monitor shall establish procedures for ensuring the opportunity for such participation.

48

The court rejects the plaintiffs' contention that this evaluative team must be composed of persons independent of MPS. A certain degree of familiarity with MPS is a virtue, not a vice, in this situation. The oversight that shall be provided by the independent monitor is sufficient to alleviate any "fox guarding the henhouse" concerns.

### iii. _Determination if Purported Class Member is a Class Member_

The court anticipates that the response to the notice to the class will cover a broad spectrum. At one end will be the obvious exclusion from the class, e.g., the purported class member had no association with MPS during the class period. At the other end will be the obvious inclusion, e.g., it is undisputed that during the class period the initial IEP team meeting was delayed beyond the statutory deadline without a valid reason. The court expects that many responses will fall in-between, and it will be far more difficult to determine whether or not a person is to be included in the class. Because an individual is eligible for compensatory services only if he or she was denied FAPE during the class period, as a threshold matter, that person must have been eligible for special education during the class period.

The permanent members of the hybrid IEP team shall have the primary responsibility for making this determination. However, in certain limited cases, for example when a purported class member seeks membership based on a failure to be referred for a special education evaluation during the class period, the permanent members of the hybrid IEP team may find it necessary to incorporate into the hybrid IEP team individuals who had personal knowledge of the purported class member during the class period in order to determine if MPS had a reasonable basis to suspect the purported class member was in need of special education. See Wis. Stat. § 115.777.

The independent monitor, in consultation and cooperation with the permanent members of the hybrid IEP team, shall develop guidelines for making the determination of whether the purported class member was, between September of 2000 through June of 2005, a student eligible

49

for special education services from MPS who was either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents of the student. The hybrid IEP team shall then apply these guidelines to each purported class member and determine whether the purported class member is a class member. In the event that a purported class member presents issues that are not adequately addressed by the pre-established guidelines, the hybrid IEP shall promptly notify the independent monitor of this deficiency, and the independent monitor, in consultation and cooperation with the permanent members of the hybrid IEP team, shall formulate additional guidelines for addressing the un-anticipated situation.

These guidelines to evaluate class eligibility shall include the type of information that the hybrid IEP team shall consider in making its determination. The court envisions that the eligibility review by the hybrid IEP team will be primarily, if not exclusively, paper-based and rely upon MPS' records. Should records be missing, as may likely be the case in light of MPS' repeatedly demonstrated deficiencies in record keeping, the following procedure shall apply. To the extent that MPS had a duty to retain particular records, the absence of such records shall permit the hybrid IEP team to draw an inference that the document would be adverse to MPS and favorable to a finding that there was a reasonable basis for MPS to suspect that the purported class member may have been in need of special education during the class period. The guidelines shall further outline the circumstances under which a purported class member or MPS may be permitted to submit additional information or when professionals outside of the permanent IEP team members should be consulted.

Certain situations may present more difficult questions of eligibility as a class member. Examples of this will likely involve purported class members who contend MPS failed to identify them as students in need of special education during the class period, or current special education students who contend that MPS failed to make an early referral. In both examples, the first question

that must be answered is whether MPS had a reasonable basis to suspect the student was in need of special education during the class period. The independent monitor in consultation and cooperation with the permanent members of the hybrid IEP team shall establish guidelines for making this determination. However, this is only the first of three questions that must be answered to determine whether such a purported class member is a class member.

Once the hybrid IEP team determines that there was a reasonable basis for MPS to suspect the purported class member was in need of special education during the class period, the next question is whether the purported class member was actually eligible for special education during the class period. Obviously, not all students that may be suspected as being in need of special education are, in fact, eligible for special education. Again, the independent monitor in consultation and cooperation with the permanent members of the hybrid IEP team shall establish guidelines for making this determination. Although the fact that a purported class member might have been later determined to be eligible for special education will be probative of a prior need for special education, it certainly is not dispositive. Like the hybrid IEP team's determination as to whether there was a reasonable basis to suspect the purported class member was in need of special education, when determining whether the purported class member was eligible for special education, the focus must be on the class period; only if the purported class member was eligible for special education during the class period must the analysis continue.

The final step in the analysis as to whether the purported class member is a class member is a determination of whether the purported class member was denied or delayed entry or participation in the process which resulted in a properly constituted meeting between the IEP team and the parents of the student. Not all students who were found eligible for special education during the class period are class members. For many students, the Child Find process worked as required. Rather, the student must have been eligible for special education and had been denied or delayed

participation in the process which resulted in a properly constituted IEP team. Therefore, it shall be necessary for the independent monitor, in consultation and cooperation with the permanent members of the hybrid IEP team, to establish guidelines for making this determination.

If the hybrid IEP team determines that the purported class member is not a member of the class, the hybrid IEP team shall notify the purported class member of its decision. Further, the hybrid IEP team shall inform the purported class member of the right to object to its determination, in accordance with the provisions the court sets forth below.

### iv. _Determination if Class Member is Entitled to Compensatory Services_

In regard to class members who should have been referred for, or were delayed in meeting with a properly constituted IEP team, during that period of delay, because the class member was not provided services in accordance with an IEP, by definition, that student was denied FAPE. See 20 U.S.C. § 1401(9)(D).

Although not explicitly mentioned in the statute, "[c]ompensatory services are well-established as a remedy under the IDEA" when a student is denied FAPE. Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M., 356 F.3d 798, 803 (7th Cir. 2004). This might include "adult compensatory education if necessary to cure a violation." Id. (citing Parents of Student W. v. Puyallup School District, 31 F.3d 1489, 1497 (9th Cir. 1994); Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 187-89 (1st Cir. 1993)).

Not every denial of FAPE mandates the provision of compensatory services. Id. For example, following the Phase III trial, the plaintiffs now clearly acknowledge that _de minimis_ violations do not warrant an award of compensatory education. (Docket No. 584 at 2.) Further, in certain cases, such as cases involving cognitive disabilities where the student's educational potential has plateaued, (see, e.g., Docket No. 569 at 145, Test. of Dr. Rogers-Adkinson), compensatory services would not be appropriate. Regardless of any denial of FAPE, if a student has reached the

maximum of his or her educational potential, providing compensatory services would not serve its purpose as an equitable remedy. Thus, in determining whether compensatory services are necessary, the question for the hybrid IEP team must be, if the student had not been denied FAPE, would the student be in a better educational position than he is now? It is not simply a matter of whether the student would have been in a *different* position. As an equitable remedy, it would be inappropriate to require compensatory services to place the student in the identical place he would have been had he not been denied FAPE. Rather, compensatory services are aimed at remedying wrongs, not undoing or correcting every potential variable. If the hybrid IEP team determines that the student would not be in any better of a position had FAPE not been denied, no compensatory services are appropriate.

If the denial of FAPE resulted in a deficiency, compensatory services must be aimed at placing the student in the position he would have been had he not been denied FAPE. Under the IDEA, an "appropriate" education is not the best possible education or everything that a loving parent may wish was provided for a child. See, e.g., San Rafael Elem. Sch. Dist. v. Cal. Special Educ. Hearing Office, 482 F. Supp. 2d 1152, 1156 (N.D. Cal. 2007). Rather, an appropriate education is one that provides a "basic floor of opportunity" and is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 201, 207; see also Michael M., 356 F.3d at 802 (citing Board of Educ. v. Illinois State Bd. of Educ., 41 F.3d 1162 (7th Cir. 1994)). And accordingly, it is not appropriate to require MPS to provide compensatory services aimed at placing a student in the best possible or ideal position. Rather, compensatory services must be aimed at elevating that student to that "basic floor of opportunity" by providing the student with the educational benefits lost during the denial of FAPE. Thus, compensatory services must be aimed at remedying MPS' failure to provide FAPE, but need not remedy every deficiency of a disabled student.

With respect to the type of compensatory services a class member may receive, there is no "one size fits all" remedy under the IDEA. The IDEA mandates determinations be made based upon the unique circumstances of each student and the provision of compensatory services pursuant to this court's order shall be no different. Thus, it shall be the responsibility of the hybrid IEP team, subject to the oversight by the independent monitor, to make individualized determinations as to the needs of each class member.

Just as there is no "one size fits all" remedy regarding the type of compensatory services, the length of time a class member shall receive compensatory services will vary depending upon the unique circumstances of each class member. Thus, the court finds that it is inappropriate to conclude that any class member who is found to be eligible for compensatory services is automatically entitled to receive compensatory services for a time period equivalent to the time period that person was denied special education. Special education services, including compensatory services, and even when those compensatory services are ordered for a class, must be determined on an individualized case-by-case basis. For example, a class member whose delay in an initial evaluation was minimal, or a class member whose special education needs are comparatively limited, may not need compensatory services. Further, any number of variables may affect the length of any compensatory services that are appropriate. For example, a class member may suffer from certain limitations for which a full time program of compensatory services would not be most beneficial; or another class member may benefit from an accelerated and focused program of compensatory services. For either class member, the result would not necessarily be semester by semester equivalence between the period of delay and the length of the compensatory services.

In the opinion of the plaintiffs' expert Dr. Rogers-Adkinson, the duration of compensatory education provided must be equivalent to the time the student was denied FAPE. During her testimony, Dr. Rogers-Adkinson explained that this 1:1 approach is necessary because of the large

size of the class. Individualized determinations underlie the IDEA. Undoubtedly, when large numbers of students are involved, it becomes more difficult to comply with this requirement of individualized attention. But difficulties, whether in complying with Child Find, or in executing an appropriate remedy for a systematic violation of Child Find, does not permit a deviation from the requirements of the IDEA.

Further, the court finds that Dr. Rogers-Adkinson's opinion that a 1:1 equivalence is necessary to remedy MPS' violation of its Child Find obligations is not adequately supported within the professional literature to be entitled to consideration by this court. As was made clear during cross-examination, Dr. Rogers-Adkinson's conclusion that 1:1 equivalence is appropriate was based upon what was, at a minimum, an exceptionally strained interpretation of a single article. In fact, on cross-examination, Dr. Rogers-Adkinson effectively abandoned her prior contention that 1:1 compensation as opposed to an individualized approach was always appropriate. The fact that Dr. Rogers-Adkinson offered as an expert opinion a conclusion for which she could not muster any degree of appropriate support, and in fact departed her own conclusion, causes this court to question this conclusion Dr. Rogers-Adkinson offered in this Phase of this case.

On this issue, the court finds persuasive the expert opinion of Dr. Hartwig that it is not the quantity but rather the quality of compensatory services that is the most important factor in determining the level of compensatory services that should be provided and this determination must be made on an individual basis.

The independent monitor, in consultation and cooperation with the permanent members of the hybrid IEP team, shall develop guidelines for the hybrid IEP team to apply to determine whether a class member is in need of compensatory services and, if so, determine the nature of the compensatory services that are appropriate. As for the nature of the compensatory services that shall be provided, the plaintiffs outline a variety of services that they believe should be considered,

55

including, for example, post-secondary education, job placement and training, provision of computers with internet access, private tutoring, mentors, and summer camps. (Docket No. 582-2 at 3-4.)

The specific nature of the compensatory services offered for any class member is a question that it is not appropriate for this court to resolve. Compensatory education in the form of traditional educational services might be appropriate for one class member, whereas for another class member the best form of compensatory education based upon the class member's current situation may be services aimed at providing the class member with transitional skills or job training necessary to sustain himself later in life. Thus, the question of what compensatory services are appropriate for an individual class member must be resolved by the hybrid IEP team based upon the unique needs and circumstances of that class member.

Except in instances where it is clear that compensatory services are not appropriate, for example where the denial of FAPE was *de minimis* or where, as discussed below, MPS has previously unequivocally evaluated and determinined the need for compensatory services, it shall be necessary at this point for the hybrid IEP team to include additional revolving members who have direct knowledge of the particular class member. The independent monitor, in consultation and cooperation with the permanent members of the hybrid IEP team, shall develop guidelines for the selection of the educational professionals who shall serve as the revolving members on an individual class member's hybrid IEP team.

If MPS had previously unequivocally determined whether compensatory services were appropriate for the denial of FAPE to a class member, (see Ex. 402 at 247-49), it is unnecessary for this matter to be reconsidered. The student had an opportunity to utilize the full panoply of procedural rights provided under the IDEA and challenge any disagreement with that prior decision. In other words, although the student is a class member, he has been provided his remedy through

means independent of this class action and therefore is not eligible to receive any benefit through this class remedy. Thus, if MPS previously determined that compensatory services were unnecessary, or the student now alleges that the compensatory services were insufficient, or, for whatever reason, the student did not take advantage of the compensatory services offered, reconsideration within the context of the court ordered remedy is inappropriate.

However, to preclude further analysis, the record must be unequivocal that a class member's need for compensatory services as a result of a denial of FAPE during the class period was evaluated and determined by the IEP team at a properly constituted IEP team meeting. The guidelines developed by the independent monitor for the hybrid IEP team to apply to determine whether a student may be eligible for compensatory services shall include guidelines for ascertaining whether the class member is barred from seeking relief under this court ordered remedy as a result of a prior unequivocal evaluation and determination.

It shall be MPS' burden to demonstrate that the student was unequivocally evaluated for a potential need for compensatory services and that a determination was made. A "Y" in the "Discussed Comp Ed" column of a spreadsheet, (see Ex. 401), by itself, is insufficient. Or take the example of a student whose entry into special education was inappropriately delayed and whose IEP provided 2 hours of individualized instruction in addition to what would ordinarily be provided by the IEP. However, this additional instructional time was never referred to as "compensatory services" or something substantively identical. (C.f. Docket No. 569 at 58, Test. of Dr. Rogers-Adkinson.) In such an example, the consideration of compensatory services was not unequivocal; the analysis by the hybrid IEP team must continue to determine whether the class member is in need of compensatory services to remedy the denial of FAPE. Nonetheless, the provision of any additional instructional services beyond the minimum required by the IEP will certainly be relevant

to the question of whether the class member has a present deficiency caused by a denial of FAPE during the class period for which compensatory services are necessary.

Further, a subsequent determination that a student is no longer eligible for special education or a student having graduated with a general education diploma does not necessarily preclude the provision of compensatory services for a denial of FAPE during the class period. Nonetheless, again, these facts shall be relevant in determining what, if any, compensatory services are appropriate and should be addressed in the guidelines developed by the independent monitor.

In the event that the evaluation of the class member presents issues that are not adequately addressed in the pre-established guidelines, the hybrid IEP shall promptly notify the independent monitor of this deficiency and the hybrid IEP team and the independent monitor shall cooperatively attempt to formulate guidelines for addressing the un-anticipated situation.

### B. Eligibility

MPS proposes that a group of people significantly narrower than the entire class should be considered for compensatory services. For example, under MPS' proposal, any person who would otherwise be within the class but who has attained 22-years-of-age or has moved out of Milwaukee should not be provided with any remedy.

The class is defined as:

Those students eligible for special education services from the Milwaukee Public School System who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student.

The time period for this class spans from September of 2000 through June of 2005.

The court finds that the scope of MPS' proposed remedy casts too narrow of a net. MPS' proposal is limited to persons who are currently eligible to receive special education services from the district. However, this case is not so limited. Simply because a person is no longer eligible to receive special education services from the district does not absolve the district of responsibility for

58

any harm it may have caused by violating the student's rights to special education in the past. The district may not avoid its remedial responsibility because the student moved outside the district or turned 22 years old. Class members, regardless of age or current residence, are entitled to equitable relief from MPS that, to the extent possible, places the individual in the position they would have been had it not been for MPS' failure to comply with the IDEA. Further, it is the conclusion of the court that a class member being removed from special education or a student's graduation from the district, even if that graduation resulted in the obtainment of a regular education diploma does not necessarily preclude an individual from being eligible for compensatory services as a class member. Thus, the appropriate group that should be evaluated to determine whether each person is entitled to compensatory education is the entire class, regardless of a member's current age or residence.

Integral with the question of who may be eligible for compensatory services is the question of how these class members will be informed of their potential eligibility. The plaintiffs seek to cast a very wide net by requiring that "[w]ritten notice will be mailed to the last known address of all potential class members . . . ." (Docket No. 585-2 at 2-3.) It seems to the court that "all potential class members" would necessarily include all general education students who were enrolled in MPS during the class period, because any student may have an undiagnosed disability that should have caused MPS to refer the student to be evaluated for special education eligibility. MPS proposes the use of both an individualized notice mailed to the last known address of students identified as being potential class members due to an untimely initial evaluation or a history of suspensions and a general notice posted at certain locations around MPS. (Docket No. 552 at 6-8.)

On the question of notice, a combination of general and individualized notice must be used. Students who are readily identifiable as being potential class members based upon certain documented facts, such as an evaluation having been conducted beyond the statutory deadline or a history of suspensions, are entitled to receive notice mailed to their last known addresses.

The court finds a general notice is also necessary because any student enrolled in MPS during the class period might be a class member. However, requiring an individualized mailed notice to each of these students' last known addresses would be incredibly inefficient and a waste of money. A general notice certainly should be posted in areas of the schools and district buildings where parents are likely to see it.

The court shall not establish here the precise details regarding the manner that notice must be provided or the contents of that notice; these are issues that the parties must work towards resolving in a cooperative fashion and then submit to the court in the form of a mutually agreed-upon proposal. The parties shall set forth a joint proposal outlining the contents of the notice and the details for distributing a general and an individualized notice to identifiable potential class members that shall then be subject to the final approval of the court. Although this decision provides certain parameters to guide the parties' discussions, it shall be incumbent upon the parties to work towards resolving the details and logistics of the notice.

With respect to the dissemination of a general notice, the parties should consider whether it would be practical to include a general notice in certain regular communications the district may have with parents and other community members, such as parent newsletters. Additionally, because certain potential class members may no longer be in the community and thus not in a position to view a general notice posted in a school building, a form of notice that has a far broader reach is necessary. The court concludes that this broad notice is accomplished by posting the notice on MPS' website. Additional means of communicating a general notice to potential class members shall be determined by the parties.

As for the questions of how long the notice should be posted and how long a potential class member should be given to respond to the notice, these are matters the parties must attempt to resolve based upon all relevant circumstances. However, the court finds that MPS' proposal that

60

potential class members should be provided only 30 days in which to respond to the notice to likely be insufficient. The notice must be posted for a period long enough for it to be reasonable to expect that a parent were to see it and then there must be sufficient time to permit a potential class member to decide whether he or she wishes to respond. The length of time in which class members may respond will depend upon when it is possible to finally post the notice and open the period for accepting responses from potential class members. For example, it might not be reasonable to assume that a parent would see a notice posted in his or her child's school during a specific period if the response period fell in the middle of the summer. However, if that period included the beginning of the school year or some other time when parents are likely to be inside the school, the parties may agree that an extended period is unnecessary. Generally, the court would expect that a 90 day period for posting the general notice and permitting potential class members to respond would be sufficient. The court expects to issue an order regarding the form and procedures for dissemination of notice within 30 days of the parties' submission.

### C. Parent Advocates

The plaintiffs seek the requirement that MPS fund "at least 5 new community-based (independent of MPS) Parent Advocates to assist at all compensatory education services determination meetings and all initial IEP meetings for newly referred class members." (Docket No. 582-2 at 5.) The plaintiffs also seek the court to order MPS to fund an "expediter" who would have "the duty and authority to ensure that compensatory education services are delivered in a timely and appropriate manner." (Docket No. 585-2 at 5.) These positions would be in addition to the separate independent monitor (who, in the plaintiffs' view, would be separate from the monitor overseeing the settlement between the DPI defendants and the plaintiffs).

Certainly, navigating the special education process, particularly in the unique context of this litigation, can be a daunting challenge for a parent or guardian or individual class member, and the

services of an independent parent advocate may be beneficial for all parties involved. However, Congress designed the IDEA framework as a system aimed at being navigable for lay parents; if "parent advocates" were necessary for a parent to navigate the special education framework, Congress would have required them.

Further, the court finds that providing for an independent parent advocate would be redundant in light of the circumstances of this case. Under the settlement agreement between the DPI defendants and the plaintiffs, DPI is funding a parent trainer whose services may be available to class members. (See Docket No. 431-2 at 13.)

### D. Segregated Fund

As part of their proposed remedy, the plaintiffs seek:

> A separate account will be established to fund compensatory education services in an amount to be determined by the parties and the Monitor. A separate fund is required to ensure that individual school budgets are not burdened by the cost of these services and that there are funds available for their delivery.

(Docket No. 585-2.) The court disagrees with the plaintiffs that a separate fund is required. One way or another, MPS is going to pay the costs associated with complying with its obligations under this court ordered remedy. Whatever the expense may be, it will not be discretionary; it is not an expense that can be reduced or eliminated in an effort to balance a perennially strained budget. Requiring the costs associated with complying with the court ordered remedy be paid from a segregated and dedicated fund would simply create an unnecessary requirement that would make no substantive difference.

### E. Dispute Resolution

As the court discussed above, the court rejects MPS' request that the court impose binding arbitration as the exclusive means by which class members may be able to resolve disputes relating to decisions of the hybrid IEP team or independent monitor. MPS has presented no authority to indicate that the court is authorized to impose binding arbitration, either pursuant to the IDEA or as

part of any inherent authority the court may possess when tasked with structuring a remedy for a class of individuals.

Notwithstanding, it would be an incredibly inefficient application of the court's limited resources for every dispute that may arise to be resolved by this court. Thus, the primary means for resolving any disputes that may arise must be the good faith efforts of cooperation between the parties. Cooperation among parties in an effort to avoid or resolve disputes is a principle prevalent throughout the IDEA. See, e.g., 20 U.S.C. § 1415(e) and (f)(1)(B)(i). Further protraction of this litigation benefits no party. It drains the limited resources of MPS and further delays any remedy a class member may receive.

Built into the remedial framework outlined above are certain decisional junctures at which the parties and the independent monitor must cooperate and attempt to agree to certain details necessary to effect the court ordered remedy. One such juncture is the determination of who the independent monitor shall appoint as permanent members of the hybrid IEP team. As is discussed above, the court explicitly calls for the parties to attempt to reach an agreement on this point. But cooperation among the participants in this remedial framework shall be essential at all stages, not just those stages where the court has explicitly required it. Thus, it shall be incumbent upon the independent monitor to permit the parties, i.e. class counsel and MPS, to offer input to the independent monitor prior to the independent monitor issuing any substantive order relating to the procedures that will be utilized to effect this remedy (this requirement need not apply to ministerial orders of the independent monitor, such as those relating to scheduling and the like).

Therefore, after consulting with the hybrid IEP team and composing an initial draft of the guidelines that shall be utilized to determine whether a purported class member is a class member, how rotating members shall be chosen for the hybrid IEP team, whether compensatory services are appropriate for a class member, and the nature of those compensatory services, the independent

monitor shall submit the draft guidelines to MPS and class counsel for their review and input. If any party objects to a guideline, the parties and the independent monitor shall then attempt to reach an agreement as to any disputes. It shall be incumbent upon the independent monitor to establish the procedures that shall permit the parties to provide input and to permit dispute resolution.

Notwithstanding, after considering the input of the parties and attempting to resolve any disputed issues on substantive matters, such as who shall serve as a permanent member on the hybrid IEP team or the guidelines that the hybrid IEP team shall apply, the final decision shall be that of the independent monitor. Therefore, following the input and dispute resolution process, the independent monitor shall file an order pursuant to Rule 53(d) incorporating his determination as to the guidelines that shall be followed or any other substantive matter. The parties may file an objection with the court to this order of the independent monitor in accordance with Rule 53(f). Upon the filing of any substantive order by the independent monitor, including the order appointing the permanent members to the hybrid IEP team or any order outlining the guidelines that shall be applied by the hybrid IEP team, either party shall have **14 days** in which to file an objection. The non-objecting party shall respond no later than **5 days** after the objection is filed. No reply shall be permitted absent leave of the court. Hearings shall be scheduled at the court's discretion. The court shall then resolve the party's objection in accordance with Rule 53(f).

A slightly different procedure shall apply to disputes relating to whether or not a purported class member is, in fact, a class member. As discussed above, the hybrid IEP team is tasked with initially making this decision. Upon completing its review of all persons who responded to the class notice, the hybrid IEP team shall notify all respondents to the class notice of its decision to include or exclude the respondent in the class. Any individual whom the hybrid IEP team determines is not a class member shall be informed of the right to object to a decision of exclusion and be informed as to the procedure for filing an objection. The procedure for filing an objection shall be established by

the independent monitor in accordance with the terms set forth here. The hybrid IEP team shall then promptly send to the independent monitor its list indicating which respondents it determined to be class members. Additionally, the hybrid IEP team shall provide to the independent monitor a list of individuals who responded to the class notice but were excluded and a brief explanation as to why each was determined to not be a class member. The independent monitor shall promptly provide these documents to class counsel and MPS.

An individual who responded to the class notice but who was found to not be a class member shall be permitted to file an objection to the hybrid IEP team's determination with the independent monitor. The independent monitor shall then conduct a de novo review of the evidence presented to the hybrid IEP team to determine if the individual is a class member. The independent monitor shall notify the individual of his decision and the individual's right to object to a decision of exclusion in accordance with the terms set forth herein.

Upon the completion of the independent monitor's de novo review of any objecting purported class members, the independent monitor shall file an order in accordance with Rule 53(d). In this order, the independent monitor shall identify those individuals the hybrid IEP team determined to be class members as well as any additional individuals he determined to be class members based upon the independent monitor's de novo review following the objection of an excluded class member. Additionally, the independent monitor shall file with the court a list identifying any purported class member who filed an objection with the independent monitor but who the independent monitor determined was not a class member. Any purported class member who was not included in the independent monitor's order identifying class members and who filed an appropriate objection with the independent monitor may file an objection with the court within **14 days** of the independent monitor informing the individual of the unfavorable decision.

Further, at this stage, MPS may object to the inclusion of any individual whom it does not believe qualifies as a class member. MPS may object by filing an objection within **14 days** of the filing of the independent monitor's order identifying all class members. The court shall then inform the individual of MPS' objection. The individual and class counsel shall then have **14 days** from the date of the filing of MPS' objection in which to respond. No reply shall be permitted absent leave of the court. Hearings shall be scheduled at the court's discretion. The court shall then resolve the party's objection in accordance with Rule 53(f).

As for disputes relating to the resolution of the claim of any individual class member, e.g. disputes regarding a determination as to whether the class member is eligible for compensatory services or the nature of compensatory services ordered, any disputes must first be brought to the attention of the independent monitor. Either the class member or MPS, as the local education agency, see 20 U.S.C. § 1415(b)(6), may object to a determination of the hybrid IEP team. The independent monitor shall assume the role of mediator and attempt to encourage the parties to arrive at a mutually agreeable resolution of the dispute.

If the class member and MPS are unable to agree upon a resolution of the dispute, the independent monitor shall then conduct an adjudicative review of the disputed decision of the hybrid IEP team. The review of the independent monitor shall be limited to ensuring that the hybrid IEP team complied with the pre-established guidelines and that the determination of the hybrid IEP team is not plainly erroneous. The independent monitor shall either affirm the determination of the hybrid IEP team or, if the IEP team failed to comply with the guidelines or engaged in plain error, remand the matter to the hybrid IEP team for reconsideration. If the hybrid IEP team appropriately complied with the pre-established guidelines and the decision was not plainly erroneous, the independent monitor shall affirm the decision of the hybrid IEP team.

The independent monitor's affirmance of the decision of the hybrid IEP team shall constitute a final decision of the local education agency that may be challenged exclusively through the State of Wisconsin's pre-existing due process framework under the IDEA. See Wis. Stat. § 115.80; see also 20 U.S.C. § 1415. The right to challenge a decision relating to compensatory services shall exist regardless of any procedural bar that might have existed absent this class remedy, see, e.g., Wis. Stat. § 115.80(1)(a) (one-year statute of limitations), up to and including, if necessary, the initiation of a civil action independent of this case.

**F. Named Plaintiffs**

The individually named plaintiffs seek a wide variety of compensatory services. Melanie V. seeks "coverage of any expenses related to her completion of the GED program at MATC, . . . [t]ution, books, supplies and transportation stipend and tutoring for at least two year of post-secondary education at the school of [her] choice," as well as a laptop computer and a high speed internet connection. Jamie S. seeks "[t]uition and services to take all necessary child care and child development related courses at M.A.T.C. including books, supplies, lab or similar fees, transportation stipend and individual tutoring at the appropriate time," a laptop computer and high speed internet connection, "[t]raining on self-determination, self-advocacy[,] sexuality . . . budgeting, money management, food planning and preparation . . . [and] [j]ob placement and training at the appropriate time." (Docket No. 582-2 at 7.) Bryan E. similarly seeks compensatory services for a minimum of four years including "[t]uition and services to take all necessary plumbing related courses at M.A.T.C. including books, supplies, lab or similar fees, transportation stipend and individual tutoring," a laptop computer with a high speed internet connection, and job placement assistance. (Docket No. 582-2 at 7-8.)

MPS proposes a remedy for only Melanie V. and Jamie S. For Jamie S., MPS proposes to reconvene her IEP team "to determine whether compensatory education is necessary due to a two

month delay in her referral for special education services." (Docket No. 552 at 1-2.) MPS proposes a similar remedy for Melanie V. but any remedy for her would be contingent upon her re-enrolling in MPS. (Docket No. 552 at 1.)

First, at the liability phase of this litigation, the named plaintiffs served to exemplify the sorts of Child Find failures that were systemic in MPS. And at the remedy phase of this litigation, the named plaintiffs demonstrated that these systemic failures resulted in lasting consequences for class members. Although the court received evidence indicating the future aspirations of the named plaintiffs and vague indications as to the sorts of services that might be beneficial to persons in situations similar to those of the named plaintiffs, at no point did the court receive specific evidence from educational professionals who engaged in an individualized assessment of the named plaintiffs, determined the nature of any denial of FAPE, and determined precisely what sorts of services were necessary to restore that floor of opportunity that was lost as a result of the denial of FAPE. These sorts of individualized determinations are essential to the IDEA and are the determinations that an IEP team is expected to make. Absent such an individualized determination or detailed individualized evidence, the court is in no position to order any remedy for the named plaintiffs. Accordingly, it is the conclusion of this court that if any named plaintiff is entitled to any individualized remedy as a result of this action, it is to be found through the system the court devises here as being applicable to the entire class.

However, to the extent that the court's assessment of the parties' proposed remedies may be beneficial in offering guidance to the independent monitor and the hybrid IEP team, it may be instructive to note that, the nature of the compensatory services proposed by the plaintiffs strikes the court as an effort to place the named plaintiffs in the *best* possible position they might be in had it not been for a denial of FAPE. As discussed above, this is inconsistent with the requirements of the IDEA. Rather, any compensatory services that might be appropriate must be aimed at remedying

68

the wrong, i.e. placing the named plaintiffs and class members in the positions they would have been had it not been for the denial of FAPE. Likewise, MPS' proposed remedy strikes the court as again being too narrow. For example, as discussed above, there is no requirement that a class member be currently enrolled at MPS to be provided with compensatory services.

## VI. DPI'S MOTION

The DPI defendants have filed a motion seeking a declaration that this court's order approving the class settlement between the plaintiffs and DPI precludes MPS from seeking contribution from DPI for the costs associated with implementing the remedy ordered by this court or if the court's approval of the class settlement did not address this issue, a declaration that MPS cannot later seek contribution from DPI. (Docket No. 559.) MPS has responded, (Docket No. 582), and DPI has replied, (Docket No. 589.) For the reasons set forth below, the court shall deny DPI's motion.

In this court's order approving the class settlement between the plaintiffs and DPI, the court acknowledged MPS' objection that the settlement did not require DPI to pay any portion of any compensatory services the court may order after Phase III. (Docket No. 471 at 14.) However, at no point did the court hold that DPI was forever precluded from being required to contribute to any remedy that the court might impose following Phase III; that issue was not before the court. When the court was deciding the joint motion for approval of the class settlement, the issue before the court was whether the settlement was fair, reasonable, and adequate for the class members.

As for DPI's alternative request that the court now declare that it is not responsible for any portion of the expenses related to the remedy the court sets forth here, the court finds no basis to make such a declaration. DPI is dismissed as a defendant in this case. The court no longer possesses the jurisdiction over DPI that would be necessary to make such a finding. For the same reason, the court has not and cannot order DPI to be responsible for any portion of the remedy set forth above

Case 2:01-cv-00928-RTR   Filed 06/09/09   Page 69 of 72   Document 598

(although the court acknowledges that this remedy may indirectly result in certain costs to the state as a result of class members challenging compensatory services determinations of the hybrid IEP team through the statutory due process framework). If MPS has a claim for contribution against DPI in light of <u>Board of Educ. v. Nancy E.</u>, 207 F.3d 931 (7th Cir. 2000), if it may be found at all, it may be found only in an action independent of the present case. Accordingly, DPI's motion, (Docket No. 559), is **denied**.

## VII. CONCLUSION

It is the conclusion of the court that MPS' systemic failures to meet its Child Find obligations necessitates an individualized evaluation of all class members to determine whether compensatory services are appropriate for a resulting denial of FAPE, and accordingly, the court hereby orders the remedy set forth herein. This remedy shall require the establishment of a procedural framework in which these determinations may be made. The court shall appoint an independent monitor to oversee the development and implementation of this process. The independent monitor shall appoint MPS staff members to serve as permanent members of the hybrid IEP team. In consultation and cooperation with the permanent members of the hybrid IEP team, the independent monitor shall establish guidelines for the hybrid IEP team to apply when determining if a purported class member is, in fact, a class member, and the relief, if any, in the form compensatory services that any individual class member may receive pursuant to the court ordered remedy.

The parties must engage in good faith efforts to resolve any disputes that may develop. However, should the parties fail to reach a mutually agreed upon resolution, disputes relating to the procedural framework or a purported class member's eligibility as a class member, shall ultimately be resolved by the court in accordance with the framework set forth above. Disputes relating to the

individualized remedy that any class member shall receive under this court ordered remedy shall be resolved within the existing administrative framework under the IDEA.

The next step of this litigation requires the parties to meet in a good faith effort to reach an agreement as to certain essential matters set forth above. First, the parties must identify and attempt to agree upon an independent monitor to oversee this remedy. Second, the parties must attempt to agree on the details as to the procedures that shall be utilized to provide individualized notice to certain readily identifiable potential class and a general notice that is likely to reach other potential class members who may not be so readily identifiable. This shall also require the parties to attempt to agree as to the specific contents of any proposed notice.

Therefore, no later than **July 24, 2009**, the parties shall submit joint proposals detailing the means that shall be used to provide individual and general notice to potential class members, as well as the contents of any proposed notice. If after good faith efforts, the parties are unable to reach a mutual agreement, the parties shall each submit separate proposals.

Further, no later than **July 24, 2009**, the parties shall submit jointly the name, curriculum vitae, affidavit pursuant to Rule 53(b)(3)(a), and information indicating the terms under which the independent monitor shall be compensated for the proposed independent monitor. If after good faith efforts, the parties are unable to reach a mutual agreement, the parties shall each submit such information for up to two proposed independent monitors.

**SO ORDERED.**

Dated at Milwaukee, Wisconsin this 9th day of June 2009.


s/ AARON E. GOODSTEIN
U.S. Magistrate Judge

**APPENDIX – Benchmarks / Timeline for Implementing Court Ordered Remedy**

| | Time | Event |
|---|---|---|
| 1 | July 24, 2009 | Parties shall submit proposals regarding the appointment of an independent monitor and class notice. |
| 2 | 30-45 days after the court enters an order appointing independent monitor. | Independent monitor shall appoint permanent members of hybrid IEP team. |
| 3 | 30-60 days after the court enters an order appointing permanent members of hybrid IEP team. | Independent monitor shall enter an order establishing the guidelines the hybrid IEP team shall apply in its initial evaluation to determine class membership of respondents to the class notice. |
| 4 | 45-90 days after the court enters an order appointing permanent members of hybrid IEP team. | Independent monitor shall enter an order establishing all guidelines the hybrid IEP team shall apply in evaluating individual class members in regard to compensatory services. |
| 5 | 60-75 days after the close of the response period. | Hybrid IEP team shall complete its evaluation and determination of class membership and the independent monitor shall enter an order listing all class members. |
| 6 | 150-210 days after the court enters an order identifying all class members who responded to the notice. | Hybrid IEP team shall evaluate all class members to determine if compensatory services are necessary to remedy a denial of FAPE and if so, the nature of the compensatory services to be provided. |

The timeline set forth herein is intended to move the process toward completion without undue delay. However, any firm deadlines established by the independent monitor for benchmarks 5 and 6 must take into consideration the number of individuals responding to the class notice and the number of those determined to be class members. Accordingly, if the independent monitor concludes that additional time is needed to complete any of these benchmarks, the independent monitor shall file a request for an extension of time with the court.